# Exhibit E

Our support package for your business—choose the offer that's right for you!     Learn more now

# Wirecard AG: KPMG delivers report on special investigation



### Financial media and investor relations inquiries

**Iris Stöckl**

VP Corporate Communications / IR

 [+49 (0) 89 4424 1424](tel:+4989 4424 1424)

 [iris.stoeckl@wirecard.com](mailto:iris.stoeckl@wirecard.com)

[**View public relations contact**](#)

Apr 28, 2020

Wirecard AG was handed the report on the special investigation by the auditing company KPMG in the early morning of April 28, 2020. It will be published at [https://www.wirecard.com/transparency](https://www.wirecard.com/transparency) as soon as possible.

No incriminating evidence was found for the publicly raised accusations of balance sheet manipulation. In all four areas of the audit - third-party partner business (TPA) and Merchant Cash Advance (MCA) / Digital Lending as well as the business activities in India and Singapore - no substantial findings were found which would have led to a need for corrections to the annual financial statements for the investigation period 2016, 2017 and 2018.

In the course of the audits of the annual financial statements for the years 2016 to 2018, the available evidence and audit procedures were sufficient to provide evidence of the revenues from third-party partner business (TPA). However, due to the increased forensic requirements of the investigation by KPMG, it was not possible to obtain all of the requested data that would have fulfilled the requirement to provide evidence of sales revenues in these years, as these documents are mostly in the third-party partner's access area. As Wirecard now maintains the necessary data itself, more than 200 million data records

Wirecard AG: KPMG delivers report on special investigation | Wirecard

were made available to KPMG for a forensic examination for the period December 2019. This did not give rise to any indications of discrepancies between the sales revenues reported and the account balances.

KPMG identified documentation and organizational weaknesses in the period under review, which have already been identified by Wirecard. Since 2019, these have been remedied by setting up the Global Compliance Organization and with the support of external consultants.

KPMG sees no further need for an audit of Wirecard's business activities in Singapore beyond that already carried out as part of the audit of the 2018 annual financial statements.

With regard to the structure of the "Merchant Cash Advance" business of the Wirecard companies in Turkey and Brazil, there were no indications of legal inadmissibility.

According to Wirecard AG, the purchase price for the acquisition of the "payment business" of an Indian group of companies was determined on the basis of strategic considerations and plausibly verified by means of various objective factors, such as a company valuation of the payment business based on the results of the financial due diligence, corporate transactions by third parties, avoidance of minority companies and the strategic interest in entering the Indian market within the framework of the Group's globalization strategy. KPMG has not been able to identify any other evidence in the documents submitted or the investigation activities carried out that would indicate factors in pricing that are not objectively justified.

Wirecard AG made all payments in connection with the takeover of the Indian Group's "payment business" exclusively to the seller, whose beneficial owner could not be finally verified by KPMG on the basis of public registers. KPMG has found no indications in interviews, documents submitted and the investigative activities conducted that members of Wirecard's management were involved in this seller.

The sale of individual assets in the wake of the acquisition of the payment business from a company acquired by the Wirecard Group in the course of this transaction to a company associated with the seller was fully comprehensible by KPMG, both in terms of the contract and the settlement. According to the documents submitted by KPMG and the investigation activities carried out, there were no indications of "roundtripping".

Since October 2019, KPMG has been conducting a special investigation on behalf of the Supervisory Board of Wirecard AG in order to clarify the accusations of balance sheet manipulation made against the company by the media.

The publication of the annual financial statements and the annual press conference will not take place on April 30, 2020. Wirecard will coordinate with the auditors E&Y as quickly as possible when the audit work can be completed, taking into account the Corona-related restrictions and the KPMG report.

 Back                in

Case 2:20-cv-05017-AB   Document 74-8   Filed 04/30/20   Page 4 of 78

## Solutions

Accepting payments

Making payments

## Industries

Digital

Retail

Travel & mobility

Financial services

## Company

About Wirecard

Newsroom

Social Media

Careers

Investor Relations

Blog

## Knowledge Hub

Overview

E-Books & White Papers

Case Studies

Insights

Support

Videos

Payment Base

Glossary

## Newsletter

Email ...

I consent to receiving further information from Wirecard in accordance with the Privacy Policy. I can revoke this consent at any time without incurring any additional costs other than Internet connection costs.

**Follow us**



English – Global

© Wirecard 2020          Documents          Legal Notice          Privacy Policy



# Bericht

## ÜBER DIE UNABHÄNGIGE SONDERUNTERSUCHUNG

Wirecard AG,
München

27. April 2020

KPMG AG Wirtschaftsprüfungsgesellschaft

# Inhaltsverzeichnis

| 1 | **Untersuchungsauftrag und Ergebniszusammenfassung** | **1** |
|---|---|---|
| 1.1 | Untersuchungsauftrag und Untersuchungsgegenstand | 1 |
| 1.1.1 | Untersuchungsauftrag | 1 |
| 1.1.2 | Untersuchungsgegenstand | 1 |
| 1.2 | Art und Umfang der Untersuchungsdurchführung | 3 |
| 1.2.1 | Übergreifende Untersuchungshandlungen | 8 |
| 1.2.1.1 | Analyse von Presseveröffentlichungen | 8 |
| 1.2.1.2 | Auswertung von Protokollen der Vorstands- und Aufsichtsratssitzungen | 8 |
| 1.2.1.3 | Auswertung von Revisions- und ggf. weiterer Berichten von externen Dritten sowie ggf. Berichten an das Compliance Committee. | 8 |
| 1.2.1.4 | Erörterung mit dem Abschlussprüfer | 8 |
| 1.2.1.5 | Meldungen über das Interne Hinweisgebersystem während der Sonderuntersuchung | 9 |
| 1.2.1.6 | Hinweise an KPMG während der Sonderuntersuchung | 9 |
| 1.2.1.7 | Verzögerte Lieferung von Unterlagen | 10 |
| 1.3 | Ergebniszusammenfassung | 10 |
| 1.3.1 | Ergebniszusammenfassung Third-Party Acquiring | 10 |
| 1.3.1.1 | Höhe und Existenz der Erlöse | 10 |
| 1.3.1.1.1 | Vorwürfe | 10 |
| 1.3.1.1.2 | Ergebnisse der Untersuchungshandlungen | 12 |
| 1.3.1.1.3 | Umfang des Third Party Acquiring-Geschäftes mit TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 2016 bis 2018 | 14 |
| 1.3.1.1.4 | Informationen zu den TPA-Partnern und den Treuhändern | 16 |
| 1.3.1.1.5 | Nachweise zu den Umsatzerlösen aus Abrechnungen der TPA-Partner, Zahlungen auf Escrow-Accounts und Datenanalysen | 17 |
| 1.3.1.1.6 | Zwischenergebnisse der erweiterten Untersuchungshandlungen im Third-Party Acquiring-Geschäft für den Monat Dezember 2019 (Auftragserweiterung) | 25 |
| 1.3.1.2 | Existenz bestimmter Kundenbeziehungen | 27 |
| 1.3.1.2.1 | Vorwürfe | 27 |
| 1.3.1.2.2 | Ergebnisse der Untersuchungshandlungen | 28 |
| 1.3.1.3 | Darstellungen zum Third Party Acquiring-Geschäft in Geschäftsberichten und Investoren-Präsentationen der Wirecard AG | 30 |
| 1.3.1.3.1 | Vorwürfe | 30 |
| 1.3.1.3.2 | Ergebnisse der Untersuchungshandlungen | 31 |
| 1.3.1.4 | Bilanzierung des Third Party Acquiring-Geschäfts | 31 |
| 1.3.1.4.1 | Vorwürfe | 31 |
| 1.3.1.4.2 | Bilanzierung der Umsatzerlöse aus Third Party Acquiring-Geschäften mit TPA-Partnern | 32 |
| 1.3.1.4.3 | Bilanzierung der Escrow Accounts | 33 |
| 1.3.1.4.4 | Abschlussprüfungen der Cardsystems Middle East und Wirecard UK & Ireland | 35 |
| 1.3.2 | Ergebniszusammenfassung Digital Lending Business | 35 |
| 1.3.2.1 | Wirecard-Definitionen | 35 |
| 1.3.2.2 | Veröffentlichte Zahlenangaben zum Merchant Cash Advance-Geschäft, u. a. in Brasilien und der Türkei | 36 |
| 1.3.2.2.1 | Vorwürfe | 36 |
| 1.3.2.2.2 | Ergebnisse der Untersuchungshandlungen | 37 |



| | | |
|---|---|---|
| 1.3.2.3 | Rechtliche Zulässigkeit des Merchant Cash Advance-Geschäfts in der Türkei und Brasilien | 39 |
| 1.3.2.3.1 | Vorwürfe | 39 |
| 1.3.2.3.2 | Ergebnisse der Untersuchungshandlungen | 39 |
| 1.3.2.4 | Geschäftshintergrund bestimmter Kreditvergaben | 41 |
| 1.3.2.4.1 | Vorwürfe | 41 |
| 1.3.2.4.2 | Ergebnisse der Untersuchungshandlungen | 42 |
| 1.3.3 | Ergebniszusammenfassung Singapur | 43 |
| 1.3.3.1 | Vorwürfe | 43 |
| 1.3.3.2 | Ergebnisse der Untersuchungshandlungen | 45 |
| 1.3.3.2.1 | Compliance Audit bzw. Internal Investigation der Rechtsanwaltskanzleien | 45 |
| 1.3.3.2.2 | Nachvollzug Vorwürfe Singapur | 46 |
| 1.3.4 | Ergebniszusammenfassung Indien | 49 |
| 1.3.4.1 | Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann" | 49 |
| 1.3.4.1.1 | Vorwürfe | 49 |
| 1.3.4.1.2 | Ergebnisse der Untersuchungshandlungen | 50 |
| 1.3.4.2 | „Roundtripping" von Zahlungen | 55 |
| 1.3.4.2.1 | Vorwürfe | 55 |
| 1.3.4.2.2 | Ergebnisse der Untersuchungshandlungen | 56 |
| **2** | **Schlussbemerkung** | **59** |
| **Anlagen** | | |



# Anlagenverzeichnis

**Untersuchungsergebnisse unter Angabe von personenbezogenen und vertraulichen Informationen und weitergehenden Erläuterungen**     **1**

**Vollständigkeitserklärung „Escrow Accounts"**     **2**

**Übersicht Konzerngesellschaften Wirecard AG**     **3**

**Allgemeine Auftragsbedingungen**     **4**



# Tabellenverzeichnis

Tabelle 1: Vorwürfe in Bezug auf Höhe und Existenz von TPA-Umsatzerlösen ...................... 12

Tabelle 2: Erläuterungen zum „Digital lending business" (Quelle: Investor Presentation Q3/9M results, 6. November 2019) ...................................................................................... 35

Tabelle 3: Vorwürfe in Bezug auf veröffentlichte Zahlenangaben zum Merchant Cash Advance-Geschäft ...................................................................................................... 36

Tabelle 4: Vorwürfe in Bezug auf die rechtliche Zulässigkeit des Merchant Cash Advance-Geschäfts in der Türkei und Brasilien........................................................................ 39

Tabelle 5: Vorwürfe in Bezug auf den Geschäftshintergrund bestimmter Kreditvergaben ...... 41

Tabelle 6: Pressezitate zu Geschäftsaktivitäten in Singapur ..................................................... 44

Tabelle 7: Pressezitate zur Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann" .......................................................................................................... 49

Tabelle 8: Pressezitate zu „Roundtripping" von Zahlungen ..................................................... 56



# Abbildungsverzeichnis



Abbildung 1: Grafische Darstellung Vorwurf „Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann"" ................................................................................................ 50

Abbildung 2: Zeitlicher Ablauf des Erwerbs des „Payment-Geschäfts" des Unternehmens 9 52

Abbildung 3: Grafische Darstellung Vorwurf „„Roundtripping" von Zahlungen" ..................... 56

# Abkürzungsverzeichnis

| Abkürzung | Erläuterung |
|---|---|
| Bank 1 | ███████████ |
| Bank 2 | ███████████ |
| Bank 3 | ███████████ |
| Cardsystems Middle East | Cardsystems Middle East FZ LLC, Dubai, Vereinigte Arabische Emirate |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| DRS | Deutscher Rechnungslegungsstandard |
| EBITDA | Earnings Before Interest, Taxes, Depreciation and Amortization |
| EUR | Euro |
| EY Audit | Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Audit |
| EY FIS | Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Forensic & Integrity Services |
| EY iGAAP | International GAAP, Ernst & Young LLP, 978-1119557760 |
| FAQ | Frequently Asked Questions |
| FT | Financial Times |
| GI Philippines | GI Philippines Corp., Manila, Philippinen, Tochtergesellschaft von Hermes I Tickets Pte. Ltd. |
| GI Technology | GI Technology Pte. Ltd., Chennai, Indien, Tochtergesellschaft von Wirecard Acquiring & Issuing GmbH |
| Hermes | Hermes I Tickets Pte. Ltd., Chennai, Indien, Tochtergesellschaft von Wirecard Sales International Holding GmbH |
| IAS | International Accounting Standards |
| IFRIC | International Financial Reporting Interpretations Committee |
| IFRS | International Financial Reporting Standards |
| INR | Indische Rupie |
| KYC | Know your customer |
| MCA | Merchant Cash Advance |
| Mio | Millionen |
| Q | Quartal (eines Jahres, beispielsweise Q1 für 1. Quartal) |



| Abkürzung | Erläuterung |
|---|---|
| **Rechtsanwaltskanzlei 1** | ███████████████████ |
| **Rechtsanwaltskanzlei 2** | ███████████████████ |
| **T** | Tausend (in Verbindung mit Währungskürzel) |
| **TPA** | Third Party Acquiring |
| **TPA-Partner 1** | Third Party Acquiring-Partner 1 |
| **TPA-Partner 2** | Third Party Acquiring-Partner 2 |
| **TPA-Partner 3** | Third Party Acquiring-Partner 3 |
| **Treuhänder 1** | ███████████████████ |
| **Treuhänder 2** | ███████████████ |
| **USD** | US Dollar |
| **Website 1** | Website, die Vorwürfe gegen die Wirecard AG im Internet veröffentlicht |
| **Wirecard Acquiring & Issuing** | Wirecard Acquiring & Issuing GmbH, Aschheim, Tochtergesellschaft der Wirecard AG |
| **Wirecard Bank** | Wirecard Bank AG, Aschheim, Tochtergesellschaft von Wirecard Acquiring & Issuing GmbH |
| **Wirecard Brasilien** | Wirecard Brazil S.A., Sao Paulo, Brasilien, Tochtergesellschaft von Wirecard Acquiring & Issuing GmbH |
| **Wirecard Sales** | Wirecard Sales International Holding GmbH, Aschheim, Tochtergesellschaft der Wirecard AG |
| **Wirecard Technologies** | Wirecard Technologies GmbH, Aschheim, Tochtergesellschaft der Wirecard AG |
| **Wirecard Türkei** | Wirecard Ödeme Ve Elektronik Para Hizmetleri A.S., Istanbul, Türkei |
| **Wirecard UK & Ireland** | Wirecard UK & Ireland Ltd., Dublin, Irland |
| **Wirecard AG** | Wirecard AG, Aschheim |



# 1 Untersuchungsauftrag und Ergebnis-zusammenfassung

## 1.1 Untersuchungsauftrag und Untersuchungsgegenstand

### 1.1.1 Untersuchungsauftrag

Die

**Wirecard AG, München,**
(im Folgenden „Wirecard AG" oder „Gesellschaft"), vertreten durch den Aufsichtsrat,

hat die **KPMG AG Wirtschaftsprüfungsgesellschaft, Berlin** (im Folgenden „KPMG"),

mit Auftragsbestätigung vom 31. Oktober 2019 beauftragt, eine unabhängige Sonderuntersuchung durchzuführen.

**Anlass der Untersuchung** waren in der Presse und im Internet veröffentlichte Vorwürfe gegen die Wirecard AG. Dabei wurden folgende Themengebiete wiederholt angesprochen, die Ausgangspunkte der nachfolgend dargestellten Untersuchung von KPMG waren:

– Angebliche Erhöhung des Umsatzes durch fiktive Kundenbeziehungen, insbesondere im Dritt-Acquiring mit einem Third Party Acquiring-Partner, (2016 bis 2018);

– Veröffentlichungen im Internet (Webseite 1) (2016 bis 2018);

– Vorwürfe zu Buchhaltungsthemen in Singapur (2015 bis 2018).

### 1.1.2 Untersuchungsgegenstand

**Gemäß Auftrag waren Gegenstand unserer Untersuchung** die in Presse- und Internet-Veröffentlichungen dargestellten Sachverhalte, insbesondere:

1. Angebliche Erhöhung des Umsatzes durch fiktive Kundenbeziehungen, insbesondere im Dritt-Acquiring mit einem Third Party Acquiring-Partner (2016 bis 2018)

   Die „FINANCIAL TIMES" (nachfolgend „FT") veröffentlichte mehrere Artikel mit dem Vorwurf, die Wirecard AG habe aufgrund fiktiver Kundenumsätze einen erhöhten Konzernumsatz und damit ein erhöhtes Konzernergebnis ausgewiesen.

   In diesem Zusammenhang wurde insbesondere die Zusammenarbeit mit einem Third Party Acquiring-Partner (im Folgenden „TPA-Partner") , einem Geschäftspartner der Wirecard AG, thematisiert. Aus Transaktionen mit einem TPA-Partner und zwei weiteren Unter-



nehmen soll laut FT im Jahr 2016 etwa die Hälfte des Unternehmensgewinns vor Zinsen, Steuern und Abschreibungen erzielt worden sein. Die FT habe 34 Kunden, deren Zahlungen u. a. über einen TPA-Partner abgewickelt worden seien, kontaktiert und dabei potenzielle Unplausibilitäten festgestellt. Es bestehe laut FT insbesondere der Verdacht, dass es einen konzertierten Versuch des erhöhten Ausweises der Umsätze und Gewinne in Dubai und Irland gegeben habe.

Laut FT seien die von einem TPA-Partner generierten Erlöse über die Wirecard-Gesellschaften Cardsystems Middle East FZ-LLC, Dubai, VAE („Cardsystems Middle East"), und die Wirecard UK & Ireland Ltd., Dublin, Irland („Wirecard UK & Ireland"), geflossen, deren Abschlüsse nicht durch den Konzernabschlussprüfer bzw. dessen Netzwerkgesellschaften geprüft worden seien.

2. Veröffentlichungen im Internet (Webseite 1) (2016 bis 2018)

Auf der Webseite 1 finden sich u. a. an verschiedene Organe und Berater der Wirecard AG adressierte Schreiben. Darin werden Vorwürfe im Hinblick auf das sogenannte „Merchant Cash Advance"-Geschäft erhoben. Insbesondere wird behauptet, dass das Kreditvolumen aus dem „Merchant Cash Advance"-Geschäft durch den Vorstand der Wirecard AG nicht korrekt und transparent dargestellt worden sein soll.

3. Vorwürfe zu Buchhaltungsthemen in Singapur (2015 bis 2018)

Die FT hat seit dem 30. Januar 2019 Vorwürfe zu Unregelmäßigkeiten im Zusammenhang mit der Buchhaltung von Tochtergesellschaften in Singapur erhoben. Danach sollen Umsätze zu hoch ausgewiesen worden sein. Damit im Zusammenhang stehen u. a. Vorwürfe der Zurückdatierung von Verträgen und Kreislaufbuchungen.

4. Vorwürfe zu einer Unternehmenstransaktion in Indien

Im Verlauf der Untersuchung wurden auch Vorwürfe zu Geschäftsaktivitäten in Indien untersucht, die ursprünglich nicht Gegenstand des Untersuchungsauftrags waren. Hintergrund hierzu ist, dass aus den KPMG von der Wirecard AG übergebenen Dokumenten inhaltliche Verknüpfungen zu Vorwürfen in der Presse und im Internet zu Geschäftsaktivitäten der Wirecard AG in Indien identifiziert wurden. Diese Vorwürfe stehen im Zusammenhang mit einer Unternehmenstransaktion der Wirecard AG in Indien, bei der ein überhöhter Kaufpreis an den Verkäufer für den Erwerb des „Payment-Geschäfts" der Unternehmen 9 bezahlt worden sein soll. Darüber hinaus wurden in der Presseberichterstattung Vorwürfe zum sogenannten „Roundtripping" von Zahlungen veröffentlicht. Diese Vorwürfe wurden vom Konzernabschlussprüfer, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Audit, Stuttgart (im Folgenden „EY Audit"), im Rahmen der Jahresabschlussprüfungen untersucht. Die Ergebnisse hierzu wurden im Rahmen der Sonderuntersuchung analog des Vorgehens zu Vorwürfen zu den Buchhaltungsthemen in Singapur nachvollzogen.



## 1.2      Art und Umfang der Untersuchungsdurchführung

KPMG hat die Untersuchung in den Räumen der Wirecard AG sowie in den Niederlassungen von KPMG in der Zeit vom 31. Oktober 2019 bis zum 24. April 2020 durchgeführt. Darüber hinaus hat KPMG in den Räumlichkeiten des Abschlussprüfers Einsicht in Unterlagen genommen und Befragungen von Geschäftspartnern der Wirecard in deren Räumen in Dubai , auf den Philippinen und in einem Fall mittels Videokonferenz vorgenommen.

Die nachstehenden Untersuchungsergebnisse basieren auf den bis einschließlich zum 24. April 2020, 08:30 Uhr, erhaltenen Dokumenten und erteilten Auskünften.

Den Umfang und die Art der diesbezüglichen Untersuchungshandlungen hat KPMG auftragsgemäß unabhängig und nach unserem eigenen Ermessen bestimmt.

KPMG hat eine eigene Presserecherche durchgeführt. Die Wirecard AG hat KPMG eine Auflistung mit gegen das Unternehmen erhobenen Vorwürfen zur Verfügung gestellt. KPMG hat die Auflistung der Vorwürfe zu den einzelnen Untersuchungsbereichen auf Vollständigkeit abgeglichen.

Im Auftragsschreiben vom 31. Oktober 2019 wurde folgende **Vorgehensweise** vereinbart:

1) **Durchführung von übergreifenden Untersuchungshandlungen für die ursprünglichen drei Untersuchungsgegenstände.**

2) **Untersuchung des Dritt-Acquiring-Geschäftes mit einem TPA-Partner im Zeitraum 2016 bis 2018**

Zur Untersuchung der erhobenen Vorwürfe hat KPMG insbesondere folgende Untersuchungshandlungen vorgenommen:

1. Erlangung eines Verständnisses der Geschäftstätigkeit der Wirecard AG, insbesondere hinsichtlich des Dritt-Acquiring-Geschäftes („Third-Party Acquiring", im Folgenden „TPA"), u. a. am Beispiel eines TPA-Partners.

2. Untersuchung des Zahlungsabwicklungsprozesses, insbesondere im TPA-Geschäft, u. a. am Beispiel eines TPA-Partners und – sofern es nach dem Ermessen von KPMG in Abstimmung mit dem Aufsichtsrat erforderlich war – auch im Issuing-Geschäft, unter Berücksichtigung der Rollen der Wirecard-Gesellschaften Cardsystems Middle East, Wirecard UK & Ireland und Wirecard Technologies Aschheim („Wirecard Technologies").

3. Untersuchung des Prozesses der Umsatzrealisierung und Provisionierung von Leistungen und deren Erfassung im Konzernabschluss, auch unter Berücksichtigung von Konsolidierungssachverhalten.

4. Weitere Untersuchungshandlungen

   Analyse der Hintergründe des Vorwurfs, wonach Zahlungen von angeblich nicht mehr existenten Kunden über einen TPA-Partner abgewickelt und entsprechende Umsatzerlöse erzielt worden sein sollen, insbesondere mit Blick auf Behauptungen der FT zu 34 angeblichen Kunden eines TPA-Partners.



In verschiedenen FT-Artikeln enthaltene Behauptungen zu Einzelsachverhalten haben wir in die Untersuchungen einbezogen, soweit wir dies nach unserem eigenen Ermessen für die Beurteilung der Validität der erhobenen Vorwürfe für notwendig erachtet haben.

Im gegebenen Kontext publizierte „Hintergrundinformationen" zu den in Rede stehenden Unternehmen Third Party Acquiring-Partner (im Folgenden „TPA-Partner 1"), Third Party Acquiring-Partner 2 (im Folgenden „TPA-Partner 2") und Third Party Acquiring-Partner 3 (im Folgenden „TPA-Partner 3") haben wir neben weiteren, im Verlauf der Untersuchung erlangten Informationen (z. B. aus an Organe der Wirecard AG oder an KPMG als Sonderuntersucher adressierten Schreiben) in unsere Untersuchungshandlungen einbezogen, soweit dies nach unserem eigenen Ermessen für die Zwecke der Untersuchung geboten erschien.

### 3) Untersuchung des Merchant Cash Advance-Geschäftes im Zeitraum 2016 bis 2018

Zur Untersuchung der erhobenen Vorwürfe hat KPMG zunächst die Berichte des Konzernabschlussprüfers gesichtet und beurteilt, ob diese insoweit für Zwecke der Untersuchung dieses Untersuchungsgegenstands geeignet waren. Dazu wurde auch das Geschäftsmodell hinsichtlich des „Merchant Cash Advance"-Geschäftes (im Folgenden „MCA") analysiert.

Sodann wurden in Abstimmung mit dem Aufsichtsrat folgende weitere Untersuchungshandlungen vorgenommen:

1. Untersuchung der aufsichtsrechtlichen Zulässigkeit des Geschäfts und des Merchant-Cash Advance-Prozesses an Händler, insbesondere in der Türkei und in Brasilien;

2. Untersuchung des Prozesses zur Erfassung der Erfolge aus dem MCA-Geschäft und deren Erfassung im Konzernabschluss, auch unter Berücksichtigung von Konsolidierungssachverhalten;

3. Untersuchung des Transaktionsvolumens im MCA-Geschäft im Untersuchungszeitraum, insbesondere vor dem Hintergrund der auf der Webseite 1 erhobenen Vorwürfe.

### 4) Nachvollzug der Ergebnisse der Prüfungshandlungen zum Untersuchungsgegenstand Singapur im Zeitraum 2015 bis 2018

Der Abschlussprüfer der Wirecard AG hat im Rahmen der Jahres- und Konzernabschlussprüfung 2018 „extended audit procedures" hinsichtlich der Vorwürfe zu Unregelmäßigkeiten in der Buchhaltung in Singapur vorgenommen.

KPMG hat zunächst auf Basis der Berichterstattung des Abschlussprüfers und den Ergebnissen von mit einem Compliance Audit bzw. einer Internal Investigation beauftragten Rechtsanwaltskanzleien sowie weiterer beauftragter Berater die Untersuchungsergebnisse nachvollzogen und beurteilt, ob diese insoweit für Zwecke der Untersuchung des durch KPMG festgelegten Untersuchungsgegenstands geeignet waren. Sofern es nach dem Ermessen von KPMG zur Untersuchung der in der Presse behaupteten Sachverhalte erforderlich war, hat KPMG in Abstimmung mit dem Aufsichtsrat entsprechende eigene Untersuchungshandlungen vorgenommen.



**5)  Nachvollzug der Vorwürfe zur Unternehmenstransaktion in Indien**

Die FT hat im Dezember 2019 Vorwürfe im Zusammenhang mit einer von der Wirecard AG getätigten Transaktion im Jahr 2015 in Indien veröffentlicht, bei der ein überhöhter Kaufpreis an den Fund 1 gezahlt worden sei. Darüber hinaus wurden Vorwürfe gegenüber der Wirecard AG erhoben, welche im Zusammenhang mit „Roundtripping" von Zahlungen stehen. Diese Vorwürfe wurden bereits in verschiedenen Artikeln vor dem Beginn unserer Sonderuntersuchung thematisiert. Die Vorwürfe werden teilweise in Darstellungen auf der Webseite 1 aufgegriffen. EY Audit ist diesen Vorwürfen im Rahmen der verschiedenen Konzernjahresabschlussprüfungen seit der Transaktion nachgegangen.

Der Auftraggeber hat KPMG im Projektverlauf gebeten, die seitens des Abschlussprüfers durchgeführten Prüfungshandlungen im Rahmen der unabhängigen Sonderuntersuchung analog des Vorgehens zu den Vorwürfen zu den „extended audit procedures" in Singapur zusätzlich nachzuvollziehen.

**Auftragserweiterung**

Hinsichtlich des TPA Geschäftes ergab sich im Rahmen unserer Untersuchung, dass die Transaktionsdaten und entsprechende Settlementnachweise für den Untersuchungszeitraum 2016-2018, Verträge zwischen den TPA-Partnern und den Händlern sowie Kontoauszüge und Bankbestätigungen für Treuhandkonten (sog. Escrow-Accounts) für den Untersuchungszeitraum bislang nicht zur Verfügung gestellt wurden. Zumindest für die Zeiträume 2016 und 2017 bedarf es hier für Zwecke der forensischen Sonderuntersuchung mangels Vorliegens eigener Datenbestände der Mitwirkung durch die TPA-Partner, die bislang ausgeblieben ist. Zwischenzeitlich haben jedoch zwei Geschäftspartner signalisiert, kooperationsbereit zu sein und Transaktionsdaten – zumindest für gewisse Zeiträume – zur Verfügung stellen zu wollen.

Im Geschäftsjahr 2019 fand eine Umstellung der Transaktionsabwicklung auf eine nunmehr auch für das TPA-Geschäft eingerichtete Plattform von Wirecard (sog. Elastic Engine für das TPA-Geschäft) statt. Insoweit liegen nunmehr seit der Umstellung eigene Datenbestände über die Transaktionen vor. Dies ermöglicht die Bereitstellung von Transaktionsdaten ohne Mitwirkung Dritter. Daher wurde KPMG gegen Ende der Untersuchung für den Zeitraum Dezember 2019 Transaktionsdaten zur Verfügung gestellt. Vor diesem Hintergrund wurde mit dem Auftraggeber vereinbart, die gemäß Auftragsschreiben vom 31. Oktober 2019 durchgeführte Untersuchung des Third Party Acquiring-Geschäfts in Teilbereichen auf den Monat Dezember 2019 auszuweiten. Ziel der erweiterten Untersuchungshandlungen ist es, die Höhe und Existenz der Umsatzerlöse im Third-Party Acquiring-Geschäft unter forensischen Aspekten für den Monat Dezember 2019 nachzuvollziehen.

Über die Ergebnisse der erweiterten Untersuchungshandlungen wird KPMG nach Abschluss der erweiterten Untersuchungshandlungen gesondert berichten. KPMG weist darauf hin, dass die erweiterten Untersuchungshandlungen im Zusammenhang mit der vorstehend dargestellten Auftragserweiterung für das Third Party Acquiring-Geschäft noch nicht abgeschlossen sind. KPMG weist darauf hin, dass KPMG aus den erweiterten Untersuchungshandlungen keine Rückschlüsse auf den Untersuchungszeitraum 2016-2018 sowie aufgrund des begrenz-



ten Betrachtungszeitraums „Dezember 2019" keine Rückschlüsse auf die Grundgesamtheit der Umsatzerlöse des gesamten Jahres 2019 ziehen wird.

**Kommunikation mit dem Aufsichtsrat**

Der Aufsichtsrat als Auftraggeber wurde regelmäßig mündlich und bei Bedarf schriftlich über den Stand der Untersuchung und den Untersuchungsfortschritt informiert. Außerdem wurde er mit zwei Zwischenberichterstattungen auf Grundlage einer Folienpräsentation über den Stand der Untersuchung zu den einzelnen Untersuchungsbereichen informiert. Darüber hinaus haben wir den Aufsichtsrat in einem Schreiben über eine erhebliche Verzögerung bei der Vorlage der von uns angeforderten Unterlagen durch die Wirecard AG informiert.

**Sonstige Informationen zu Auftrag und Auftragsdurchführung**

Die **Aufdeckung und Untersuchung möglicher unzulässiger Handlungen außerhalb** der vorstehend näher beschriebenen Untersuchungsgegenstände war **nicht** Gegenstand des Auftrages von KPMG.

Die rechtliche und aufsichtsrechtliche Beurteilung der untersuchten Sachverhalte war gemäß Auftragsbestätigung vom 31. Oktober 2019 nicht Auftragsgegenstand. Sämtliche in diesem Bericht gemachten Ausführungen zu rechtlichen Fragestellungen sind als Hinweise zur juristischen Nachverfolgung zu verstehen. Sie stellen keine juristische Beurteilung dar. Zudem sind die Hinweise von KPMG stets auf Einzelaspekte beschränkt und ersetzen daher auch nicht eine umfassende Prüfung des Gesamtsachverhaltes unter Einbeziehung der relevanten ausländischen Rechtsordnungen und greifen einer Gesamtwürdigung auch nicht vor.

Die Beschränkung unserer Tätigkeit auf einzelne Aspekte bestimmter Sachverhalte oder Geschäftsfelder hat auch zur Folge, dass die Ergebnisse unserer Untersuchung keine Würdigung der Richtigkeit der veröffentlichten Jahres- bzw. Konzernabschlüsse als Ganzes beinhalten können. Die Beurteilung der Wesentlichkeit unserer Feststellungen für diese Jahres- bzw. Konzernabschlüsse ist nicht Gegenstand unseres Auftrages. KPMG hat die eigenen Untersuchungshandlungen auf datenschutzrechtliche Zulässigkeit überprüft. Die entsprechenden datenschutzrechtlichen Vorgaben wurden von KPMG beachtet.

Der Vorstand der Wirecard AG hat KPMG die als Anlage 2 beigefügte Vollständigkeitserklärung vom 4. März 2020 (Anlage 2) im Zusammenhang mit dem Escrow-Account erteilt. Eine finale Vollständigkeitserklärung wurde von uns erbeten jedoch bis zum Ende unserer Untersuchung am 27. April 2020 durch den Vorstand nicht abgegeben.

Grundlage unserer Untersuchung und Auswertung waren die erhaltenen Unterlagen, empfangenen Dokumentationen und erteilten Auskünfte, ohne dass es uns möglich gewesen wäre, die Vollständigkeit und Echtheit der uns überlassenen Unterlagen und Dokumentationen zu überprüfen. Demzufolge können wir auch keine abschließende Aussage darüber treffen, ob diese Unterlagen und Informationen vollständig, richtig und widerspruchsfrei sind. Wir können ebenfalls nicht abschließend beurteilen, ob uns alle beurteilungsrelevanten Informationen und Nachweise zugänglich gemacht wurden. Insofern können wir auch nicht ausschließen, dass



wir bei Kenntnis weiterer Informationen und Dokumente zu einem anderen Ergebnis gekommen wären.

Im Zeitraum vom 17. April 2020 bis zum 24. April 2020 wurden einige der bislang nicht vorgelegten Unterlagen und Nachweise nunmehr von der Gesellschaft vorgelegt. Darüber hinaus wurden KPMG weitere Unterlagen am 23. April 2020 durch den Abschlussprüfer EY zur Verfügung gestellt. Vor diesem Hintergrund wurde der Termin für die Berichterstattung verschoben.

KPMG weist darauf hin, dass KPMG insbesondere für die am bzw. ab dem 17. April 2020 gelieferten Unterlagen keine Untersuchung der Authentizität vorgenommen hat.

KPMG hat Fremdwährungsbeträge in Euro-Beträge umgerechnet und den Euro-Betrag gerundet. Als Stichtag für die Umrechnung wurde jeweils der Wechselkurs zum Datum des jeweiligen Dokuments – soweit vorhanden – verwendet. Alle in diesem Bericht aufgeführten Währungsumrechnungen sind ausschließlich zu Informationszwecken zu verstehen.

Bei den in der Einzelbetrachtung aufgeführten Beträgen im Untersuchungsbereich „Singapur" und „Indien" handelt es sich um Nettobeträge. Sofern Rechnungsbeträge mit einer Steuer (Bruttobeträge) angegeben werden, wird dies explizit aufgeführt.

Zahlreiche Unterlagen liegen KPMG nur in Form einer Kopie oder als Scan vor. KPMG kann nicht beurteilen, ob diese Versionen den Originalen entsprechen. Wir haben für unsere Arbeiten unterstellt, dass die vorgelegten Kopien den Originalen entsprechen.

KPMG weist darauf hin, dass, soweit öffentliche Informationsquellen zur Recherche genutzt wurden, eine Überprüfung der Richtigkeit der erhaltenen Informationen nicht durchgeführt werden konnte. Es besteht somit das Risiko, dass Informationen aus diesen Quellen falsch, unvollständig oder nicht mehr aktuell waren.

Die Art der Tätigkeit von KPMG unterscheidet sich sowohl in ihrem Umfang als auch in ihren Zielen wesentlich von einer Jahresabschlussprüfung oder ähnlichen Tätigkeiten. Demzufolge erteilt KPMG kein Testat und gibt auch keine andere Form der Bescheinigung oder Zusicherung hinsichtlich der von KPMG für die Arbeit gegebenenfalls herangezogenen Jahresabschlüsse oder des internen Kontrollsystems der Wirecard AG.

Die von uns durchgeführte forensische Untersuchung unterscheidet sich in Art und Umfang sowie der Detailtiefe wesentlich von einer Jahresabschlussprüfung. Dies führt u. a. dazu, dass teilweise höhere Maßstäbe an die Untersuchungshandlungen sowie Nachweise angelegt werden, sodass beispielsweise Transaktionsketten vollständig und bis zum Ursprung zurückverfolgt werden.

Dem Auftrag, in dessen Erfüllung KPMG vorstehend benannte Leistung für die Wirecard AG erbracht hat, lagen die Allgemeinen Auftragsbedingungen für Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften vom 1. Januar 2017 (Anlage 4) zugrunde. Durch Kenntnisnahme und Nutzung der in diesem Schreiben enthaltenen Information bestätigt jeder Empfänger, die dort getroffenen Regelungen (einschließlich der Haftungsregelung unter Nr. 9 der Allge-



meinen Auftragsbedingungen) zur Kenntnis genommen zu haben, und erkennt deren Geltung im Verhältnis zu KPMG an.

### 1.2.1  Übergreifende Untersuchungshandlungen

KPMG hat entsprechend dem Untersuchungsauftrag zur Untersuchung der erhobenen Vorwürfe zusätzlich zu den unter Abschnitt 1.2 aufgeführten Untersuchungshandlungen insbesondere folgende übergreifende Untersuchungshandlungen vorgenommen:

#### 1.2.1.1  Analyse von Presseveröffentlichungen

Es wurden Presseveröffentlichungen seit dem 1. Januar 2016 in Verbindung mit Wirecard hinsichtlich etwaiger Vorwürfe in Bezug auf die unter Abschnitt 1.1.2 aufgeführten Untersuchungsgegenstände ausgewertet.

#### 1.2.1.2  Auswertung von Protokollen der Vorstands- und Aufsichtsratssitzungen

Nach Auskunft der Wirecard AG wurden keine Protokolle zu Vorstandssitzungen erstellt. Es wurde KPMG eine Übersicht der Vorstandsbeschlüsse für den Zeitraum 2015 bis 2018 vorgelegt. KPMG hat auf dieser Grundlage einzelne Vorstandsbeschlüsse angefordert.

Im Rahmen der Sonderuntersuchung hat die Wirecard AG der KPMG einen Vorstandsbeschluss zur Verfügung gestellt, welcher nicht in der Übersicht der Vorstandsentscheidungen aufgeführt war. Die Vollständigkeit der uns übergebenen Übersicht der Vorstandsbeschlüsse können wir dementsprechend nicht beurteilen.

Zur Auswertung der Protokolle zu Aufsichtsratssitzungen wurde zwischen der Wirecard AG und KPMG die folgende Vorgehensweise vereinbart: KPMG wurden die Tagesordnungen sämtlicher Aufsichtsratssitzungen seit dem 1. Januar 2016 zur Verfügung gestellt. KPMG hat auf Basis der Tagesordnungspunkte Protokollauszüge angefordert und erhalten.

#### 1.2.1.3  Auswertung von Revisions- und ggf. weiteren Berichten von externen Dritten sowie ggf. Berichten an das Compliance Committee.

Grundlage für die Auswertung war der jeweilige „Multi Year Plan" von „Group Internal Audit" für die Zeiträume 2016 bis 2018, 2017 bis 2019 und 2018 bis 2020. Für vier Prüfungen wurde KPMG die jeweilige Management Summary zur Verfügung gestellt, die im Rahmen der von KPMG durchgeführten Untersuchungshandlungen berücksichtigt worden sind.

#### 1.2.1.4  Erörterung mit dem Abschlussprüfer

KPMG hat die in diesem Bericht dargestellten Bilanzierungsfragen mit dem Abschlussprüfer der Wirecard AG erörtert. Darüber hinaus hat der Abschlussprüfer KPMG Auskünfte zu durch-



geführten Prüfungshandlungen und -ergebnissen im Rahmen seiner Abschlussprüfungen erteilt.

KPMG hat dem Abschlussprüfer keine Informationen über den Stand der Untersuchung von KPMG erteilt. Unsere Berichterstattung richtet sich ausschließlich an den Aufsichtsrat der Wirecard AG.

### 1.2.1.5    Meldungen über das Interne Hinweisgebersystem während der Sonderuntersuchung

Es sollten KPMG sämtliche vorliegende und während des Projektzeitraums eingehende Hinweise des internen Hinweisgebersystems der Wirecard AG zu den Untersuchungsgegenständen und zu in Presse- und Internet-Veröffentlichungen erwähnten Vorwürfen weitergeleitet werden.

Da keine Vollständigkeitserklärung abgegeben wurde, haben wir keine Bestätigung von Wirecard erhalten, dass während unserer Untersuchung keine Hinweise eingegangen sind, die einen thematischen Bezug zum Untersuchungsgegenstand aufweisen. Am Ende der Untersuchung wurde uns bestätigt, dass keine Hinweise über das Hinweisgebersystem eingegangen sind.

### 1.2.1.6    Hinweise an KPMG während der Sonderuntersuchung

Während unserer Sonderuntersuchung wurden KPMG teilweise anonym von externen Dritten verschiedene Hinweise und Dokumente zur Verfügung gestellt. KPMG hat diese Hinweise und Dokumente auf Bezug zu den Untersuchungsbereichen geprüft und entsprechend berücksichtigt, sofern ein Bezug zu einem der Untersuchungsbereiche bestand. KPMG hat diese Hinweise und Dokumente in die Untersuchung einbezogen, soweit dies nach dem Ermessen von KPMG für Zwecke der Untersuchung geboten erschien.

KPMG hat den Auftraggeber stets über die Kontaktaufnahme informiert. In Einzelfällen wurde diese Information auch dem Abschlussprüfer zur Verfügung gestellt.



### 1.2.1.7 Verzögerte Lieferung von Unterlagen

Zur Auftragsdurchführung sind folgende Umstände zu berichten:

– Die Wirecard AG hat von KPMG im Verlauf der Untersuchung angeforderte Dokumente teilweise nicht bzw. erst mehrere Monate nach Anforderung geliefert, wodurch sich die Untersuchung insgesamt verzögerte.

– Die Wirecard AG hat einzelne vereinbarte Interview-Termine mit wesentlichen Wirecard-internen Ansprechpartnern mehrfach verschoben, wodurch ebenfalls erhebliche Verzögerungen der Untersuchungshandlungen entstanden.

– Einzelne, im Rahmen der ursprünglichen, dem Auftraggeber zu Beginn der Untersuchung zur Kenntnis gebrachte Untersuchungshandlungen konnten mangels verfügbarer Dokumente bzw. IT-Systemzugänge nicht bzw. nicht in der ursprünglich vorgesehenen Weise durchgeführt werden.

– Bei den KPMG vorgelegten Dokumenten handelte es sich nahezu ausschließlich um elektronische Kopien, deren Authentizität nicht überprüft werden konnte.

– Für die Übergabe von Transaktionsdaten zumindest für die Jahre 2016 und 2017 bedurfte es der Unterstützung durch die TPA-Partner, die jedoch bisher ausblieb.

– Im Übrigen verweisen wir hinsichtlich konkreter, für die Auftragsdurchführung relevanter Aspekte auf die in den entsprechenden Abschnitten zu den einzelnen Untersuchungsfeldern enthaltenen Inhalte.

## 1.3    Ergebniszusammenfassung

Im Folgenden stellt KPMG die Untersuchungsergebnisse in zusammengefasster Form dar. KPMG hat zum Schutz von personenbezogenen Informationen und vertraulichen Geschäftsgeheimnissen weitergehende Ausführungen zu allen untersuchten Themenkomplexen in die Anlagen des Berichtes aufgenommen.

### 1.3.1    Ergebniszusammenfassung Third-Party Acquiring

#### 1.3.1.1 Höhe und Existenz der Erlöse

##### 1.3.1.1.1 Vorwürfe

In Bezug auf das TPA-Geschäft mit TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 wurde in den veröffentlichten FT-Artikeln die Höhe und Existenz der Umsatzerlöse in Frage gestellt, insbesondere mit Verweis auf angeblich fragwürdige Kundenbeziehungen. In diesem Zusammenhang wurde auch der Vorwurf mangelnder Transparenz erhoben.



Im Einzelnen wurden insbesondere folgende Vorwürfe erhoben:

| Zitat | Quelle |
| --- | --- |
| *„Half of the worldwide revenue and almost all of the reported profits of Wirecard, the German payments group that is battling an accounting scandal, have come from only three opaque partner companies in recent years, according to documents seen by the Financial Times."* | FT-Artikel vom 24. April 2019, Titel „Wirecard relied on three opaque partners"[1] |
| *„In 2016 (…)[…], […] and […] together contributed earnings before interest, tax, depreciation and amortisation of €290m on revenues of €541m, according to a spreadsheet created in July 2017 by a member of Wirecard's Munich accounting team. The total was equivalent to 95 per cent of the ebitda and just over half the revenues reported by the group for 2016."* | FT-Artikel vom 24. April 2019, Titel „Wirecard relied on three opaque partners"[1] |
| *„An internal Wirecard spreadsheet shows that three partner companies contributed half the sales and more than 90 per cent of the profits to the scandal-hit German payments group in 2016 and early 2017."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |
| *„In the past five years CardSystems has contributed €600m of ebitda, much of it from third-party partners. That has made up more than a third of the worldwide total ebitda reported by Wirecard in that period, according to information provided by whistleblowers. One whistleblower said the substantial business recorded for CardSystems in Wirecard's books did not appear to be matched by flows of cash. The person said CardSystems had accounts at Wirecard Bank as well as institutions in the Middle East, but said 'he revenues never passed through these accounts'."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |
| *„According to documents seen by the FT, CardSystems chalked up €58m of commission due from […] in 2017, equivalent to 4.4 per cent of the €1.3bn of payments processed by the Dubai-based partner. Such lucrative commissions (…) raise questions about where Wirecard finds merchants willing to pay such fees."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |
| *„A focal point of the FT's inquiries into Wirecard is one of these partner companies, a Dubai-based intermediary called […], which documents indicate contributed half of the German company's worldwide profits in 2016. (…) Internal financial reports from 2016 and 2017 (…), detail the business which has supposedly flowed through […]. The documents record about €350m of payments from 34 key clients as passing through […], on behalf of Wirecard, each month during the period."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |

---

[1]  Link: https://www.ft.com/content/a7b43142-6675-11e9-9adc-98bf1d35a056, zuletzt eingesehen am 20. März 2020

[2]  Link: https://www.ft.com/content/7d394c4e-77c4-11e9-be7d-6d846537acab, zuletzt eingesehen am 20. März 2020



| Zitat | Quelle |
|---|---|
| *„According to one of the spreadsheets, shared between executives in July 2017 and titled 'Übersicht Dritt-Acquirer' (overview of third-party acquirers), […] was responsible for €265m of revenues in 2016 and an 'ebitda-effekt' of €173m. That is equivalent to a quarter of Wirecard's worldwide sales that year and more than half of its earnings before interest, tax depreciation and amortisation. Somehow, the €4.2bn of payments routed through […] in 2016 produced more profit for Wirecard than the rest of the €62bn worth of transactions it processed that year, if the figures in the overview are taken at face value."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |
| *„The group's Munich finance team appears to have prepared documents (…) which said CardSystems earned €69m of profit from €1.6bn of payments processed by […] in 2017."* | FT-Artikel vom 15. Oktober 2015, Titel „Wirecard suspect accounting practices revealed"[3] |
| *„At the end of March 2017, […] owed €123m to a German subsidiary of Wirecard. […] owed €27m to Wirecard units in Dubai and Gibraltar. […] owed €37m to Wirecard units in Ireland and Dubai. The biggest total in the document was €334m ascribed to […] in two items under the heading 'trustee account'."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |
| *„Internal Wirecard documents (…) suggest […] was also important to the group's balance sheet, which held €1.45bn of cash and equivalents at the end of March 2017. Correspondence indicates […] was associated with €334m held in 'trustee accounts' as of that date."* | FT-Artikel vom 9. Dezember 2019, Titel „Wirecard's singular approach to counting cash"[4] |
| *„For the first quarter of 2017, (…) 33 clients of […] (…) generated €36.8m of commission, equivalent to 45 per cent of the earnings before interest, tax, depreciation and amortisation reported by Wirecard in the period."* | FT-Artikel vom 20. Mai 2019, Titel „Wirecard document points to reliance on 3 partners"[2] |

Tabelle 1: Vorwürfe in Bezug auf Höhe und Existenz von TPA-Umsatzerlösen

#### 1.3.1.1.2    Ergebnisse der Untersuchungshandlungen

**Hinsichtlich der Höhe und Existenz der Umsatzerlöse aus den TPA-Geschäftsbeziehungen zwischen der Cardsystems Middle East, der Wirecard UK & Ireland sowie der Wirecard Technologies und den jeweils relevanten TPA-Partnern kann KPMG als Ergebnis der durchgeführten forensisch geprägten Untersuchungshandlungen in Bezug auf den Untersuchungszeitraum 2016 bis 2018 weder eine Aussage treffen, dass die Umsatzerlöse existieren und der Höhe nach korrekt sind noch die Aussage treffen, dass die Umsatzerlöse nicht existent und in der Höhe nicht korrekt sind. Insoweit liegt ein Untersuchungshemmnis vor.**

---

[3]    Link: https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901, zuletzt eingesehen am 20. März 2020

[4]    Link: https://www.ft.com/content/845b0dce-1836-11ea-9ee4-11f260415385, zuletzt eingesehen am 20. März 2020



Ursächlich sind neben Mängeln in der internen Organisation insbesondere die fehlende Bereitschaft der Third Party Acquirer umfassend und transparent an dieser Sonderuntersuchung mitzuwirken. So konnten für Zwecke der von KPMG unter forensischen Aspekten durchgeführten Untersuchung Transaktionsdaten und entsprechende Settlement-Nachweise für den Untersuchungszeitraum 2016-2018, Verträge zwischen den TPA-Partnern und den Händlern sowie Kontoauszüge und Bankbestätigungen für Treuhandkonten (sog. Escrow-Accounts) für den Untersuchungszeitraum bislang nicht zur Verfügung gestellt werden. Die diesbezüglich bereitgestellten Nachweise, d. h. insbesondere die Saldenbestätigungen der TPA-Partner gegenüber dem Abschlussprüfer, die Abrechnungen der TPA-Partner, die Verträge mit den TPA-Partnern sowie entsprechende Pricing-Schedules, die Screenshots über Transaktionsvolumina u. a. aus den Systemen der TPA-Partner und Protokolle zu vierteljährlichen Gesprächen mit den TPA-Partnern, die die Abstimmung relevanter Abrechnungsparameter dokumentieren, stellten keine für unsere forensische Untersuchung ausreichenden Nachweise dar, da sie nur die Beziehung zum TPA-Partner und nicht die gesamte Transaktionskette betrachten. Insoweit war es KPMG nicht hinreichend möglich die Existenz der Transaktionsvolumina im Untersuchungszeitraum 2016 bis 2018 forensisch nachzuvollziehen.

Im Geschäftsjahr 2019 fand eine Umstellung der Transaktionsabwicklung auf eine nunmehr auch für das TPA-Geschäft eingerichtete Plattform von Wirecard (sog. Elastic Engine für das TPA-Geschäft) statt. Insoweit liegen nunmehr seit der Umstellung eigene Datenbestände über die Transaktionen vor. Dies ermöglicht die Bereitstellung von Transaktionsdaten ohne Mitwirkung Dritter. Daher hat KPMG über 200 Mio. Datensätze mit Transaktionsdaten für den Monat Dezember 2019 entgegengenommen, die derzeit analysiert werden. KPMG weist darauf hin, dass die diesbezüglichen auch im Rahmen einer Auftragserweiterung vorgesehenen Untersuchungshandlungen (siehe dazu im Einzelnen Abschnitt 1.2. dieses Berichtes) im Zusammenhang mit dem Third-Party Acquiring-Geschäft noch nicht abgeschlossen sind.

Nach dem aktuellen Zwischenstand der Datenanalysen hat KPMG in diesem Teilbereich bisher keine Anhaltspunkte, dass die in den Abrechnungen für den Monat Dezember 2019 ausgewiesenen Transaktionsvolumina in wesentlichen Belangen von den durch KPMG auf Basis des KPMG zur Verfügung gestellten Datenbestandes ermittelten Transaktionsvolumina abweichen. KPMG weist darauf hin, dass eine inhaltliche Untersuchung der Vertragskonformität und Richtigkeit dieser Abrechnungen bisher noch nicht durchgeführt wurde.

Darüber hinaus sind KPMG nach dem aktuellen Zwischenstand der Datenanalysen bisher keine Sachverhalte bekannt geworden, die Anlass zu wesentlichen Zweifeln an der Authentizität, der für Dezember 2019 bereitgestellten Daten geben. KPMG weist darauf hin, dass weder die KPMG - Datenanalysen (u. a. auch die Untersuchung des Datenextraktionsprozesses) noch die weiteren Untersuchungshandlungen durch KPMG für den Monat Dezember 2019 abgeschlossen sind und dass sich die dargestellten Ergebnisse mit dem weiteren Fortgang der Untersuchung ändern können. Ferner weist KPMG darauf hin, dass KPMG aufgrund des begrenzten Betrachtungszeitraums „Dezember 2019" für Zwecke unserer forensischen Untersuchung keine Rückschlüsse auf die Grundgesamtheit der Umsatzerlöse des gesamten Jahres 2019 ziehen wird.



**Darüber hinaus hat KPMG Bankbestätigungen der Bank 2 und der Bank 3 zum Stichtag 31. Dezember 2019 gegenüber dem Abschlussprüfer von Wirecard mit Datum vom 16. März 2020 bzw. vom 17. März 2020 erhalten, die Gesellschaften von Wirecard als wirtschaftlich Berechtigte der Gelder ausweisen. Entsprechende unmittelbare Bankbestätigungen gegenüber KPMG, die vor dem Hintergrund der forensischen Aspekte der Untersuchung durch die jeweils neutralen für entsprechende Anfragen zuständigen Stellen der jeweiligen Banken erfolgen sollen, konnten vor dem Hintergrund der Ausbreitung des Corona-Virus nicht zeitgerecht bereitgestellt werden. Insoweit konnte KPMG bisher die Verlässlichkeit der Bankbestätigungen nicht abschließend beurteilen.**

**Hinsichtlich der Ergebnisse der weiteren Untersuchungshandlungen im Zusammenhang mit der Auftragserweiterung für den Monat Dezember 2019 wird KPMG berichten, sobald die Untersuchungshandlungen im Zusammenhang mit der im Abschnitt 1.2 dargestellten Auftragserweiterung für das Third Party Acquiring-Geschäft abgeschlossen sind. KPMG weist darauf hin, dass KPMG aus den zusätzlichen Untersuchungshandlungen keine Rückschlüsse auf den Untersuchungszeitraum 2016-2018 ziehen wird.**

Bei der Untersuchung haben wir zunächst die von den betreffenden Wirecard-Gesellschaften implementierten Abläufe und Verfahren und die entsprechenden Vorkehrungen des rechnungslegungsbezogenen internen Kontrollsystem untersucht, die der Erfassung der Umsatzerlöse aus dem Third Party Acquiring-Geschäft zugrunde lagen. Darauf aufbauend haben wir Detail-Untersuchungshandlungen in Bezug auf die Höhe und die Existenz der Umsatzerlöse geplant und soweit möglich durchgeführt.

### 1.3.1.1.3  Umfang des Third Party Acquiring-Geschäftes mit TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 2016 bis 2018

Die zwischen der Cardsystems Middle East, der Wirecard UK & Ireland sowie der Wirecard Technologies und den jeweils relevanten TPA-Partnern geschlossenen, im Untersuchungszeitraum geltenden Verträge sahen im Wesentlichen vor, dass die TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 jeweils Kreditkartentransaktionen für an diese TPA-Partner durch Wirecard vermittelte Kunden abwickeln. Dabei wurden die von den jeweiligen Kunden gezahlten Abwicklungsgebühren von den betreffenden Wirecard-Gesellschaften jeweils als (Brutto-) Umsatzerlöse vereinnahmt bzw. als solche ausgewiesen. Die TPA-Partner erhielten wiederum Provisionen für die von ihnen erbrachten Abwicklungsleistungen, die in den Wirecard-Gesellschaften als „Materialaufwände" ausgewiesen wurden. Für die betreffenden Wirecard-Gesellschaften ergaben sich somit aus den Quartals-Abrechnungen jeweils Forderungen an die TPA-Partner, die der Höhe nach den um die „Materialaufwände" (bzw. Provisionsansprüche der TPA-Partner) verminderten (Brutto-)Umsatzerlösen entsprachen.

Die folgenden Zahlenangaben haben wir rechnerisch aus den Konzernabschlüssen der Wirecard AG und den in diesen verarbeiteten, für die relevanten Gesellschaften erstellten „Reporting Packages" sowie aus Buchungsjournalen abgeleitet. Diese fassen insoweit lediglich in den „Reporting Packages" verarbeitete Zahlen zusammen.



Die Umsatzerlöse der Gesellschaften Cardsystems Middle East, Wirecard UK & Ireland und Wirecard Technologies waren im Untersuchungszeitraum im Wesentlichen durch die über die TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 generierten Umsatzerlöse geprägt. Im Untersuchungszeitraum resultierte der weit überwiegende Anteil der Umsatzerlöse dieser drei Wirecard-Gesellschaften aus der Zusammenarbeit mit den genannten TPA-Partnern. Ausweislich der jeweiligen für die relevanten Gesellschaften erstellten „Reporting Packages", den Buchungsjournalen und den erteilten Auskünften umfassten die über diese Wirecard-Gesellschaften erzielten EBIT im Untersuchungszeitraum den überwiegenden Anteil am Konzern-EBIT. Nach den uns erteilten Auskünften werden Aussagen zum EBIT auf der Ebene einzelner Konzerngesellschaften durch die Verrechnung von Kostenumlagen beeinflusst. Wir weisen darauf hin, dass der Anteil der für das TPA-Geschäft relevanten Wirecard-Gesellschaften am Konzern-EBIT daher von der Schlüsselung und Allokation von Kostenumlagen im Konzern abhängig ist.

Ausweislich der zwischen den Beteiligten im Untersuchungszeitraum geschlossenen Verträge verpflichten sich die Wirecard-Gesellschaften dazu, den jeweiligen TPA-Partner von Vermögensverlusten aus der Geschäftsbeziehung schadlos zu halten. Diese Haftungsübernahme sollte insbesondere etwaige Schäden der TPA-Partner aus der Rückabwicklung von Zahlungsvorgängen sowie gegebenenfalls von Kartennetzwerkorganisationen verhängte Strafzahlungen umfassen.

Ausweislich der vorgelegten Unterlagen und erteilten Auskünfte erfolgte die Besicherung dieser vereinbarten Haftungen in den Jahren 2016 bis 2018 über die Stellung treuhänderisch verwalteter Barsicherheiten durch die jeweiligen Wirecard-Gesellschaften Cardsystems Middle East bzw. Wirecard UK & Ireland. Im Untersuchungszeitraum wurden die für Rechnung von Cardsystems Middle East bzw. Wirecard UK & Ireland hierzu geführten Escrow Accounts durch den Treuhänder 1 verwaltet. Die Besicherung der von Wirecard Technologies zugunsten von TPA-Partner 3 übernommenen Haftungen erfolgte in den Geschäftsjahren 2016 und 2017 durch Einbehalte von Zahlungen durch TPA-Partner 3, die an Wirecard Technologies zu leisten waren. Seit dem Jahr 2018 erfolgte die Stellung der Sicherheiten für TPA-Partner 3 auch über Einlagen auf Escrow Accounts, die ebenfalls von dem Treuhänder 1 verwaltet wurden.

Die Entwicklung der Sicherheitsleistungen zugunsten der jeweiligen TPA-Partner auf den Escrow Accounts korrespondiert relativ stark mit der Entwicklung der im Untersuchungszeitraum über die TPA-Partner generierten Umsatzerlöse.

Wir weisen darauf hin, dass die vorstehenden Ausführungen auf Zahlenangaben basieren, die ausschließlich aus der Buchhaltung der Wirecard resultieren.

Die in der externen Rechnungslegung im Untersuchungszeitraum abgebildeten Bestände auf Treuhandkonten konnten im Rahmen der Untersuchung durch Saldenbestätigungen des Treuhänders 1 belegt werden. Bankbestätigungen und Kontoauszüge der die Treuhandkonten führenden Bank wurden uns nicht übermittelt, da der Treuhänder 1 auskunftsgemäß das Vertragsverhältnis mit den Wirecard-Gesellschaften beendet hat und auf Anfragen seitens Wirecard nicht mehr reagiert. Daher konnten die auskunftsgemäß erfolgten einzelnen Einzahlungen der TPA-Partner auf die Treuhandkonten durch KPMG nicht anhand von Kontoauszü-



gen nachvollzogen werden. Insoweit konnte auch nicht hinreichend belegt werden, dass die Einzahlungen im Untersuchungszeitraum tatsächlich durch die TPA-Partner erfolgt sind.

Neben diesen nicht hinreichend nachgewiesenen Einzahlungen auf Treuhandkonten im Umfang von rund EUR einer Mrd. sind im Untersuchungszeitraum ausweislich der Buchungsjournale Einzahlungen auf Bankkonten, die für die Wirecard Technologies und die Cardsystems Middle East bei der Wirecard Bank geführt werden, i. H. v. EUR 85 Mio durch die TPA-Partner 1 und TPA-Partner 3 erfolgt. Diese Einzahlungen wurden anhand der vorgelegten Kontoauszüge der Wirecard Bank nachgewiesen.

Insoweit sind nach den internen Buchungsjournalen Zahlungen seitens der TPA-Partner im Untersuchungszeitraum, die insbesondere die Ergebnisse der Abrechnungen und damit Erlöse von Wirecard-Gesellschaften betreffen, zu einem wesentlichen Anteil auf Treuhandkonten bei dem Treuhänder 1 erfolgt und nur zu einem kleineren Anteil auf Konten von Wirecard-Gesellschaften bei der Wirecard Bank erfolgt.

### 1.3.1.1.4  Informationen zu den TPA-Partnern und den Treuhändern

Bei den TPA-Partnern handelt es sich ausweislich eigener Angaben dieser Unternehmen auf deren Internet-Seiten um Anbieter von Zahlungsabwicklungslösungen. Treuhänder 1 und Treuhänder 2 verwalteten im gegebenen Kontext als Treuhänder auf Escrow Accounts hinterlegte Sicherheiten für die Wirecard-Gesellschaften Cardsystems Middle East, Wirecard UK & Ireland sowie Wirecard Technologies.

Im Folgenden fassen wir die im Rahmen unserer Untersuchung zu diesen Unternehmen erlangten Informationen zusammen.

**TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3**

Im Rahmen unserer Hintergrundrecherchen konnten wir die betreffenden TPA-Partner in den Unternehmensregistern der jeweiligen Länder identifizieren.

Die im Rahmen von Gesprächen im März 2020 mit Vertretern von zwei TPA-Partnern erteilten Auskünfte zur Ausgestaltung der TPA-Partnerschaft entsprachen sinngemäß den uns bereits anderweitig erteilten Auskünften.

Im Rahmen der Untersuchung wurde uns von Wirecard ein testierter Jahresabschluss des TPA-Partners 1 zum 31. Dezember 2018sowie testierte Jahresabschlüsse des TPA-Partners 3 zum 31. Dezember 2016, zum 31. Dezember 2017 und zum 31. Dezember 2018 vorgelegt. Wirecard hat uns bis zum Abschluss unserer Untersuchung keine Jahresabschlüsse des TPA-Partners 2 vorgelegt, obwohl ein entsprechendes Auskunftsrecht ausweislich der vertraglichen Vereinbarungen ab 2018 bestand. Im Rahmen unserer Hintergrundrecherchen konnten wir aus öffentlichen Quellen insbesondere eine Kopie eines Jahresabschlusses zum 31 Dezember 2017 des TPA-Partners 2 erlangen.



**Treuhänder 1**

Für Treuhänder 1 lagen Wirecard auskunftsgemäß für den Untersuchungszeitraum keine Jahresabschlüsse vor.

Nachweise über während des Untersuchungszeitraums erfolgte Beurteilungen der wirtschaftlichen Verhältnisse und zur Zuverlässigkeit von Treuhänder 1 als Treuhänder wurden uns nicht vorgelegt.

Nachweise über eine vor der Mandatierung von Treuhänder 1 vorgenommene Zuverlässigkeitsbeurteilung dieses Unternehmens, auch unter Berücksichtigung von Abhängigkeitsverhältnissen und entsprechenden Abwägungen, insbesondere zu etwaigen Interessenkonflikten, wurden uns nicht vorgelegt.

Im Laufe der Untersuchung wurde KPMG mitgeteilt, dass die Geschäftsbeziehungen zwischen den betreffenden Wirecard-Gesellschaften und Treuhänder 1 im Q4 2019 durch Treuhänder 1 beendet worden seien. Daraufhin sei auf Empfehlung von Treuhänder 1 im Dezember 2019 Treuhänder 2 für die Verwaltung der Treuhandkonten mandatiert worden.

**Treuhänder 2**

Auch in Bezug auf den neuen Treuhänder, einer Anwaltskanzlei, hatten wir um Vorlage der vor der Beauftragung vorgenommenen Zuverlässigkeitsbeurteilung dieser Kanzlei unter Berücksichtigung von Unabhängigkeitsüberlegungen und entsprechenden Abwägungen gebeten.

Nachweise über hierzu erfolgte Beurteilungen wurden uns nicht vorgelegt.

Ein von uns in diesem Zusammenhang angeforderter Beschluss des Vorstands der Wirecard AG, mit dem die Anwaltskanzlei als neuer Treuhänder benannt und die Geschäftsführer der betreffenden Wirecard-Gesellschaften angewiesen wurden, diesen Beschluss vertraglich umzusetzen, datiert vom 20. Februar 2020. Das Treuhandverhältnis wurde allerdings bereits im November 2019 übertragen. Aus dem Beschlussprotokoll ist nicht ersichtlich, dass Alternativen zu der Beauftragung von Treuhänder 2 erwogen und die Zuverlässigkeit von Treuhänder 2 im Vorfeld der Entscheidung geprüft worden sind.

1.3.1.1.5   Nachweise zu den Umsatzerlösen aus Abrechnungen der TPA-Partner, Zahlungen auf Escrow-Accounts und Datenanalysen

Als Nachweise für die Höhe und Existenz der Umsatzerlöse aus den TPA-Geschäftsbeziehungen zwischen der Cardsystems Middle East, der Wirecard UK & Ireland sowie der Wirecard Technologies und den jeweils relevanten TPA-Partnern im Untersuchungszeitraum wurden KPMG insbesondere Verträge mit den jeweiligen TPA-Partnern, Abrechnungen der jeweiligen TPA-Partner (TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3), Saldenbestätigungen dieser TPA-Partner über die aus den Abrechnungen resultierenden Forderungsbestände zum Ende der jeweiligen Geschäftsjahre im Untersuchungszeitraum und Saldenbestätigungen des Treuhänders 1 vorgelegt. Darüber hinaus wurden uns Bankkonto-



auszüge vorgelegt, die Zahlungseingänge auf Forderungen gegenüber TPA-Partnern von insgesamt EUR 85 Mio im Untersuchungszeitraum auf bei der Wirecard Bank geführten Konten von Konzerngesellschaften belegen. Bankkontoauszüge, die Zahlungseingänge in Höhe von rd. EUR einer Mrd. auf Treuhandkonten bei dem Treuhänder 1 belegen, wurden uns nicht übermittelt. Diesbezüglich liegen nur die o.a. Saldenbestätigungen des Treuhänders 1 vor.

Als Grundlage für die Abrechnungen mit den TPA-Partnern lagen Verträge mit den TPA-Partnern sowie entsprechende Pricing-Schedules mit den jeweiligen Partnern vor. Hinsichtlich der den Abrechnungen zugrunde liegenden Transaktionsvolumina lagen Screenshots über Transaktionsvolumina u. a. aus den Systemen der TPA-Partner und Protokolle zu vierteljährli-chen Gesprächen mit den TPA-Partnern vor, die die Abstimmung relevanter Abrechnungspa-rameter dokumentieren.

Diese Nachweise sind aus unserer Sicht aufgrund der - durch die in der Presse erhobenen Vorwürfe - bestehenden Zweifel an der Höhe und Existenz der Umsatzerlöse für Zwecke unserer forensisch geprägten Untersuchung nicht hinreichend.

Daher haben wir unter forensischen Aspekten weitere Untersuchungshandlungen zur Höhe und Existenz der Umsatzerlöse durchgeführt.

Im Untersuchungszeitraum wurden den Gesellschaften Cardsystems Middle East, Wirecard UK & Ireland Wirecard Technologies jeweils vierteljährlich von dem TPA-Partner 1, TPA-Partner 2 bzw. TPA-Partner 3 erstellte Abrechnungen über in den entsprechenden Zeiträumen abgewickelte Kreditkartentransaktionen und hierfür nachträglich fällige Provisionen in elektro-nischer Form (E-Mail) übermittelt.

Aus den von TPA-Partner 1 und TPA-Partner 2 erstellten Abrechnungen waren jeweils Anga-ben zur Anzahl und zum Volumen der abgewickelten Kreditkartentransaktionen und der hierfür fälligen Provisionen – jeweils heruntergebrochen auf „Account Name"-Bezeichnungen für Kunden der TPA-Partner – ersichtlich. In den von TPA-Partner 3 erstellten Abrechnungen waren die Angaben zu Transaktionsanzahlen und -volumina sowie zu fälligen Provisionen nicht auf der Ebene einzelner „Account Name"-Bezeichnungen, sondern lediglich summarisch dargestellt.

TPA-Partner 1 und TPA-Partner 2 stellten neben den Abrechnungen jeweils zusätzlich eine in Microsoft Excel verarbeitbare Datei zur Verfügung, die Angaben zu Transaktionsanzahlen und -volumina sowie zu fälligen Provisionen auf der Ebene einzelner „Account Name"-Bezeichnungen enthielt. Diese Microsoft Excel-Dateien bildeten für die Wirecard-Gesellschaften Cardsystems Middle East und Wirecard UK & Ireland die Grundlage für ent-sprechende Buchungen von Umsatzerlösen und Materialaufwendungen, wobei zuvor gege-benenfalls Umrechnungen von Fremdwährungsbeträgen erfolgten. Die von TPA-Partner 3 erstellten Abrechnungen dienten unmittelbar als Grundlage für die Buchungen von Umsatzer-lösen und Materialaufwendungen der Wirecard Technologies.

Wesentliche Parameter für die konkrete Höhe der Provisionsansprüche waren ausweislich der im Untersuchungszeitraum jeweils zwischen den Parteien geschlossenen Vereinbarungen die



im jeweiligen Zeitraum abgewickelten Transaktionsvolumina, die Anzahl abgewickelter Transaktionen und teilweise einheitlich bzw. teilweise auf der Ebene einzelner „Account Names" festgelegte, spezifische Provisionssätze.

Mit der Zielsetzung, die Höhe und Existenz der Umsatzerlöse zu untersuchen, haben wir zunächst das diesbezüglich implementierte interne Kontrollsystem der betreffenden Wirecard-Gesellschaften untersucht. Der Bereich Accounting der Wirecard AG stützte sich auskunftsgemäß auf von den Gesellschaften Cardsystems Middle East, Wirecard UK & Ireland und Wirecard Technologies durchgeführte Kontrollen der in Abrechnungen des TPA-Partners 1, TPA-Partners 2 und TPA-Partners 3 enthaltenen Zahlenangaben. Auskunftsgemäß beschränkten sich die von der Wirecard AG selbst durchgeführten Kontrollhandlungen auf Plausibilitätsbeurteilungen, aufgrund derer gegebenenfalls nachträgliche Sachverhaltsklärungen veranlasst worden seien. Diese nachträglichen Sachverhaltsaufklärungen seien durch Mitarbeiter der Cardsystems Middle East, der Wirecard UK & Ireland bzw. der Wirecard Technologies durchgeführt worden.

Zu den von den jeweiligen Wirecard-Gesellschaften durchgeführten Kontrollhandlungen wurde uns mitgeteilt, dass Abstimmungen der in den jeweiligen Abrechnungen der TPA-Partner ausgewiesenen Transaktionsvolumina und Transaktionsanzahlen mit den originären Transaktionsdaten aus den jeweiligen „Payment Platforms" der TPA-Partner erfolgt seien. Hierbei gegebenenfalls auftretende Abweichungen seien bis zu einer Höhe von 5 % toleriert worden. Etwaige Differenzen seien im Rahmen der Quartalsmeetings mit den TPA-Partnern besprochen und die Ergebnisse dieser Meetings mittels Screenshots in den Protokollen dokumentiert worden. Hierzu wurden uns Protokolle von vierteljährlichen Meetings mit den TPA-Partnern vorgelegt, die jeweils Screenshots zu im jeweiligen Quartal abgewickelten Transaktionsvolumina enthielten.

Darüber hinaus fanden regelmäßig Abgleiche von Zahlenangaben in Abrechnungen der TPA-Partner mit „Sales forecasts" der für die entsprechenden Kunden zuständigen Wirecard-Vertriebseinheiten statt, die ebenfalls in den o.a. Protokollen dokumentiert wurden.

Neben diesen Kontrollhandlungen seien nach den uns erteilten Auskünften jedenfalls von Mitarbeitern der jeweiligen Wirecard-Gesellschaften keine wesentlichen weiteren Kontrollhandlungen durchgeführt worden. Auf Basis der uns erteilten Auskünfte und der vorgelegten Abrechnungen, Buchungsgrundlagen und der Protokolle der Quartalsmeetings mit den TPA-Partnern stellen wir Folgendes fest:

–  Protokolle für die Quartalsmeetings in den Jahren 2016 und 2017, die Nachweise für eine wesentliche Kontrolle darstellen, wurden uns am 23. April 2020 von EY als Abschlussprüfer der Gesellschaft zur Verfügung gestellt. Wirecard hatte uns zuvor über die Anforderungsliste folgendes mitgeteilt: „Der Prozess hat sich über die Jahre weiterentwickelt und wurde dann ab 2018 formal in Minutes übernommen. In den Jahren davor wurden mit den Partnern am Screen die Zahlen überprüft, allerdings liegen hierzu keine formalen Protokolle vor."

–  Organisationsrichtlinien und Arbeitsanweisungen im Hinblick auf durchzuführende Kontrollhandlungen wurden KPMG nicht vorgelegt.



– Eine Überprüfung der Vertragskonformität der erhaltenen Abrechnungen, insbesondere in Bezug auf die Höhe der Provisionssätze je „Account Name", erfolgte im Untersuchungszeitraum, nach den uns erteilten Auskünften, nicht.

– Die Durchführung der Fremdwährungsumrechnungen sowie der Buchungen in den bestandsführenden Systemen erfolgten nicht in einer durch ein dokumentiertes 4-Augen-Prinzip gesicherten Form.

– Eine inhaltliche Analyse und Überprüfung der, der Abrechnung zugrunde liegenden Transaktionsdaten u. a. auf Einzeltransaktionsebene ist aus den vorgelegten Unterlagen nicht ersichtlich.

Vor diesem Hintergrund sind die eingerichteten internen Kontrollen aus Sicht von KPMG nicht vollumfänglich ausreichend, um die Höhe und Existenz der Umsatzerlöse im Untersuchungszeitraum vollumfänglich sicherzustellen. Dementsprechend konnten wir die Höhe und Existenz der Umsatzerlöse, insbesondere für Zwecke unserer unter forensischen Aspekten durchgeführten Sonderuntersuchung nicht hinreichend aus Kontrolldokumentationen ableiten.

Vor diesem Hintergrund haben wir die Abrechnungen der TPA-Partner und daraus abgeleitete Buchungsgrundlagen in den Jahren 2016 bis 2018 im Hinblick auf deren rechnerische Richtigkeit und Vertragskonformität der mit den TPA-Partnern geschlossenen Verträge untersucht.

Nachdem die vorgelegten Verträge mit den TPA-Partnern in weiten Teilen zunächst keine Anlagen zu den Konditionsvereinbarungen enthielten, wurden uns am 22. April 2020 einige weitere Konditionsvereinbarungen zwischen den einzelnen TPA-Partnern und den jeweiligen Wirecard-Gesellschaften vorgelegt, die jedoch teilweise nicht auf zwischen den Parteien bestehende Verträge Bezug nahmen und teilweise nicht unterzeichnet waren. Da uns die entsprechenden Unterlagen erst am 22. April 2020 zugingen, konnten wir keine Untersuchungshandlungen im Hinblick auf deren Authentizität durchführen.

Auf dieser Basis konnten im Ergebnis im Untersuchungszeitraum hinsichtlich der Höhe der vereinnahmten Umsatzerlöse die den Abrechnungen zugrunde liegenden (spezifischen) Provisionssätze nur teilweise mit den zugehörigen Verträgen und Konditionsvereinbarungen abgestimmt werden, da insbesondere

– die für die Jahre 2016 und 2017 jeweils vorgelegten Verträge keine Konditionsvereinbarungen enthielten,

– bei den stattdessen erstmals am 22 April 2020 vorgelegten Konditionsvereinbarungen eine eindeutige Zuordnung der enthaltenen Konditionen zu den entsprechenden Account-Bezeichnungen nicht in allen Fällen möglich war, und

– die Abrechnungen in den Jahren 2016 bis 2018 zum Teil keine Aufgliederung der Transaktionsvolumina bzw. -anzahlen und Provisionssätze enthielten.

Unter Berücksichtigung der zuvor dargestellten Einschränkungen ergaben unsere Untersuchungshandlungen im Hinblick auf die rechnerische Richtigkeit und die Vertragskonformität der Umsatzerlöse Abweichungen in Höhe von EUR 5 Mio und im Hinblick auf die Materialaufwendungen Abweichungen in Höhe von EUR 9 Mio. Diese Abweichungen in Höhe von netto EUR 14 Mio wurden insoweit von Wirecard nicht ergebniswirksam vereinnahmt.



Unsere Untersuchungshandlungen ergaben im Hinblick auf die **rechnerische Richtigkeit** und **Vertragskonformität** der Abrechnungen, dass die Überprüfung für ca. 75 % der Umsatzerlöse der TPA-Partner im Untersuchungszeitraum möglich war. Darüber hinaus konnten wir für weitere 12 % der Umsatzerlöse eine Plausibilisierung vornehmen. Unsere Untersuchungsergebnisse im Hinblick auf die Vertragskonformität gliedern sich dabei wie folgt auf:

– Für ca. 40 % der Umsatzerlöse der TPA-Partner im Untersuchungszeitraum war uns in Bezug auf die einzelnen Abrechnungen eine Überprüfung der Vertragskonformität nahezu vollständig möglich.

– Für weitere ca. 35 % war eine Überprüfung der Vertragskonformität aufgrund der nicht für alle Account-Name-Bezeichnungen eindeutig zuzuordnenden Konditionen nur teilweise möglich.

– Da die Abrechnungen zum Teil keine Angaben zu Transaktionsanzahlen und -volumina sowie zu fälligen Provisionen auf der Ebene einzelner Account Name-Bezeichnungen enthalten, konnten wir für weitere ca. 12 % lediglich eine Plausibilisierung der Umsatzerlöse und Materialaufwendungen vornehmen, indem wir den durchschnittlichen Provisionssatz auf das gesamte Transaktionsvolumen angewendet haben. Der durch uns hierbei gebildete Erwartungswert weicht von gebuchten Umsatzerlösen und Materialaufwendungen um ca. 6 % bzw. ca. 10 % ab.

– Für die verbleibenden 13 % der Umsatzerlöse konnte KPMG aufgrund der oben genannten Einschränkungen keine Überprüfung im Hinblick auf die Vertragskonformität im Untersuchungszeitraum durchführen.

Im Hinblick auf die identifizierten Abweichungen zwischen den vertraglichen Vereinbarungen und den tatsächlichen Abrechnungen wurde KPMG die Auskunft erteilt, dass die Verträge jeweils lediglich den Charakter von „Rahmenvereinbarungen" gehabt hätten, von denen „aus operativen Gründen" teilweise abgewichen worden sei. Schriftliche Dokumentationen zu Abweichungen oder Anpassungen existierten auskunftsgemäß nicht, vielmehr sei das kaufmännische Einvernehmen der betreffenden Vertragspartner in allen Fällen durch konkludentes Handeln hergestellt worden. Im Hinblick auf die Nachvollziehbarkeit der jeweils gültigen Konditionen durch Dritte entspricht diese Vorgehensweise nicht den Anforderungen an eine ordnungsgemäße Dokumentation insbesondere der jeweils relevanten vertraglichen Vereinbarungen.

Die im Rahmen der Untersuchung angeforderten Verträge und Konditionsvereinbarungen wurden KPMG teilweise nicht oder nur mit Verzögerungen von teilweise mehreren Monaten vorgelegt. Auf den KPMG im Rahmen der Untersuchung vorgelegten Vertragskopien fehlten teilweise Unterschriften der Vertragspartner. Die KPMG vorliegenden Vertragskopien enthalten Vereinbarungen, die zum Teil nicht eingehalten wurden bzw. vertraglich vereinbarte Rechte, die nicht nachweislich eingefordert wurden. So erfolgten zum Beispiel die Abrechnungen des TPA-Partners 1, TPA-Partners 2 und TPA-Partners 3 im Untersuchungszeitraum regelmäßig vierteljährlich, obwohl vertraglich eine monatliche Abrechnung vereinbart war.

Die Vollständigkeit der buchhaltungsrelevanten Unterlagen sowie deren korrekte Abbildung im externen Rechnungswesen sind ohne ein angemessenes Vertragsarchiv bzw. Vertragsmanagement nicht sichergestellt. In Anbetracht des Umfangs und der Komplexität des TPA-



Geschäfts sowie der insbesondere aus den vertraglichen Vereinbarungen herzuleitenden Bilanzierungsvorgaben und Kontrollmaßnahmen hält KPMG die Verfügbarkeit eines alle getroffenen Nebenabreden umfassenden, auch in formaler Hinsicht vollständigen und konsistenten Vertragswerks (zu jedem Zeitpunkt) für zwingend erforderlich.

Zur Verifikation der in den Abrechnungen des TPA-Partners 1, TPA-Partners 2 und TPA-Partners 3 ausgewiesenen Transaktionsvolumina und Transaktionsanzahlen hatte KPMG im Rahmen der Untersuchung geplant, auf Basis der originären (Kreditkarten)-Transaktionen aus den „Payment Platforms" forensische Datenanalysen durchzuführen und die tatsächliche Abwicklung von Transaktionen anhand von Zahlungen im Untersuchungszeitraum 2016 bis 2018 auf Basis von Settlement-Daten nachzuvollziehen.

Dies erwies sich als unmöglich, da uns ein Zugriff auf die entsprechenden Datenbestände für den Untersuchungszeitraum nicht ermöglicht wurde bzw. uns die entsprechenden Datenbestände nicht zur Verfügung gestellt wurden. Nach den uns erteilten Auskünften sei zumindest für die Geschäftsjahre 2016–2017 dafür die Mitwirkung der TPA-Partner erforderlich gewesen, die jedoch bislang nicht erfolgt sei.

Zur Verifikation der Existenz der Transaktionen und der den Transaktionen zugrunde liegenden Kundenbeziehungen hatten wir darüber hinaus Verträge der TPA-Partner mit deren Vertragspartnern, die den aus den jeweiligen Abrechnungen ersichtlichen „Account Name"-Bezeichnungen zugeordnet waren, angefordert. Entsprechende Verträge wurden KPMG nicht vorgelegt.

Weiterhin hatten wir geplant, die Höhe und Existenz von Umsatzerlösen über die tatsächlichen Zahlungseingänge auf Konten der Wirecard-Gesellschaften zu verifizieren. Aus den hierzu im Rahmen unserer Untersuchung analysierten Buchungsjournalen der betreffenden Wirecard-Gesellschaften war ersichtlich, dass aufgrund der Abrechnungen der TPA-Partner gebuchte Forderungen überwiegend durch Zahlungen zugunsten der Escrow Accounts erfüllt worden sein sollen. Die Analyse der Buchungsjournale ergab, dass die Buchungen zugunsten der Escrow Accounts nicht auf Basis einzelner von Wirecard nachvollzogener Geld- bzw. Kontobewegungen erfolgten. Vielmehr waren die jeweils vierteljährlich von Treuhänder 1 erstellten Saldenbestätigungen über die auf den Escrow Accounts geführten Guthaben-Bestände Grundlage für diese Buchungen. Die Saldenbestätigungen der Treuhänders 1 zeigten jeweils nur einen Saldo zugunsten der begünstigten Gesellschaft. Kontobewegungen waren nicht angegeben. Die Buchungen erfolgten jeweils in einer Summe auf den neuen, von Treuhänder 1 bestätigten Saldo. Abstimmungen einzelner Bewegungen auf dem Escrow Account mit einzelnen, aus Abrechnungen der TPA-Partner ersichtlichen Forderungen gegen die TPA-Partner waren damit nicht möglich.

Zwischen den gebuchten Beträgen und den von Treuhänder 1 gegenüber dem Konzernabschlussprüfer bestätigten Salden haben wir keine Abweichungen festgestellt.

Auskunftsgemäß erfolgte die treuhänderische Verwaltung der Bar-Sicherheiten durch Treuhänder 1 (ausschließlich) auf Konten der Bank 1. Im Verlauf der Untersuchung haben wir Kontoauszüge bzw. Bankbestätigungen der Bank 1 in Bezug auf die Escrow Accounts angefordert, die wir für die Untersuchung der Zahlungsflüsse und als Nachweis für die Existenz der



Gelder und damit der Umsatzerlöse im Untersuchungszeitraum als zwingend notwendig erachten. Kontoauszüge und Bankbestätigungen für den Untersuchungszeitraum 2016 bis 2018 wurden uns jedoch nicht vorgelegt. Auskunftsgemäß reagiere der Treuhänder 1 nicht mehr auf entsprechende Anfragen. Es war daher auch nicht möglich, die Salden der Escrow Accounts zu den auskunftsgemäß dahinter liegenden Kontoauszügen der Konten der Bank 1 abzustimmen.

Auskunftsgemäß seien die Geschäftsbeziehungen zwischen den betreffenden Wirecard-Gesellschaften und Treuhänder 1 im Q4 2019 durch Treuhänder 1 beendet worden. Auf Empfehlung von Treuhänder 1 sei bereits im Dezember 2019 eine asiatische Rechtsanwalts-gesellschaft, Treuhänder 2, für die Verwaltung der Treuhandkonten mandatiert worden. Treu-händer 2 führe die Geschäfte auf der Basis der ursprünglich mit Treuhänder 1 getroffenen Vereinbarungen, ausweislich einer zwischen den Treuhändern geschlossenen Übernahmever-einbarung weiter. Neue schriftliche vertragliche Vereinbarungen zwischen den jeweiligen Parteien hierzu lägen noch nicht vor.

Ferner wurde uns in diesem Zusammenhang mitgeteilt, dass die Kontoguthaben seit der Übernahme der Verwaltung dieser Treuhandkonten durch den Treuhänder 2 im Dezember 2019 nunmehr auf Konten von zwei anderen Banken (im Folgenden „Bank 2" und „Bank 3") übertragen worden seien.

Scans der an den Abschlussprüfer gerichteten Bankbestätigungen der Bank 2 und der Bank 3 mit Datum vom 16. März 2020 bzw. vom 17. März 2020, die KPMG vom Abschlussprüfer zur Verfügung gestellt wurden, weisen Gesellschaften von Wirecard als wirtschaftlich Berechtigte der Gelder aus. Entsprechende unmittelbare Bankbestätigungen gegenüber KPMG, die vor dem Hintergrund der forensischen Aspekte der Untersuchung durch die jeweils neutralen für entsprechende Anfragen zuständigen Stellen der jeweiligen Banken erfolgen sollen, konnten vor dem Hintergrund der Ausbreitung des Corona-Virus bisher nicht zeitgerecht bereitgestellt werden. Insoweit konnten wir die Verlässlichkeit der an den Abschlussprüfer gerichteten Bankbestätigungen bisher nicht abschließend beurteilen.

In chronologischer Hinsicht stellen wir unsere Untersuchungsergebnisse wie folgt dar:

Ausweislich in Form elektronischer Kopien vorgelegter Kontoauszüge der Bank 2 zu zwei jeweils auf Treuhänder 2 lautenden Konten vom 10. Februar 2020 wurden

– auf eines der beiden Konten am 1. Dezember 2019 EUR 1.000,00 und am 16. Dezember 2019 EUR (...) sowie

– auf das andere Konto am 1. Dezember 2019 EUR 1.000,00 sowie am 16. Dezember 2019 EUR (…).

übertragen.

Aus den uns am 19. Februar 2020 in Form elektronischer Kopien übermittelten Kontoauszü-gen der Bank 2 sind keine Hinweise auf Wirecard bzw. Wirecard-Gesellschaften ersichtlich.



Aus uns am 5. März 2020 ebenfalls in Form elektronischer Kopien vorgelegten Kontoauszügen der Bank 3 zu zwei jeweils auf Treuhänder 2 lautenden Konten ist ersichtlich, dass

– auf eines dieser Konten erstmals am 9. Dezember 2019 eine Einzahlung i. H. v. EUR 1.000,00 und am 16. Dezember 2019 eine Einzahlung i. H. v. EUR (…) erfolgten und das Konto im Zeitraum vom 9. Januar 2020 bis zum 9. Februar 2020 einen während dieses Zeitraums unveränderten Bestand von EUR (…) aufwies,

– auf das andere Konto erstmals am 9. Dezember 2019 eine Einzahlung i. H. v. EUR 1.000,00 und am 16. Dezember 2019 eine Einzahlung i. H. v. EUR (…) erfolgten und das Konto im Zeitraum vom 9. Januar 2020 bis zum 9. Februar 2020 einen während dieses Zeitraums unveränderten Bestand von EUR (…) aufwies.

Auch aus den uns am 5. März 2020 vorgelegten Kontoauszügen der Bank 3 sind keine Hinweise auf Wirecard bzw. Wirecard-Gesellschaften bzw. vom Kontoinhaber Treuhänder 2 abweichende wirtschaftliche Berechtigte ersichtlich.

Auf Basis dieser Kontoauszüge konnten wir keine Verbindungen zwischen den Bankkonten und den auskunftsgemäß von TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 durch Zahlung auf das Escrow Account beglichenen Forderungen und damit den erzielten Umsatzerlösen herstellen. Somit konnten wir auch auf Basis der Auszüge der Bankkonten weder für den Untersuchungszeitraum (2016 bis 2018) noch für 2019 gesicherte Aussagen zur Herkunft der Gelder auf den Konten treffen. Insoweit haben diese Untersuchungshandlungen nicht zu einem positiven Nachweis zu der Existenz der Umsatzerlöse durch Zahlungseingänge von dem jeweiligen TPA-Partner im Untersuchungszeitraum geführt.

Im Rahmen unseres Besuches der Banken vor Ort wurde uns am 4. März 2020 von einer Mitarbeiterin der Bankfiliale der Bank 2 mündlich mitgeteilt, dass die entsprechenden Kontoguthaben für Rechnung von Wirecard gehalten werden.

Nunmehr vorgelegte Scans der an den Abschlussprüfer gerichteten Bankbestätigungen der Bank 2 und der Bank 3 mit Datum vom 16. März 2020 bzw. vom 17. März 2020, die KPMG vom Abschlussprüfer zur Verfügung gestellt wurden, weisen Gesellschaften von Wirecard als wirtschaftlich Berechtigte der Gelder aus.

Ein von KPMG durchgeführter Vergleich der zum 31. Dezember 2019 bestätigten Kontostände bei beiden bei der Bank 3 geführten Konten führte jedoch zu dem Ergebnis, dass diese jeweils um EUR 1.000,00 niedriger bestätigt wurden, als dies aufgrund der uns vorgelegten, jeweils für den Zeitraum vom 9. Dezember 2019 bis zum 9. Januar 2020 übermittelten Kontoauszüge zu erwarten gewesen wäre. Hintergrund ist nach den uns erteilten Auskünften, dass von Treuhänder 2 im Rahmen der Kontoeröffnung ein Betrag von EUR 1.000,00 jeweils auf die Bankkonten initial eingezahlt wurde. Der Saldo des Kontoauszuges zum 31. Dezember 2019 umfasst diesen initial eingezahlten Betrag und die im Nachgang der Eröffnung auf die Bankkonten jeweils auf die Konten transferierten Beträge. Der in der Saldenbestätigung zum 31. Dezember 2019 bestätigte Betrag umfasst jedoch nur die transferierten Beträge und nicht den initial eingezahlten Betrag von EUR 1.000,00. Auskunftsgemäß berücksichtige die Bank in der Saldenbestätigung abweichend vom Kontoauszug jeweils die unterschiedlichen wirtschaftlichen Berechtigten für die Kontosalden und weist in der Bankbestätigung nicht den initial



eingezahlten Betrag (wirtschaftlich Berechtigter Treuhänder 2), sondern nur die auf die Konten transferierte Beträge (wirtschaftlich Berechtigter Wirecard-Gesellschaften) aus.

Entsprechende unmittelbare Bankbestätigungen gegenüber KPMG, die vor dem Hintergrund der forensischen Aspekte der Untersuchung durch die jeweils neutralen für entsprechende Anfragen zuständigen Stellen der jeweiligen Banken erfolgen sollen, konnten vor dem Hintergrund der Ausbreitung des Corona-Virus nicht zeitgerecht bereitgestellt werden. Insoweit konnten wir bisher die Verlässlichkeit der an den Abschlussprüfer gerichteten Bankbestätigungen nicht beurteilen.

### 1.3.1.1.6    Zwischenergebnisse der erweiterten Untersuchungshandlungen im Third-Party Acquiring-Geschäft für den Monat Dezember 2019 (Auftragserweiterung)

**Hintergrund**

Im Geschäftsjahr 2019 fand eine Umstellung der Transaktionsabwicklung auf eine nunmehr auch für das TPA-Geschäft eingerichtete Plattform von Wirecard (sog. Elastic Engine für das TPA-Geschäft) statt. Insoweit liegen nunmehr seit der Umstellung eigene Datenbestände über die Transaktionen vor. Dies ermöglicht die Bereitstellung von Transaktionsdaten ohne Mitwirkung Dritter. Daher hat KPMG am 15. April 2020 entsprechend dem dafür originär vereinbarten Terminplan über 200 Mio. Datensätze mit Transaktionsdaten für den Monat Dezember 2019 entgegengenommen, die derzeit analysiert werden. KPMG weist darauf hin, dass die diesbezüglichen auch im Rahmen einer Auftragserweiterung vorgesehenen Untersuchungshandlungen (siehe dazu im Einzelnen Abschnitt 1.2. dieses Berichtes) im Zusammenhang mit dem Third-Party Acquiring-Geschäft noch nicht abgeschlossen sind.

**Ergebnisse der Datenanalysen und erweiterten Untersuchungshandlungen**

Für Zwecke der Durchführung der erweiterten Untersuchungshandlungen für den Monat Dezember 2019 hat KPMG entsprechend dem vereinbarten Zeitplan für die Auftragserweiterung am 15. April 2020 die Transaktionsdaten für den Monat Dezember 2019 für die über TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 abgewickelten Transaktionen entgegengenommen, die derzeit in der Hochsicherheitsumgebung von KPMG analysiert und nach Abschluss der Analysen final gelöscht werden. Der KPMG übermittelte Datenbestand umfasste ausschließlich genehmigte Transaktionen von insgesamt 863 Merchants Accounts. Die enthaltenen Transaktionsdaten haben Transaktionen für die Währungen JPY, USD und EUR umfasst.

Hinsichtlich dieses Datenbestandes hat KPMG Datenanalysen auf KPMG Servern durchgeführt und die Summen der Transaktionsvolumina je TPA-Partner auf Basis der Transaktionsdaten für den Monat Dezember 2019 mit der jeweiligen Abrechnung von dem jeweiligen TPA-Partner (TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3) für den Monat Dezember verglichen. Im Rahmen dieses Abgleichs der Transaktionsdaten mit den Abrechnungen hat KPMG für zwei TPA-Partner zusätzlich auf Ebene der einzelnen Merchant Accounts einen Abgleich der Transaktionsvolumina in Originalwährung mit den entsprechenden Abrechnungen vorgenommen. Zusätzlich konnte KPMG für einen dieser beiden TPA-Partner auch die Anzahl der Trans-



aktionen auf Ebene der Merchant Accounts mit der Abrechnung abgleichen. Bei dem dritten TPA-Partner erfolgte ein Abgleich zwischen den bereitgestellten Transaktionsdaten und der Abrechnung für die Transaktionsvolumina nach Währungen und die Anzahl der Transaktion in Summe, da die Abrechnung keine Angaben zu den einzelnen Merchant Accounts enthielt.

Weitere Inhalte unserer Datenanalysen waren u. a. die Analyse Häufigkeitsverteilung von den Transaktionsbeträgen, die Identifizierung von besonders hohen Transaktionsbeträgen sowie die Ermittlung der minimalen, maximalen und durchschnittlichen Transaktionsbeträgen je Merchant Account. Weiterhin hat KPMG je Merchant Account untersucht, welche Felder vollständig, teilweise oder gar nicht befüllt sind. Darüber hinaus hat KPMG die Buchung der Abrechnungen für den Monat Dezember 2019 in der Buchhaltung der relevanten Wirecard-Gesellschaften untersucht.

Der Abgleich der erhaltenen Transaktionsdaten mit den Abrechnungen für den Monat „Dezember 2019" für die drei TPA-Partner (TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3) hat zu nicht wesentlichen Abweichungen geführt. Diese betrugen bei den Transaktionsvolumina und der Anzahl der Transaktionen zwischen 0 % und 0,017 %. Die Abrechnungen für den Monat Dezember 2019 konnte KPMG zu den Buchungssätzen in der Rechnungslegung abstimmen.

Damit hat KPMG nach dem aktuellen Zwischenstand der Datenanalysen in diesem Teilbereich bisher keine Anhaltspunkte, dass die in den Abrechnungen für den Monat Dezember 2019 ausgewiesenen Transaktionsvolumina in wesentlichen Belangen von den durch KPMG auf Basis des KPMG zur Verfügung gestellten Datenbestandes ermittelten Transaktionsvolumina abweichen. KPMG weist darauf hin, dass eine inhaltliche Untersuchung der Vertragskonformität und Richtigkeit dieser Abrechnungen bisher noch nicht durchgeführt wurde.

Die im Rahmen der o.a. weiteren Datenanalysen identifizierten Sachverhalte und gestellten Fragen konnten KPMG durch Wirecard nachvollziehbar erläutert und beantwortet werden.

Nach dem aktuellen Zwischenstand der Datenanalysen sind KPMG insoweit bisher keine Sachverhalte bekannt geworden, die Anlass zu wesentlichen Zweifeln an der Authentizität der bereitgestellten Daten geben. KPMG weist darauf hin, dass weder die KPMG - Datenanalysen (u. a. auch die Untersuchung des Datenextraktionsprozesses) noch die weiteren Untersuchungshandlungen durch KPMG für den Monat Dezember 2019 abgeschlossen sind und dass sich die dargestellten Ergebnisse mit dem weiteren Fortgang der Untersuchung ändern können.

Ferner weist KPMG darauf hin, dass KPMG aus den zusätzlichen Untersuchungshandlungen keine Rückschlüsse auf den Untersuchungszeitraum 2016-2018 sowie aufgrund des begrenzten Betrachtungszeitraums „Dezember 2019" keine Rückschlüsse auf die Grundgesamtheit der Umsatzerlöse des gesamten Jahres 2019 ziehen wird.

Im Rahmen des Weiteren Fortgangs der Untersuchung werden wir weitere Datenanalysen durchführen und die Ergebnisse der Abrechnungen für den Monat Dezember 2019 mit entsprechenden Zahlungseingängen auf den Treuhandkonten abstimmen. Weiterhin werden wir



für eine bewusste Auswahl und eine zufallsbasierte Stichprobe aus den zur Verfügung gestellten Transaktionsdaten Transaktionsbestätigungen von den jeweiligen Händlern einholen.

Hinsichtlich der finalen Ergebnisse der weiteren Untersuchungshandlungen im Zusammenhang mit der Auftragserweiterung für den Monat Dezember 2019 wird KPMG gesondert berichten.

### 1.3.1.2    Existenz bestimmter Kundenbeziehungen

#### 1.3.1.2.1    Vorwürfe

Ein am 15. Oktober 2019 erschienener FT-Artikel „Wirecard's suspect accounting practices revealed" enthält unter anderem verschiedene Behauptungen in Bezug auf (angeblich) fragwürdige Kundenbeziehungen im TPA-Geschäft mit einem TPA-Partner, die in einem weiteren FT-Artikel „Wirecard: the unanswered questions" vom 18. Oktober 2019 erneut aufgegriffen wurden:

> *„At the heart of the matter are the names of 34 companies. Internal financial reports appeared to attribute substantial profits to payments processed for these companies on behalf of Wirecard by a third-party: […]. (…)*
>
> *Wirecard's statement said 'the 34 company names mentioned by the Financial Times refer to labels of customer clusters created for reporting and reconciliation purposes, each containing hundreds of individual genuine merchants. The conclusions drawn by the Financial Times are therefore not correct.'*
>
> *Whistleblowers with experience of Wirecard operations in multiple countries said they were unaware of any practice of using aliases to mask client identities in financial reports."*

Bei der in dem FT-Artikel erwähnten Firma handelt es sich offensichtlich um einen TPA-Partner, zu der die zur Wirecard Gruppe gehörigen Gesellschaften Cardsystems Middle East FZ-LLC, Dubai, Vereinigte Arabische Emirate („Cardsystems Middle East") sowie die Wirecard UK & Ireland Ltd., Dublin, Irland („Wirecard UK & Ireland"), im Untersuchungszeitraum 2016-2018 Geschäftsbeziehungen unterhielten.

Der FT-Artikel vom 15. Oktober 2019 enthält einen Link, der den Download eines ZIP-Archivs ermöglicht, welches (angeblich) Wirecard-interne Dokumente enthält. Hierzu veröffentlichte die FT am 15. Oktober 2019 einen weiteren Artikel mit dem Titel „The Wirecard documents, explained", in dem insbesondere auf eine in dem ZIP-Archiv enthaltene Microsoft Excel-Datei „Übersicht Dritt-Acquirer 2017-06-30 Stand 20-07-2017 V1.xlsx" Bezug genommen wird. Das Tabellenblatt „Q1 2017 […] Card Systems" dieser Microsoft Excel-Datei soll gemäß der FT Angaben zu Transaktionen enthalten, die für die 34 aufgeführten „companies" über abgewickelt worden seien.



Im Hinblick auf die angebliche Fragwürdigkeit der von den Wirecard-Gesellschaften in Kooperation mit einem TPA-Partner unterhaltenen Kundenbeziehungen enthält der FT-Artikel vom 15. Oktober 2019 insbesondere folgende Aussagen:

> *"The FT found that eight of the 34 companies had shut down by the time their names appeared next to monthly financial data for transactions and sales in 2017. (…)*
> *"A further 15 of the 34 told the FT they had never heard of […]."*

Somit wurde in den zitierten FT-Artikeln letztlich die Authentizität von aus der Geschäftsbeziehung zu einem TPA-Partner erzielten Umsatzerlösen in Frage gestellt.

### 1.3.1.2.2 Ergebnisse der Untersuchungshandlungen

**Bei den in der Presse angegebenen Namen handelte es sich auskunftsgemäß um „Account Name"-Bezeichnungen bzw. Alias-Namen, unter denen seinerzeit die Umsätze von an einen TPA-Partner vermittelte Kunden erfasst worden seien. Da uns die hinter den 34 in der Presse zitierten angeblichen Kunden (Alias-Namen) stehenden tatsächlichen Kundennamen nicht vorgelegt werden konnten, konnte die Existenz dieser Kundenbeziehungen für den Untersuchungszeitraum 2016 bis 2018 durch KPMG nicht verifiziert werden.**

**Im Verlauf der Untersuchung wurden uns jedoch Listen der auskunftsgemäß in den Abrechnungen eines TPA-Partners im Jahr 2019 verwendeten (Kurz-)Bezeichnungen mit diesen zugeordneten tatsächlichen Unternehmen zur Verfügung gestellt. Unsere Recherchen zu den in den Listen für das Jahr 2019 enthaltenen 33 Unternehmen führten für 2019 zu dem Ergebnis, dass 32 der insgesamt 33 angegebenen Unternehmen in den Unternehmensregistern der entsprechenden Länder recherchiert werden konnten.**

Bei den von Wirecard an die TPA-Partner vermittelten Kunden handelte es sich zum Teil auskunftsgemäß um Unternehmen, die als sogenannte „Aggregator Merchants" bzw. „Payment Facilitators" agierten, wobei Letztere bestimmte Zahlungsverkehrsdienstleistungen für ihnen angeschlossene, „dahinterliegende" sogenannte „Sub-Merchants" erbrachten bzw. in deren Auftrag organisierten. Die originären Kreditkartentransaktionen fanden auskunftsgemäß auf der Ebene von (Händler-)Unternehmen (Sub-Merchants) statt, die keine Vertragsbeziehungen zu den TPA-Partnern unterhielten, sondern in Vertragsbeziehungen zu den „Aggregator Merchants" bzw. „Payment Facilitators" standen. Daher waren die originären (Händler-) Unternehmen (Sub-Merchants) weder mit Wirecard-Gesellschaften vertraglich verbunden noch (auskunftsgemäß mit Ausnahme einiger bedeutender Kunden) der gruppenweit agierenden Sales-Organisation der Wirecard bekannt.

Bei den in dem FT-Artikel vom 15. Oktober 2019 angegebenen Namen handelte es sich auskunftsgemäß um „Account Name"-Bezeichnungen, unter denen seinerzeit die Umsätze von an einen TPA-Partner vermittelten Kunden ausgewiesen worden seien. Diese Bezeichnungen seien auskunftsgemäß nicht in allen Fällen (im gesamten Untersuchungszeitraum) Kurzbezeichnungen von Unternehmen gewesen, deren Umsätze tatsächlich in den Abrech-



nungen ausgewiesen wurden. Vielmehr seien die Bezeichnungen auch in den Fällen beibehalten worden, in denen die einer bestimmten Bezeichnung ursprünglich zugeordneten und für die Wahl der Bezeichnung insoweit ursprünglich „prägenden" Kundenbeziehung zu einem späteren Zeitpunkt nicht mehr bestand. Vor diesem Hintergrund seien insbesondere im Q1 2017 über einen TPA-Partner abgewickelte Umsätze teilweise unter ursprünglichen „Account Name"-Bezeichnungen zusammengefasst worden, die tatsächlich mit anderen Unternehmen erzielt worden seien. Die Wirecard AG gab als Begründung für die Beibehaltung ursprünglich gewählter Bezeichnungen in denjenigen Fällen an, in denen die ursprüngliche „namensgebende" Kundenbeziehung später nicht mehr bestand, dass der mit der Änderung der Bezeichnungen verbundene Anpassungsaufwand vermieden werden sollte.

Unabhängig davon haben wir zu den im FT-Artikel vom 15. Oktober 2019, Titel „Wirecard suspect accounting practices revealed"[5] enthaltenen Bezeichnungen für die 34 (angeblichen) Kunden von einem TPA-Partner Hintergrundrecherchen durchgeführt.

Unsere Hintergrundrecherchen waren dabei auf die Identifikation derjenigen acht der 34 Unternehmen fokussiert, die gemäß dem FT-Artikel im Q1 2017 nicht mehr existent bzw. aktiv gewesen sein sollen. In sieben von acht Fällen könnten auf der Basis der in den Abrechnungen eines TPA-Partners enthaltenen Kurzbezeichnungen (Account Name) identifizierte Unternehmen im Jahr 2017 tatsächlich nicht mehr existiert bzw. keine relevanten Geschäftsaktivitäten mehr betrieben haben. In einem Fall ergaben unsere Hintergrundrecherchen, dass eine Übernahme durch eine andere Gesellschaft erst Ende 2017 erfolgte.

Da nach den uns erteilten Auskünften die unter den (Kurz-)Bezeichnungen („Account Names") zugeordneten Umsätze jedenfalls teilweise aus Transaktionen mit anderen Unternehmen resultierten, haben wir Übersichten der für die Jahre 2016 bis 2018 geltenden Zuordnungen der verwendeten Kurzbezeichnungen zu den tatsächlichen Kunden angefordert. Da uns diese Übersichten für die Jahre 2016 bis 2018 nicht vorgelegt wurden, konnten wir insoweit für den Untersuchungszeitraum die Existenz dieser Unternehmen durch Überprüfungen bzw. Hintergrundrecherchen nicht verifizieren.

Nachdem die angeforderten Übersichten für den Untersuchungszeitraum nicht vorgelegt wurden, wurden uns im Verlauf der Untersuchung jedoch Listen der ausweislich der von Wirecard verwendeten Tabellenbezeichnungen in den Abrechnungen eines TPA-Partners im Jahr 2019 verwendeten (Kurz-)Bezeichnungen mit diesen zugeordneten Unternehmensbezeichnungen zur Verfügung gestellt. Einige der in diesen Listen aufgeführten Unternehmen sind (gleichzeitig) verschiedenen (Kurz-)Bezeichnungen zugeordnet. Das heißt, die Zuordnungen sind nicht eindeutig. Aus der für die Cardsystems erstellten Liste sind 20 (Kurz)Bezeichnungen mit insgesamt 17 zugeordneten Unternehmen, aus der Liste für die Wirecard UK & Ireland erstellten Liste sind 20 (Kurz)Bezeichnungen mit insgesamt 16 zugeordneten Unternehmen ersichtlich.

---

[5]    Link: https://www.ft.com/content/19c6be2a-ee67-11e9-bfa4-b25f11f42901, zuletzt eingesehen am 20. März 2020



Für diese insgesamt 33 Unternehmen haben wir entsprechende Hintergrundrecherchen durchgeführt. Im Ergebnis unserer Hintergrundrecherchen zu den 33 Unternehmen in den von Wirecard zur Verfügung gestellten Listen ist festzuhalten, dass

– unter der in der für die Cardsystems erstellten Liste angegebenen Firmenadresse nicht das aufgeführte Unternehmen 1, sondern ein Unternehmen 2 registriert ist, welches kosmetische Produkte importiert; dabei weisen Unternehmen 1 und Unternehmen 2 weitgehende Namensübereinstimmung auf;

– die übrigen 32 der insgesamt 33 in den genannten Listen angegebenen Unternehmen in den Unternehmensregistern der entsprechenden Länder registriert waren,

– die Geschäftsprofile dieser Unternehmen sehr unterschiedlich sind und teilweise Zahlungsabwicklungsleistungen bzw. IT-Dienstleistungen im Zahlungsverkehr umfassen, wobei für eines der Unternehmen (Unternehmen 3) keine näheren Informationen zu dessen Gegenstand erlangt werden konnten.

Nach den uns erteilten Auskünften würden entsprechende Kontrollen zur Existenz der Kunden von den TPA-Partnern im Rahmen der Compliance-Prüfungen (KYC) im Zuge des Onboardings der jeweiligen Kunden vorgenommen. Wirecard-Gesellschaften würden diese auskunftsgemäß von den TPA-Partnern durchgeführten unter anderem auf die Existenz der Kunden ausgerichteten KYC-Compliance-Prüfungen im Rahmen des Onboardings der Kunden jedoch nach den uns erteilten Auskünften weder nachvollziehen, überwachen noch entsprechende Nachweise hierzu anfordern, da hierfür der jeweilige TPA-Partner verantwortlich ist.

### 1.3.1.3    Darstellungen zum Third Party Acquiring-Geschäft in Geschäftsberichten und Investoren-Präsentationen der Wirecard AG

#### 1.3.1.3.1  Vorwürfe

In der Presse wurde auch der Vorwurf angeblich nicht sachgerechter Darstellungen zum TPA-Geschäft in Geschäftsberichten und Investoren-Präsentationen der Wirecard AG erhoben.

In einem am 24. April 2019 veröffentlichten FT-Artikel mit dem Titel „Wirecard relied on three opaque partners" findet sich hierzu Folgendes:

> „(…) the revelations suggest Wirecard's executive leadership in Munich (…) have for years failed to disclose fundamental information about the nature and structure of the business."

Aus dem Kontext ergibt sich, dass sich dieser Vorwurf insbesondere auf das mit den Geschäftspartnern TPA-Partner 1, TPA-Partner 2 und TPA-Partner 3 betriebene TPA-Geschäft bezieht.



1.3.1.3.2    Ergebnisse der Untersuchungshandlungen

**Aus der im Lagebericht vorgenommenen Darstellung des Debitorenrisikos und des Bestandskundenrisikos ergeben sich Zweifel daran, dass die Reichweite dieser Risiken in Bezug auf das TPA-Geschäft für den Abschlussadressaten ausreichend erkennbar ist.**

In Bezug auf das Debitorenrisiko könnte sich aus der vorgenommenen Darstellung im Lagebericht der Eindruck ergeben, dass das Risiko aus Rückbelastungen (Chargebacks) ausschließlich im Zusammenhang mit den Forderungen aus dem Acquiring-Bereich steht. Tatsächlich betrifft das Rückbelastungsrisiko nach den gewonnenen Erkenntnissen aber bei dem TPA-Geschäft von Wirecard einen erheblichen Teil der als Zahlungsmittel- und Zahlungsmitteläquivalente ausgewiesenen Escrow Accounts, da diese als Sicherheit für die von den TPA-Partnern und mittelbar damit auch von den Acquiring-Banken übernommen Adressenausfallrisiken in Charge-Back-Fällen dienen. Somit ergeben sich Zweifel daran, dass der Adressat der externen Berichterstattung die Höhe des Rückbelastungsrisikos richtig einschätzen kann, da nicht ohne weiteres erkennbar ist, dass und in welchem Umfang die Escrow-Beträge zur Abdeckung des Rückbelastungsrisikos als Barsicherheit hinterlegt wurden.

In Bezug auf das Bestandskundenrisiko ergeben sich aus unserer Sicht Zweifel daran, ob die Berichterstattung über die Risiken aus dem Wegfall von Bestandskunden ausreichend ist. Insbesondere ist zu hinterfragen, ob die Risikoberichterstattung nicht auch die Risiken aus einem möglichen Wegfall der zwischengeschalteten TPA-Partner und gegebenenfalls diesbezügliche risikomindernde Maßnahmen umfassen sollte.

Fraglich ist, ob beim Wegfall eines TPA-Partners ohne Weiteres (z. B. ohne wesentliche zeitliche Verzögerungen), die Vertragsbeziehungen zu den Merchants fortgesetzt werden könnten. Es wäre also für Zwecke der Risikobeschreibung im Lagebericht zumindest zu erwägen, ob eine Beendigung der Geschäftsbeziehung mit einem der TPA-Partner nicht ebenfalls ein erhebliches finanzielles Risiko zur Folge haben könnte. Insofern wäre unseres Erachtens zu hinterfragen, ob zum einen in der Risikoberichterstattung im Lagebericht dieser spezifische Risikoaspekt in angemessener Weise im Risikomanagementsystem Beachtung findet und zum anderen mögliche risikokompensierende Effekte zu berücksichtigen sind, über die das TPA-Konzentrationsrisiko abgemildert werden könnte.

### 1.3.1.4    Bilanzierung des Third Party Acquiring-Geschäfts

1.3.1.4.1    Vorwürfe

In einem FT-Artikel „Wirecard's problem partners" vom 29. März 2019 wird unter anderem die Bilanzierungspraxis des von Unternehmen der Wirecard Gruppe betriebenen Third-Party-Accounting-Geschäfts in Frage gestellt. Der Artikel enthält hierzu unter anderem die nachstehende Formulierung, die im Gesamtkontext des Artikels letztlich in Frage gestellt wird:

> "For the purpose of its accounts, Wirecard argues it is sufficiently involved in some transactions to treat the revenues and costs of several third parties as its own."



In diesem Kontext wird in dem Artikel unter anderem Folgendes ausgeführt:

> "Much of these profits from the three partners were booked through Wirecard's largest business, Cardsystems Middle East, in Dubai in 2016 and 2017, according to whistleblowers who said accounts for the unit were not audited in those years."

Ferner wurde in einem unter dem Titel „Wirecard's singular approach to counting cash" veröffentlichten FT-Artikel vom 9. Dezember 2019 der folgende Vorwurf erhoben:

> "Wirecard boosted its cash reserves in 2017 by including money held in 'trust accounts' used in its payments processing operations, raising fresh questions about the opacity and integrity of financial statements published by the German fintech.(…) Internal Wirecard documents (…) suggest […] was also important to the group's balance sheet, which held €1.45bn of cash and equivalents at the end of March 2017. Correspondence indicates […] was associated with €334m held in 'trustee accounts' as of that date. It is not clear if that particular sum was included in Wirecard's calculation of cash reserves; nevertheless other internal documents show an attempt to justify the general principle that money held in 'trust accounts' used in its payments processing operations, raising fresh questions about the opacity and integrity of financial statements published by the German fintech.(…)
>
> Asked by the FT to identify the nominated trustees for […] accounts, Wirecard said: 'All funds are held with reputable financial institutions. (…) Trust accounts are only used to segregate our own cash from the operating cash of partner acquirers. Such trust accounts are held in the name of Wirecard and the funds can be accessed at any time.'

Insoweit wurde in den Presseveröffentlichungen die Bilanzierungspraxis der Wirecard bzw. deren Tochtergesellschaften in Bezug auf

– die Bilanzierung der über die TPA-Partner generierten Umsatzerlöse,

– die Bilanzierung der Escrow Accounts,

in Frage gestellt. Ferner wurde die Frage aufgebracht, warum die Abschlüsse der Cardsystems Middle East sowie die Wirecard UK & Ireland angeblich nicht durch den Konzernabschlussprüfer geprüft worden seien.

### 1.3.1.4.2  Bilanzierung der Umsatzerlöse aus Third Party Acquiring-Geschäften mit TPA-Partnern

**Auf Basis der erhaltenen Nachweise und Auskünfte und unserer auf dieser Basis durchgeführten Untersuchungshandlungen konnten wir die Angemessenheit der von Wirecard gewählten „Brutto-Bilanzierung" der mit den TPA-Partnern erzielten Umsatzerlöse mangels ausreichender Nachweise u. a. zu den jeweiligen Vertragsbeziehungen nicht vollständig nachvollziehen.**



Wirecard bilanzierte die Umsatzerlöse aus den TPA-Geschäften brutto, da sich Wirecard im Sinne der IFRS als Prinzipal für die in der Transaktionskette identifizierten Leistungsverpflichtungen einstuft. Dies sei der Fall, da Wirecard die Verfügungsgewalt über die Transaktionen und somit die Erfüllung der Leistungsverpflichtung gegenüber dem jeweiligen Händler gehabt habe. Somit wurde trotz fehlender direkter vertraglicher Beziehung zwischen Wirecard und dem jeweiligen Merchant eben dieser in bilanzieller Hinsicht nach den IFRS trotzdem als Kunde angesehen. Der TPA-Partner wurde lediglich als für die Leistungserbringung an den Händler benötigter Dienstleister und somit als Agent eingestuft. Entsprechend wurden sämtliche vom Merchant getragenen Transaktionsgebühren als Umsatzerlöse erfasst. TPA-Partnern zustehenden Anteile an den obigen Transaktionsgebühren wurden als Materialaufwand erfasst.

Um dies auf Basis von vertraglichen Rechten beurteilen zu können, wären unseres Erachtens insbesondere die

– zwischen dem jeweiligen TPA-Partner und den mit diesem TPA-Partner verbundenen Acquiring-Banken geschlossenen Verträge,

– die Vorgaben der betreffenden Wirecard-Gesellschaften an die jeweiligen TPA-Partner in Bezug auf die Akzeptanz einzelner Kundenbeziehungen bzw. Transaktionen (sogenannte Payment Strategy),

– sowie die Verträge zwischen den jeweiligen Händlern und den TPA-Partnern

erforderlich.

Entsprechende Unterlagen bzw. Verträge wurden uns bis zum Abschluss unserer Untersuchung nicht zur Verfügung gestellt.

Über vertragliche Durchgriffsrechte hinaus könnte sich eine „Beherrschung der Kundenbeziehung" im Sinne der IFRS auch aus tatsächlichen Geschäftsgepflogenheiten ableiten. In diesem Zusammenhang wurden von Wirecard die Bedeutung der Payment Strategy sowie die tatsächliche Kontrolle über den Betrieb der Payment Platform angeführt.

Entsprechende Unterlagen oder Zugriffsmöglichkeiten auf die Payment Plattformen im Untersuchungszeitraum, aus denen sich eine „Beherrschung der Kundenbeziehung" im Sinne der IFRS aus den tatsächlichen Gepflogenheiten ableiten ließen, wurden uns bis zum Abschluss unserer Untersuchung nicht zur Verfügung gestellt.

KPMG war daher nicht in der Lage, die eigene Einstufung der Wirecard als Prinzipal und damit die vorgenommene „Bruttobilanzierung" der Umsatzerlöse vollständig nachzuvollziehen.

### 1.3.1.4.3  Bilanzierung der Escrow Accounts

**Zusammenfassend kommt KPMG auf der Basis der KPMG zur Verfügung gestellten Dokumente und der KPMG erteilten ergänzenden Auskünfte zu dem Ergebnis, dass Argumente gegen die von Wirecard vorgenommene Bilanzierung der Escrow Accounts als Zahlungsmittel bzw. Zahlungsmitteläquivalente im Untersuchungszeitraum 2016-**



**2018 sprechen. Aus Sicht von KPMG liegen Argumente vor, nach denen es sich bei den Beständen auf den Escrow Accounts um sonstige finanzielle Vermögenswerte handeln könnte. Es bestehen jedoch in den betroffenen Regelungsbereichen der IFRS Auslegungs- und Ermessensspielräume, die Wirecard entsprechend einer gutachterlichen Stellungnahme nutzt.**

**Wirecard hat KPMG zum Ende der Untersuchung mit Datum vom 17. April 2020 einen Entwurf einer gutachtlichen Stellungnahme (unvollständiger Entwurf, für interne Diskussionszwecke) einer auf Rechnungslegung spezialisierten Beratungsgesellschaft zum Ausweis von als Sicherheit für Vertragspartner dienenden Zahlungsmitteln in den Konzernabschlüssen der Jahre 2016 bis 2018 vorgelegt. Gemäß dieser gutachtlichen Stellungnahme ist die Bilanzierung der Escrow Accounts als Zahlungsmittel bzw. Zahlungsmitteläquivalente in den Konzernabschlüssen der Jahre 2017 und 2018 nicht zu beanstanden.**

**Die in der gutachtlichen Stellungnahme getroffenen Annahmen zum Sachverhalt sowie die unter Bezugnahme auf die IFRS und die dazu bestehende Fachliteratur gezogenen Schlussfolgerungen im Hinblick auf die Bilanzierung der Escrow Accounts unterscheiden sich in zentralen Punkten, von den Annahmen, die unserer Argumentation zugrunde liegen, und den daraus gezogenen Schlussfolgerungen.**

Ein Ausweis als **Zahlungsmittel** ist aus Sicht von KPMG zu hinterfragen. Nach unserer Einschätzung sprechen Argumente gegen die Einhaltung der Voraussetzungen zur Klassifizierung der Gelder auf den Escrow Accounts als Zahlungsmittel, da Zweifel bestehen, ob die in den IFRS verankerten Voraussetzungen einer „jederzeitigen Verfügbarkeit ohne Strafe" erfüllt waren. Im Einzelnen bestehen insbesondere folgende Argumente, die für die jeweiligen Geschäftsjahre unterschiedliche Relevanz haben:

– Beim Abruf der Guthaben hätte Wirecard ökonomische Nachteile im Sinne einer Strafe (Penalty) erlitten.

– Wirecard hätte bei Abruf der Guthaben auf den Escrow Accounts unterhalb einer vereinbarten Mindesthöhe alternative Sicherheiten hinterlegen müssen. Es ergaben sich Anhaltspunkte dafür, dass Wirecard über diese Sicherheiten nicht in dem erforderlichen Umfang verfügte.

– Wirecard hätte (im Jahr 2016) zum Abruf der Guthaben der Zustimmung des TPA-Partners bedurft.

Gegen die Klassifizierung als **Zahlungsmitteläquivalente** bestehen Argumente darin, dass die auf den Treuhandkonten hinterlegten Mittel Sicherungszwecken dienten und entsprechend den KPMG schriftlich vorliegenden Aussagen nicht zur Begleichung von kurzfristigen Zahlungsverpflichtungen verwendet werden sollten. Die vorgesehene Verwendung der Mittel der Treuhandkonten zur Begleichung von kurzfristigen Zahlungsverpflichtungen ist jedoch eine nach den IFRS erforderliche Voraussetzung für den Ausweis als Zahlungsmitteläquivalent.

Hinsichtlich der zuvor dargestellten Aspekte bestehen Auslegungs- und Ermessensspielräume die Wirecard entsprechend einer gutachterlichen Stellungnahme nutzt.



1.3.1.4.4   Abschlussprüfungen der Cardsystems Middle East und Wirecard UK & Ireland

Hinsichtlich des Vorwurfs, dass die Abschlüsse der Cardsystems Middle East sowie die Wirecard UK & Ireland angeblich nicht durch den Konzernabschlussprüfer geprüft worden seien, ergaben die diesbezüglichen Untersuchungen von KPMG Folgendes:

Die Rechnungslegungsinformationen der Cardsystems Middle East sowie der Wirecard UK & Ireland wurden ausweislich der entsprechenden Konzernabschlussprüfungsberichte von EY Audit in den Jahren 2016 bis 2018 in die Prüfung des Konzernabschlusses unter Berücksichtigung einer Teilbereichswesentlichkeit einbezogen („full scope").

## 1.3.2   Ergebniszusammenfassung Digital Lending Business

### 1.3.2.1   Wirecard-Definitionen

Unter der Bezeichnung „Digital Lending Business[6]" fasst die Wirecard AG folgende Produkte zusammen:

| Produkt | Erläuterung |
|---|---|
| Fintech Loan | – Support Fintechs with liquidity for their own products<br>– Offered as service in addition to WD platform, banking license, etc. |
| Digital Credit | – Access to liquidity and working capital for merchants<br>– Customized credit based on historical and future expected transactions, as well as other scoring models |
| Merchant Cash Advance („MCA") | – Early settlement to the merchant to improve liquidity<br>– Scoring based on historic transactions and other scoring models |

Tabelle 2: Erläuterungen zum „Digital lending business" (Quelle: Investor Presentation Q3/9M results, 6. November 2019)

Das MCA-Produkt ist nach Darstellung von Wirecard dadurch charakterisiert, dass ein Acquirer den an einen Händler auszuzahlenden Betrag früher zur Verfügung stellt, als dies üblicherweise im Rahmen des Settlements der Kartentransaktion der Fall wäre („Early settlement"). Die Auszahlung des Betrags an den Händler erfolgt nach der Kreditkartenzahlung durch dessen Kunden und teilweise gegen den Einbehalt einer zusätzlichen, neben sonstigen Gebühren vom ursprünglichen Zahlungsbetrag abzuziehenden Gebühr.

---

[6]   Definition „Digital Lending Business" gemäß der „Investor Presentation Q3/9M results, 6. November 2019", veröffentlicht unter https://ir.wirecard.com/websites/wc/English/500/overview.html



### 1.3.2.2 Veröffentlichte Zahlenangaben zum Merchant Cash Advance-Geschäft, u. a. in Brasilien und der Türkei

#### 1.3.2.2.1 Vorwürfe

Im Zusammenhang mit veröffentlichten Zahlenangaben zum Merchant Cash Advance-Geschäft, u. a. in Brasilien und der Türkei wurden folgende Vorwürfe erhoben:

| Zitat | Quelle |
|---|---|
| „The issues regarding Wirecard's Merchant Cash Advance product are in two distinct areas:<br><br>1. The Management Board has been inconsistent in explaining the size of this lending, as well as where and how it is taking place. Conflicting information has been offered during company announcements and in meetings/calls with investment analysts.<br><br>2. [Webseite 1] has compelling evidence demonstrating that the two countries in which Management has claimed MCA lending is most significant – Brazil and Turkey – cannot possibly be offering any meaningful programme of this type.<br><br>In combination, these inconsistencies strongly suggest that the Management Board is attempting to hide the truth of its MCA-lending programme and disguise a significant hole in the balance sheet." | Webseite 1, 23. August 2019: Letter to the Supervisory Board[7] |
| „Inconsistent disclosures<br><br>The MCA programme was first disclosed to investors in November 2018 at which time the balance was announced as €200M of lending. Management described this programme as a reason for Cashflow being weaker than otherwise expected. Over the following quarters, the size of the programme grew, peaking at the end of Q1 with lending of €400M.<br><br>During the recent results announcement at the end of Q2, the Management Board claimed the total amount had shrunk to €370M. On multiple occasions, analysts have been told that most or at least 33 % (or €133M) was being lent in Brazil and Turkey, but this was backtracked in August 2019 when the firm claimed that 'Brazil and Turkey was a little bit under 1/3.'" | Webseite 1, 23. August 2019: Letter to the Supervisory Board[8] |

Tabelle 3: Vorwürfe in Bezug auf veröffentlichte Zahlenangaben zum Merchant Cash Advance-Geschäft

Demnach wurde zusammenfassend die Höhe und Zusammensetzung des Merchant Cash Advance Geschäfts im Rahmen der Veröffentlichungen der Gesellschaft in Frage gestellt.

---

[7]    Webseite 1, abgerufen am 5. November 2019

[8]    Webseite 1, abgerufen am 5. November 2019



1.3.2.2.2   Ergebnisse der Untersuchungshandlungen

**Nach einem KPMG vorgelegten internen Aktenvermerk sollten die veröffentlichten Angaben zum Volumen von Merchant Cash Advance der Erläuterung von Business Modellen dienen. Es handle sich nicht um ein definiertes Produkt, sondern um eine Mehrwertleistung, die teilweise integraler Bestandteil der Dienstleistungen von Wirecard sei. Daher sei dieses Volumen eine Management-Schätzung, die auf verschiedenen Annahmen und Kalkulationen beruht. Diese wurden grob gerundet und spiegeln daher eher eine strategische Richtungsweisung wider. Demzufolge sei zu keiner Zeit geplant gewesen, diese im Geschäftsbericht aufzuführen. Vor diesem Hintergrund konnten uns keine Übersichten zu Kunden zur Verfügung gestellt werden, die zu den jeweiligen Stichtagen Merchant Cash Advance erhalten haben sollen. Wirecard hat die Vorgehensweise im Rahmen der Schätzung der Merchant Cash Advance Volumina und die jeweils verwendeten Parameter in einem für Zwecke dieser Untersuchung erstellten Aktenvermerk dokumentiert. Die Schätzungsgrundlagen basieren teilweise auf Expertenschätzungen des Managements lokaler Wirecard-Gesellschaften (u. a. zur Dauer der Vorfinanzierungen).**

**Das Merchant Cash Advance-Volumen, insbesondere im Hinblick auf Brasilien und die Türkei sei nicht aus den jeweiligen Jahresabschlüssen der betreffen Wirecard-Gesellschaften ersichtlich, da die betreffenden Wirecard-Gesellschaften lediglich Zahlungen an ihre (Händler-)Kunden weiterleiteten, nachdem sie selbst die entsprechende Liquidität von den jeweiligen Acquiring-Banken erhalten hätten.**

Die Wirecard AG hat das Merchant Cash Advance-Geschäftsvolumen in der Unterlage „Investor Presentation Q3/9M results, 6 November 2019" (im Folgenden „Investorenpräsentation") zur Vorstellung der Q3-Ergebnisse 2019 in folgendem Umfang angegeben:

– Q4 2018: EUR 285 Mio

– Q1 2019: EUR 400 Mio

– Q2 2019: EUR 370 Mio

– Q3 2019: EUR 320 Mio

Nach den KPMG erteilten Auskünften wurden die MCA-Volumina einerseits

1)  durch Addition der dem TPA-Partner 1 und TPA-Partner 3 eingeräumten und gezogenen Kreditlinien und andererseits

2)  durch Schätzungen der MCA-Volumina übriger Wirecard-Gesellschaften auf der Grundlage von verschiedenen Schätzungsgrundlagen (u. a. Dauer der Vorfinanzierung) ermittelt.

**Zu 1) Kreditlinien an TPA-Partner 1 sowie TPA-Partner 3:**

Das auf diese TPA-Partner entfallende MCA-Volumen soll dabei jeweils dem bilanziellen Forderungsbestand der Wirecard AG gegenüber diesen TPA-Partnern entsprochen haben, das heißt den von diesen TPA-Partnern gezogenen Kreditlinien. Im Geschäftsjahr 2018 wurde



TPA-Partner 1 von der Wirecard AG eine unbesicherte Kreditlinie i. H. v. EUR 150 Mio sowie TPA-Partner 3 eine unbesicherte Kreditlinie i. H. v. EUR 100 Mio zur Verfügung gestellt. Aus den Kreditverträgen ergibt sich als Verwendungszeck jeweils „Merchant Cash Advance".

KPMG wurde keine Übersicht über die Kunden, denen diese Mittel in Form Merchant Cash-Advance gewährt wurden, vorgelegt.

In einer entsprechenden Dokumentation zusammengefasste und durch Wirecard bewertete Nachweise über eine Prüfung und Beurteilung der wirtschaftlichen Verhältnisse der TPA-Partner durch Wirecard bestanden im Untersuchungszeitraum nicht. Insbesondere wurden uns keine in einem strukturierten Prozess vorgenommenen Analysen der wirtschaftlichen Verhältnisse der Kreditnehmer (TPA-Partner) vorgelegt (z. B. inhaltliche Auswertungen von Jahresabschlüssen etc.).

**Zu 2) Wirecard Brazil S.A., Wirecard Ödeme ve Elektronik Para Hizmetleri A.Ş, Hermes I Tickets Pte Ltd, Wirecard Bank AG:**

Die MCA-Volumina wurden nach den KPMG erteilten Auskünften unter Verwendung von Schätzparametern zum Umfang von „Early settlements" u. a. auf Basis von Transaktionsdaten und der Dauer von Vorfinanzierungen geschätzt. Nach einem KPMG vorliegenden Aktenvermerk seien diese Schätzungen erfolgt, da es sich nicht um ein definiertes Produkt handele, sondern um eine Mehrwertleistung, die teilweise integraler Bestandteil der Dienstleistungen von Wirecard sei. Daher sei dieses Volumen eine Management-Schätzung, die auf verschiedenen Annahmen und Kalkulationen beruht. Diese seien grob gerundet worden und spiegeln daher eher eine strategische Richtungsweisung wider.



### 1.3.2.3   Rechtliche Zulässigkeit des Merchant Cash Advance-Geschäfts in der Türkei und Brasilien

#### 1.3.2.3.1   Vorwürfe

Im Zusammenhang mit der rechtlichen Zulässigkeit des Merchant Cash Advance-Geschäftes in der Türkei und Brasilien wurden die folgenden Vorwürfe erhoben:

| Zitat | Quelle |
|---|---|
| *„Deloitte audited accounts for Wirecard Turkey show just €2.3M in revenue for 2018, and no net lending to merchants is shown. In addition, an opinion from a respected and experienced Turkish lawyer states that MCA as described by Wirecard is illegal in Turkey."* | Webseite 1, 23. August 2019: Letter to the Supervisory Board[9] |
| *"The lack of lending in Brazil was also highlighted given Wirecard Brazil did not have the necessary acquiring license, so could not lend from its balance sheet".* | Webseite 1, 15. Januar 2020: Letter to the Supervisory Board[10] |

Tabelle 4: Vorwürfe in Bezug auf die rechtliche Zulässigkeit des Merchant Cash Advance-Geschäfts in der Türkei und Brasilien

Demnach wurde die rechtliche Zulässigkeit der Geschäftsaktivitäten der Wirecard in der Türkei und Brasilien in Zusammenhang mit dem Merchant Cash Advance-Produkt in Frage gestellt.

#### 1.3.2.3.2   Ergebnisse der Untersuchungshandlungen

**Im Rahmen der Untersuchung der Zulässigkeit des MCA-Geschäfts in der Türkei hat KPMG die im Memorandum einer von Wirecard beauftragten Rechtsanwaltsgesellschaft zusammengefassten Ergebnisse nachvollzogen. KPMG kam im Hinblick auf die Angemessenheit der Ausgestaltung des Merchant Cash Advance-Geschäfts mit internationalen Kunden („International merchants") unter Einbeziehung der Wirecard Bank ebenfalls zu der Einschätzung, dass die Geschäfte mit internationalen Kunden in der Türkei rechtlich zulässig waren.**

**Vor dem Hintergrund der erteilten Auskünfte zur Ausgestaltung des „Merchant Cash Advance" Geschäfts der Wirecard-Gesellschaften in der Türkei und in Brasilien ergaben sich nach dem Ergebnis unserer Untersuchung keine Hinweise auf die rechtliche Unzulässigkeit der diesbezüglichen Geschäftsaktivitäten.**

---

[9]   Webseite 1, abgerufen am 5. November 2019

[10]   Webseite 1, abgerufen am 18. April 2020



Die Wirecard Ödeme ve Elektronik Para Hizmetleri A.S., Istanbul, Türkei („Wirecard Türkei"), war im Untersuchungszeitraum in der Türkei als Payment Service Provider tätig. Die Wirecard Türkei war zur Erbringung von Zahlungsdienstleistungen durch die Banking and Supervision Agency (BRSA) in der Türkei lizensiert, jedoch nicht zur Übernahme von Garantien oder zur Gewährung von Krediten.

Vor dem Hintergrund der Änderung der Gesetzeslage im Juni 2013 (Law on Payment and Security Settlement Systems, Payment Services and Electronic Money Institutions, No. 6493 vom 27. Juni 2013) beauftragte die Wirecard AG in 2015 eine Anwaltskanzlei mit der Erarbeitung von Handlungsalternativen zur möglichen Ausgestaltung das Merchant Cash Advance-Geschäfts im Einklang mit der nunmehr geltenden Gesetzeslage.

Ausweislich des Memorandums vom 6. Dezember 2019, das die Ergebnisse der Beratung durch die Anwaltskanzlei im Jahre 2015 zusammenfasst, waren vorzeitige Auszahlungen nur an Kunden mit Sitz außerhalb der Türkei („International merchants") vorgesehen. Für diese Kunden sollte die Wirecard Bank als Acquirer eingebunden werden und das MCA-Geschäft mit den „International merchants" ausschließlich in dieser Rollenkonstellation betrieben werden. Für die in der Türkei ansässigen Kunden („Domestic merchants") sollte durch die lokale Wirecard-Gesellschaft jeweils nur eine Weiterleitung von Acquiring-Banken bereits erhaltener Zahlungen erfolgen, was mit der vorliegenden Lizenz vereinbar sei.

Im Rahmen der Untersuchung hat KPMG die im Memorandum der von Wirecard beauftragten Rechtsanwaltsgesellschaft zusammengefassten Ergebnisse nachvollzogen. KPMG kam im Hinblick auf die Angemessenheit der Ausgestaltung des Merchant Cash Advance-Geschäfts mit internationalen Kunden („International merchants") unter Einbeziehung der Wirecard Bank zu keiner von der Beurteilung der von der Wirecard AG beauftragten Kanzlei abweichenden Einschätzung.

Für in der Türkei ansässige Kunden der Wirecard Türkei wurden im Untersuchungszeitraum nach den KPMG von Mitarbeitern der Wirecard Türkei erteilten Auskünften Zahlungen stets – auch im Falle eines „Early settlement" im Sinne des MCA-Produkts – erst dann an ihre (Händler-)Kunden weitergeleitet, nachdem die Wirecard Türkei selbst die entsprechende Liquidität von den entsprechenden Acquiring-Banken erhalten hatte.

In Brasilien wurde das MCA-Produkt von der als Payment Service Providers lizensierten Wirecard Brazil S.A., Sao Paolo auskunftsgemäß nur denjenigen Händlern angeboten, für welche die jeweiligen Acquiring-Partner entsprechende Zahlungen an die Wirecard Brazil weitergeleitet haben. Damit liegt nach den uns erteilten Auskünften nur eine Weiterleitung erhaltener Zahlungen und keine Kreditvergabe vor.

Vor dem Hintergrund dieser Ausgestaltung sind vorzeitige Settlements im Sinne des Merchant Cash Advance-Geschäfts der Wirecard nicht als Differenz zwischen den Forderungen und Verbindlichkeiten aus dem Acquiring-Geschäft in den Abschlüssen der jeweiligen Wirecard-Gesellschaften ersichtlich.



### 1.3.2.4    Geschäftshintergrund bestimmter Kreditvergaben

1.3.2.4.1  Vorwürfe

Im Zusammenhang mit bestimmten Kreditvergaben wurden folgende Vorwürfe erhoben:

| Zitat | Quelle |
|---|---|
| „[…] has multiple close ties to Wirecard, making the timing of their MCA business launch interesting: […] was formerly known as […]. Wirecard lent €25M to […], a related business, in May 2017. […] was also widely reported as being a material driver of Wirecard revenues, EBITDA and receivables. (…)<br><br>The FT has previously reported that […] (now […]) had significant unpaid receivables at Wirecard and that a substantial portion of their revenues and EBITDA come from […]. It seems reasonable to conclude that Wirecard was the 3rd party that lent the €115M to […]. If any of this money has made it back to Wirecard to pay-off the receivables that are owed by […]/[…] – that would be round-tripping.“ | Webseite 1, 9. September 2019: Is Wirecard round tripping with Singapore entities?[11] |
| „ (…) business purpose of the €115M loan made to […], formerly […], in Singapore in 4Q2018? (…)<br><br>[…] claims to have originated $100M of MCA lending in 2017. This seems unlikely, as […] had assets of only $25M in 4Q2017 and all revenues reported in their audited accounts came from 'Ship management services' with zero revenues from 'interest income'. For all of 2018, […] produced $6M in total revenue. We do not understand how it is then that […] could be a responsible partner/counterparty for over €100M of loans. (…)<br><br>(…) substantial loan to a related party with negligible revenues from financial services/payments and previously reported delinquent receivables? If any of the funds loaned to […] returned to Wirecard to pay down receivables, that is the definition of 'round-trip' transactions and could constitute accounting fraud.“ | Webseite 1, 9. September 2019: Letter to the Legal Advisor of the Supervisory Board[12] |

Tabelle 5: Vorwürfe in Bezug auf den Geschäftshintergrund bestimmter Kreditvergaben

Insbesondere wird somit der Geschäftshintergrund von möglicherweise an Unternehmen 4 vergebenen Darlehen in Frage gestellt.

---

[11]    Webseite 1, abgerufen am 5. November 2019

[12]    Webseite 1, abgerufen am 5. November 2019



1.3.2.4.2   Ergebnisse der Untersuchungshandlungen

**Die Wirecard Asia Holding Pte. Ltd., Singapur, hat Unternehmen 4 im Jahr 2018 mehrere unbesicherte Kredite in einem Gesamtvolumen von EUR 115 Mio mit einjähriger Laufzeit zu Zwecken des „Merchant Cash Advance-Geschäfts" gewährt.**

**Da KPMG im Rahmen der Untersuchung keine Informationen über die Kunden von Unternehmen 4 – insbesondere auch nicht zu den von Wirecard an Unternehmen 4 weitergeleiteten Kunden – erhalten hat, konnte KPMG nicht feststellen, welche Gesellschaften oder Personen in welchem Umfang an den Unternehmen 4 zu „Merchant Cash Advance-Zwecken" gewährten Darlehen wirtschaftlich partizipiert haben.**

Bei Unternehmen 4 handelt es sich nach den Ergebnissen der Hintergrundrecherchen von KPMG um ein Unternehmen, das bis zum 9. Oktober 2017 unter Unternehmen 5, firmierte. Unternehmen 5 war bis zum Erwerb sämtlicher Anteile durch Unternehmen 7, eine 100%ige Tochtergesellschaft von Unternehmen 6, zu dem auch der TPA-Partner 2 der Wirecard gehörte. Auskunftsgemäß wurden die Anteile des Unternehmens 7. im November 2018 an Unternehmen 8, weiterveräußert. Nach den KPMG erteilten Auskünften ist ein registriertes Tochterunternehmen eines europäischen Versicherungskonzerns, Alleineigentümer des Unternehmen 8 und profitiere daher von der Geschäftsentwicklung von Unternehmen 4. Die von KPMG hierzu durchgeführten Hintergrundrecherchen konnten die Eigentumsverhältnisse von Unternehmen 4 bestätigen, nicht aber die wirtschaftlich Berechtigten von Unternehmen 8 anhand öffentlich verfügbarer Registerinformationen verifizieren. Ausweislich der KPMG als Kopie vorgelegten Selbstauskunft des corporate secretary von Unternehmen 8 sei ein Tochterunternehmen eines europäischen Versicherungskonzerns zu über 99 % an Unternehmen 8 beteiligt. Darüber hinaus weist der Jahresabschluss von Unternehmen 4 zum 31. Dezember 2018 dieses Tochterunternehmen eines europäischen Versicherungskonzerns als alleinigen Anteilseigner von Unternehmen 8 aus.

Bei den Kunden von Unternehmen 4 handelt es sich auskunftsgemäß zu ca. 60 % um Wirecard-Kunden in Asien. Auskunftsgemäß hat Wirecard Kunden an Unternehmen 4 verwiesen und in deren Folge habe Unternehmen 4 Vorfinanzierungsgeschäfte mit diesen Wirecard-Kunden abgeschlossen. Schriftliche vertragliche Vereinbarungen zur Vermittlung bzw. Weiterleitung von Kunden zwischen Wirecard und Unternehmen 4 bestünden im Untersuchungszeitraum nicht. Gemäß einer KPMG am 4. Februar 2020 von der Wirecard AG zur Verfügung gestellten schriftlichen Bestätigung resultierten aus der Weiterleitung von Kunden an Unternehmen 4 in den Jahren 2016 bis 2018 keine Umsatzerlöse. Eine Übersicht der im Untersuchungszeitraum an Unternehmen 4 weitergeleiteten Kunden bzw. Merchants lag KPMG nicht vor.

Die Wirecard Bank gewährte Unternehmen 4 in den Jahren 2017 und 2018 zwei teilweise durch Finanzgarantien der Wirecard AG besicherte Darlehen. Aus den KPMG vorgelegten Unterlagen ist als Verwendungszweck für diese Kredite jeweils die Finanzierung der operativen Geschäftstätigkeit von Unternehmen 4 ersichtlich.



### 1.3.3    Ergebniszusammenfassung Singapur

#### 1.3.3.1    Vorwürfe

Die Compliance Abteilung der Wirecard AG hat im Frühjahr 2018 die Meldung eines Whistleblowers erhalten, wonach Anhaltspunkte auf betrügerische Handlungen bei Tochtergesellschaften der Wirecard AG in Singapur vorlägen. Dem Hinweis zufolge sollen Umsätze als zu hoch ausgewiesen worden sein. Damit im Zusammenhang stehen Vorwürfe der Zurückdatierung von Verträgen und Kreislaufbuchungen. Im Fokus der Anschuldigungen standen Tochtergesellschaften der Wirecard AG in Singapur. In Einzelfällen waren auch andere Länder betroffen.

Die durch den Whistleblower erhobenen Vorwürfe wurden von einer Rechtsanwaltskanzlei 1 sowie anschließend durch eine Rechtsanwaltskanzlei 2 unter Einschaltung eines Beratungsunternehmens aus Großbritannien im Rahmen von einem Compliance Audits bzw. einer Internal Investigation untersucht. Entsprechende Ergebnisse aus dem Compliance Audit bzw. der Internal Investigation wurden an die Wirecard AG berichtet.

Im Jahr 2019 wurden die Vorwürfe im Rahmen von verschiedenen Presseberichterstattungen aufgegriffen. Zusätzlich wurden dem Abschlussprüfer EY Audit am 6. Februar 2019 in München anonym verschiedene Dokumente (z. B. Auszüge von E-Mail Korrespondenz) zugesandt.

Es wurden in der Presse insbesondere folgende Zitate veröffentlicht:

| Zitat | Quelle |
|---|---|
| „A senior Wirecard executive was last year suspected of using forged and backdated contracts in a string of suspicious transactions that raise questions about the integrity of the accounting […]." | FT-Artikel vom 30. Januar 2019, Titel: „Executive at Wirecard suspected of using forged contracts" [13] |
| „The presentation also describes what appear to be so-called round-trip transactions – a fraudulent accounting technique. Money seems to have been routed from Wirecard businesses in Hong Kong and Singapore to those it owned in India – named Hermes and GI Technology– via external companies.<br><br>Those transactions, apparently suspected to be fake, may have appeared to local auditors as legitimate business conducted with suppliers and customers." | FT-Artikel vom 30. Januar 2019, Titel: „Executive at Wirecard suspected of using forged contracts"[13] |
| „Titled "Project Tiger Summary" and dated May 7 2018, the presentation outlined potential violations of Singapore law, including "falsification of accounts" and "money laundering"" | FT-Artikel vom 30. Januar 2019, Titel: „Executive at Wirecard suspected of using forged contracts"[13] |

---

[13]    Link: https://www.ft.com/content/03a5e318-2479-11e9-8ce6-5db4543da632, zuletzt eingesehen am 19. April 2020



| Zitat | Quelle |
|---|---|
| *„Financial reports submitted by the company that controls the Australian business of payments processor Wirecard may have been intentionally altered by staff in Singapore before being sent on to head office in Germany […]."* | The Australian-Artikel vom 1. Februar 2019, Titel: „Wirecard: worker blows the whistle"[14] |
| *„The preliminary lawyers' report identified potential civil and criminal violations in at least five jurisdictions: Singapore, Hong Kong, India, Malaysia, and Germany."* | FT-Artikel vom 1. Februar 2019, Titel: „Wirecard´s law firm found evidence of forgery and false accounts"[15] |
| *„The lawyers uncovered evidence that at least a dozen agreements for sums in the millions of euros appeared to have been falsified. While small relative to Wirecard's reported revenues, the agreements appear to have been used to enable businesses to hit profit targets and mislead regulators."* | FT-Artikel vom 1. Februar 2019, Titel: „Wirecard´s law firm found evidence of forgery and false accounts"[15] |
| *„Documents backdated to 2017 purport to show $3m of sales by Wirecard Hong Kong made when the entity was dormant. […] According to the Project Tiger presentation, the general manager of Hong Kong was told the revenue was an "ebitda adjustment"* | FT-Artikel vom 1. Februar 2019, Titel: „Wirecard´s law firm found evidence of forgery and false accounts"[15] |
| *„Suspect transactions, while individually small in the context of Wirecard revenues, appear to have been designed to stop Wirecard entities missing profit targets, by filling holes after the end of a financial year with fake and backdated sales agreements according to the preliminary report and certain emails reviewed by the FT."* | FT-Artikel vom 7. Februar 2019, Titel „Wirecard inside an accounting scandal"[16] |
| *„preliminary report on the investigation by one of Asia's most eminent legal firms, indicated it was part of a pattern of book-padding across Wirecard's Asian operations over several years"* | FT-Artikel vom 7. Februar 2019, Titel „Wirecard inside an accounting scandal"[16] |

Tabelle 6: Pressezitate zu Geschäftsaktivitäten in Singapur

EY Audit hat gemeinsam mit Spezialisten aus dem Bereich Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Forensic & Integrity Services (im Folgenden „EY FIS"), die in der Presseberichterstattung enthaltenen Vorwürfe in der Prüfung des Jahresabschlusses 2018 unter Anwendung des IDW Prüfungsstandards 210 „Zur Aufdeckung von Unregelmäßigkeiten im Rahmen der Abschlussprüfung" im Rahmen von „extended audit procedures" geprüft und die Ergebnisse zusammengestellt.

---

[14]  Link: https://www.pressreader.com/australia/the-australian/20190201/282557314438563, zuletzt eingesehen am 19. April 2020

[15]  Link: https://www.ft.com/content/79f23db0-260d-11e9-8ce6-5db4543da632, zuletzt eingesehen am 19. April 2020

[16]  Link: https://www.ft.com/content/ d51a012e-1d6f-11e9-b126-46fc3ad87c65, zuletzt eingesehen am 19. April 2020



EY Audit hat im Bestätigungsvermerk zum Jahresabschluss 2018 (Geschäftsbericht 2018 der Wirecard AG) das prüferische Vorgehen wie folgt dargestellt:

> *„Zur Prüfung des Ansatzes von Umsatz- und Einkaufstransaktionen, der Bewertung von Forderungen und Verbindlichkeiten sowie der Abbildung von Verträgen in der Finanz-buchhaltung und im konsolidierten Konzernabschluss haben wir uns mit den von den gesetzlichen Vertretern der Gesellschaften des Wirecard Konzerns eingerichteten Pro-zesse zur inhaltlichen Aufbereitung der Anschuldigungen auseinander gesetzt. Die dar-aus gewonnen Erkenntnisse haben wir mit den uns vorgelegten Ausarbeitungen unab-hängiger Dritter sowie der internen Compliance Abteilung abgeglichen. Auf dieser Grundlage haben wir ausgewählte Prüfungshandlungen zu ähnlichen Sachverhalten vorgenommen. Zudem haben wir Vorgänge sowie die getroffenen Einschätzungen zu Sachverhalten in Gesprächen mit Funktionsträgern der betroffenen Gesellschaften, Lie-feranten, Kunden und einbezogenen Rechtsanwälten, auch unter Einbindung eigener forensischen Experten, gewürdigt."*

Die von EY Audit untersuchten Vorwürfe im Rahmen der „extended audit procedures" wur-den von KPMG thematisch vier Clustern zugeordnet:

– Vorwurf der Manipulation von Buchhaltungsdaten im Rahmen der Berichterstattung aus Singapur nach Deutschland;

– Vorwurf der Manipulation von Finanzdaten;

– Vorwurf der Umleitungen von Zahlungen über mehrere Gesellschaften („Roundtripping");

– Vorwurf der unklaren Vertragsgestaltung und Zahlungen auf Grundlage von „Schein-verträgen".

### 1.3.3.2    Ergebnisse der Untersuchungshandlungen

1.3.3.2.1   Compliance Audit bzw. Internal Investigation der Rechtsanwaltskanzleien

**Das Compliance Audit der Rechtsanwaltskanzlei 1 weist Schwächen auf.**

**Die Schwächen des Compliance Audits der Rechtsanwaltskanzlei 1 konnten durch Untersuchungshandlungen der Rechtsanwaltskanzlei 2 und die Prüfungshandlungen von EY Audit im Rahmen der „extended audit procedures" nicht vollständig behoben werden.**

In Reaktion auf die Vorwürfe des Whistleblowers im Frühjahr 2018 hat die Wirecard AG ein Compliance Audit bei Rechtanwaltskanzlei 1 und zu einem zeitlich späteren Zeitpunkt eine Internal Investigation bei Rechtsanwaltskanzlei 2 in Auftrag gegeben. Hintergrund war, dass das Compliance Audit der Rechtsanwaltskanzlei 1 Schwächen aufweist. So wurde u. a. die Datengrundlage, insbesondere bestehend aus Buchhaltungsdaten und E-Mailverkehr, nicht vollständig gesichert. Die Unvollständigkeit der Datengrundlage konnte im Verlauf der Unter-suchungshandlungen der Rechtsanwaltskanzlei 2 nicht vollständig behoben werden. EY Audit hat einzelne Ergebnisse des Compliance Audit bzw. der Internal Investigation der Rechtsan-



waltskanzleien 1 und 2 durch eigene Prüfungshandlungen – auch unter Einsatz von EY FIS – ergänzt.

Dies führte dazu, dass die Untersuchungshandlungen der Rechtsanwaltskanzlei 2 und die Prüfungshandlungen von EY Audit im Rahmen der „extended audit procedures" nicht auf Grundlage einer vollständigen Daten- und Informationsbasis durchgeführt wurden. Es kann somit nicht ausgeschlossen werden, dass die durchgeführten Untersuchungshandlungen der Rechtanwaltskanzlei 1 und 2 sowie die Prüfungshandlungen von EY Audit im Rahmen von der „extended audit procedures" zu einem anderen Ergebnis gekommen wären, wenn eine vollständige Datenbasis vorgelegen hätte. EY Audit hat auf Grundlage der vorliegenden Datenbasis Prüfungshandlungen in Bezug auf die erhobenen Vorwürfe durchgeführt.

### 1.3.3.2.2   Nachvollzug Vorwürfe Singapur

**EY Audit ist den Vorwürfen aus der Presseberichterstattung in den „extended audit procedures" nachgegangen. Sofern sich die Vorwürfe bestätigt haben, wurden sie in der Rechnungslegung durch EY Audit berücksichtigt. Die „extended audit procedures" wurden von KPMG nachvollzogen.**

**Eine weitergehende Untersuchung der von EY Audit im Rahmen der „extended audit procedures" und der beteiligten Rechtsanwaltskanzleien 1 und 2 untersuchten Sachverhalte ist auf Basis der KPMG zur Verfügung gestellten Unterlagen nach unserer Einschätzung zum jetzigen Zeitpunkt nicht mehr erforderlich.**

**Bei den von KPMG untersuchten Sachverhalten ist eine Häufung von Software-Verträgen ohne wirtschaftliche Substanz erkennbar, die nicht oder nicht korrekt in der Buchhaltung der jeweiligen Gesellschaft erfasst wurden. Die von KPMG in Bezug auf diese Transaktionen erlangten Kenntnisse entsprechen den bereits von EY Audit und den Rechtsanwaltskanzleien gewonnenen Erkenntnissen. Die Vorwürfe sind in Singapur noch Gegenstand einer behördlichen Untersuchung.**

**Ein für die Geschäftsaktivitäten der Wirecard AG übliches Internes Kontrollsystem war in den Sachverhalten, die den Vorwürfen zugrunde lagen, nicht eingerichtet. So hat KPMG Schwächen in den Bereichen Forderungsmanagement und Mahnwesen, Vertragsmanagement und -kontrolle sowie in der Berichterstattung identifiziert. Diese wurden ebenfalls von EY Audit im Rahmen der Jahresabschlussprüfung 2018 angemerkt.**

Durch die von EY Audit untersuchten und von KPMG nachvollzogenen Sachverhalte ließen sich einzelne Vorwürfe im Rahmen der „extended audit procedures" bestätigen. Um ein vollständiges Bild über einzelne Vorwürfe zu erlangen, wäre eine Ausweitung der Prüfungshandlungen von EY Audit auf Drittparteien außerhalb des Wirecard-Konzerns notwendig gewesen. Die von EY Audit durchgeführten „extended audit procedures" zur Prüfung der Vorwürfe aus den einzelnen Sachverhalten waren unseres Erachtens sachgerecht.



Bei den von KPMG untersuchten Sachverhalten, die den Vorwürfen im Untersuchungsbereich Singapur zugrunde liegen, ist eine Häufung von Software-Verträgen ohne wirtschaftliche Substanz erkennbar. Wirecard hat gegenüber KPMG bestätigt, dass in diesen Fällen zu keiner Zeit ein Kauf oder Verkauf von Software stattgefunden habe.

Die KPMG vorliegenden Software-Verträge waren zu einem großen Teil nicht korrekt geschlossen, da diese bspw. nicht beidseitig unterschrieben waren oder Berechtigungen zur Unterzeichnung solcher Verträge fehlten. Auf Grundlage dieser Verträge wurden zu einem großen Teil auch keine Buchungen in der Buchhaltung vorgenommen. In Einzelfällen erfolgte eine nicht korrekte Buchung der jeweiligen Gesellschaft, die – sofern sie nicht im gleichen Finanzjahr ausgebucht worden sind – im Rahmen der Jahresabschlusserstellung von der Wirecard AG korrigiert wurden.

Im Geschäftsbericht 2018 der Wirecard AG werden die Korrekturen nach IAS 8 wie folgt erläutert:

> *„Im Zusammenhang mit den Untersuchungen in Asien wurden Fehler bei der Umsatzabgrenzung für das Geschäftsjahr 2017 festgestellt, die retrospektiv korrigiert wurden. Die Umsatzerlöse wurden insgesamt um 1,5 Mio. EUR reduziert.*
>
> *Grund hierfür war zum einen, dass Software-Geschäfte (Einkauf und Veräußerung von Software) zunächst in den falschen Geschäftseinheiten des Konzerns mit dem Vermittler als Vertragspartner erfasst wurden. Hierbei wurde in Höhe von rund 10,0 Mio. EUR ein immaterieller Vermögenswert (Einkauf von Software) und Umsatzerlöse in korrespondierender Höhe (Veräußerung von Software) eingebucht. Nach Korrektur wurde das gesamte Software-Geschäft in der richtigen Geschäftseinheit erfasst. Hierbei wurden Umsatzerlöse um 1,0 Mio. erhöht, Forderungen aus Lieferungen und Leistungen gegenüber dem Kunden in Höhe von 11,0 Mio. EUR sowie eine Verbindlichkeit aus Lieferungen und Leistungen gegenüber dem Software-Lieferanten in Höhe von 10,0 Mio. EUR eingebucht.“*

Der Hintergrund sowie die Motivation, warum Buchungen getätigt wurden, die die Umsatzerlöse erhöhten, obwohl nachweislich keine wirtschaftliche Substanz bestand, konnten durch die Rechtsanwaltskanzleien und in den „extended audit procedures" dokumentierten Prüfungshandlungen nicht aufgeklärt werden. Die Begründung für die Buchung dieser Transaktionen ließ sich auch durch KPMG nicht ermitteln.

Im Bestätigungsvermerk zum Jahresabschluss 2018 hat EY Audit zu den Vorwürfen in Singapur Folgendes ausgeführt:

> *„Aus unseren Prüfungshandlungen haben sich keine Einwendungen gegen die bilanzielle Behandlung von Sachverhalten auf Grundlage der Erkenntnisse aus Untersuchungen, die aufgrund von Beschuldigungen eines Hinweisgebers in Singapur durchgeführt wurden, ergeben.“*



Die Vorwürfe sind in Singapur noch Gegenstand einer behördlichen Untersuchung. Im Zuge dieser Ermittlungen waren Dokumente teilweise beschlagnahmt worden, sodass der Wirecard Singapore das Testat für den Jahresabschluss 2017 durch den lokalen Abschlussprüfer nicht erteilt wurde, da ein Prüfungshemmnis festgestellt wurde.

Das Fehlen eines für die betroffenen Geschäftsaktivitäten üblichen Internen Kontrollsystems hat nach unserer Einschätzung dazu beigetragen, dass in den Vorwürfen zugrunde liegenden Geschäftsprozessen Schwächen nicht identifiziert wurden. EY Audit hat im Rahmen der Jahresabschlussprüfung ebenfalls weitreichende Kontroll- und Prozessschwächen angemerkt.

Im Bereich Forderungsmanagement hat KPMG bei einzelnen Sachverhalten festgestellt, dass Forderungen über einen sehr langen Zeitraum nicht beglichen wurden. Daneben war für KPMG im Rahmen der Sonderuntersuchung nicht ersichtlich, dass ein ausreichendes Mahnwesen bei den beteiligten Wirecard-Konzerngesellschaften bestand. Da KPMG nur eine eingeschränkte Anzahl an Transaktionen nachvollzogen hat, kann KPMG keine Aussagen treffen, ob darüber hinaus weitere Beträge lange überfällig sind.

In einzelnen Sachverhalten hat KPMG festgestellt, dass Wirecard-Gesellschaften Verbindlichkeiten von anderen Wirecard-Gesellschaften beglichen haben und Intercompany-Verbindlichkeiten über lange Zeiträume nicht ausgeglichen wurden.

Insbesondere in Bezug auf die Infrastruktur der internen Finanzberichterstattung wurden in den Sachverhalten, die den Vorwürfen zugrunde lagen, eine Vielzahl an Prozessschwächen und Risiken identifiziert.

Die Wirecard AG hat in Reaktion auf die Untersuchungsergebnisse der Rechtsanwaltskanzleien 1 und 2 sowie den „extended audit procedures" von EY Audit ein internes Compliance-Projekt für „Wirecard in Singapore" aufgesetzt. Die inhaltliche Bewertung, wie z. B. der Scope, der Stand der Implementierung sowie die Maßnahmenwirksamkeit des Projektes, war nicht Bestandteil der Beauftragung von KPMG und wurde dementsprechend nicht durchgeführt.



### 1.3.4    Ergebniszusammenfassung Indien

#### 1.3.4.1    Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann"

##### 1.3.4.1.1   Vorwürfe

Hinsichtlich des Vorwurfs der Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann", bei dem Erwerb des „Payment-Geschäfts" des Unternehmens 9 wurden insbesondere folgende Zitate in der Presse veröffentlicht:

| Zitat | Quelle |
|---|---|
| „In 2015 Wirecard agreed to pay up to €340m for a collection of Indian payments businesses, […]. Yet a year before the acquisition the founders of that business failed to raise funding in a process which would have valued the key asset at just €46m." | FT-Artikel vom 25. Januar 2018, Titel: „Revisiting Wirecard´s big Indian deal"[17] |
| „Wirecard said it "is not in a position to disclose the ultimate beneficial owner of […]"." | FT-Artikel vom 19. Dezember 2019, Titel: „Middleman's profits draw India deal into Wirecard scandal"[18] |
| „[…] why did the German company agree to pay around €300m for an Indian business only weeks after it changed hands for €37m?" Wirecard said it "is not in a position to disclose the ultimate beneficial owner of […]." | FT-Artikel vom 19. Dezember 2019, Titel: „Middleman's profits draw India deal into Wirecard scandal"[18] |
| „The buyer was a Mauritius entity called […] - effectively a middleman - which bundled Hermes together with an unrelated Bangalore chain of currency exchange kiosks, then sold the package straight on to Wirecard for €326m." | FT-Artikel vom 19. Dezember 2019, Titel: „Middleman's profits draw India deal into Wirecard scandal"[18] |

Tabelle 7: Pressezitate zur Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann"

---

[17]   Link: https://ftalphaville.ft.com/2018/01/25/2197959/revisiting-wirecards-big-indian-deal/, zuletzt eingesehen am 20. April 2020

[18]   Link: https://www.ft.com/content/b3672388-200a-11ea-b8a1-584213ee7b2b, zuletzt eingesehen am 19. April 2020



Der Vorwurf lässt sich wie folgt grafisch darstellen:



*Abbildung 1: Grafische Darstellung Vorwurf „Zahlung eines überhöhten Kaufpreises an den Fund 1 als „Mittelsmann""*

### 1.3.4.1.2    Ergebnisse der Untersuchungshandlungen

**Der Abschlussprüfer konnte den wirtschaftlich Berechtigten des Fund 1 nicht identifizieren. Durch die Hintergrundrecherchen von KPMG konnte der wirtschaftlich Berechtigte des Fund 1 ebenfalls nicht ermittelt werden. Somit ist der Vorwurf, dass Fund 1 ein Mittelsmann ist, nicht abschließend zu klären. Da die Kenntnis des wirtschaftlich Berechtigten von wesentlicher Bedeutung für die Frage ist, wer von dem Kaufpreis profitiert hat, sind darüber hinausgehende Untersuchungshandlungen zum jetzigen Zeitpunkt, solange die Identität nicht geklärt ist, nicht sinnvoll.**

**Der Wirecard AG ist der wirtschaftlich Berechtigte des Fund 1 nach Auskünften gegenüber KPMG nicht bekannt. Die einzelnen Gesprächspartner der Wirecard AG haben gegenüber KPMG angegeben, dass sie keine Anteile an Fund 1 halten. KPMG hat in den vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen keine anderweitigen Anhaltspunkte erhalten.**

**Der Preis, den Fund 1 für Hermes vor der Transaktion bezahlt hat, war der Wirecard AG auskunftsgemäß und nach einem Schreiben der Rechtsanwaltskanzlei 2 erst nach Signing Date des Vertrages zwischen dem Fund 1 und der Wirecard Sales im Oktober 2015 bekannt geworden. KPMG hat in den vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen keine anderweitigen Anhaltspunkte erhalten.**



**Der Markteintritt in Indien ist nach Auskunft der Wirecard AG von großer strategischer Relevanz gewesen. Der Kaufpreis wurde laut der Wirecard AG von verschiedenen Faktoren beeinflusst, wie etwa Unternehmenstransaktionen von Dritten, Vermeidung von Minderheitsgesellschaftern. KPMG hat in den vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen keine anderweitigen Anhaltspunkte erhalten.**

**Die Käufergesellschaft hat alle Zahlungen im Zusammenhang mit der Übernahme des „Payment-Geschäfts" von dem Unternehmen 9 ausschließlich an den Fund 1 geleistet.**

Nach Auskünften eines damaligen Vorstandsmitglieds wollte die Wirecard AG durch eine gezielte Unternehmenstransaktion den Markteintritt in Indien erreichen. Ein organisches Wachstum sei zum damaligen Zeitpunkt keine Option gewesen. Die Wirecard AG hat sich dazu entschieden, einen strategischen Partner zu suchen, um damit vorhandene lokale Anschlüsse und Strukturen zu nutzen. Der Wirecard AG sei es darüber hinaus wichtig gewesen, dass ein gutes Händlernetzwerk und ein Zugang zum Bankensystem ermöglicht werden kann. Die Wirecard AG gab an, dass das Ziel gewesen sei, sich als „Global Player" aufzustellen.

Infolgedessen hat die Wirecard Sales International Holding GmbH, Aschheim (im Folgenden „Wirecard Sales"), das „Payment-Geschäft" der Great India Retail von dem Fund 1zu einem Kaufpreis i. H. v. EUR 216 Mio zuzüglich möglicher maximaler Earn-Out Zahlungen i. H. v. EUR 110 Mio erworben. Die letzte Earn-Out Zahlung für das Jahr 2017 ist noch nicht erfolgt. In dieser Transaktion wurde u. a. die Hermes I-Tickets Pte. Ltd., Chennai, Indien (im Folgenden „Hermes"), erworben.



Das erste Share Sale Agreement zum Kauf des „Payment-Geschäft" des Unternehmens 9 zwischen Wirecard Sales und Fund 1 wurde am 27. Oktober 2015 geschlossen. Die Ergebnisse der Legal, Financial and Tax Due Diligence wurden mit Datum vom 17. und 24. November 2015 an die Wirecard Sales bzw. die Wirecard AG berichtet. Das Closing Date war der 1. März 2016. Der zeitliche Ablauf des Erwerbs des „Payment-Geschäfts" des Unternehmens 9 lässt sich wie folgt grafisch darstellen:



*Abbildung 2: Zeitlicher Ablauf des Erwerbs des „Payment-Geschäfts" des Unternehmens 9*

EY Audit konnte den wirtschaftlich Berechtigten des Fund 1 im Rahmen der durchgeführten Prüfungshandlungen nicht identifizieren. KPMG war es ebenfalls nicht möglich, den wirtschaftlich Berechtigten des Fund 1 im Rahmen von Hintergrundrecherchen zu ermitteln.

In Bezug auf den Vorwurf, dass Wirecard nicht in der Lage sei, den letztendlichen wirtschaftlichen Eigentümer von dem Fund 1 offenzulegen, hat KPMG im Rahmen der Untersuchung zahlreiche Gespräche geführt. Keiner der Gesprächspartner konnte KPMG den wirtschaftlich Berechtigten des Fund 1 nennen. Daneben haben die Gesprächspartner der Wirecard AG gegenüber KPMG angegeben, dass sie keine Anteile an dem Fund 1 halten. KPMG hat in den vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen keine anderweitigen Anhaltspunkte erhalten.

Ein ehemaliges Vorstandsmitglied hat KPMG mitgeteilt, dass im Rahmen der Legal Due Diligence die Frage nach dem wirtschaftlichen Berechtigten des Fund 1 nicht gestellt wurde.



KPMG wurde die Legal Due Diligence zu Hermes, durchgeführt von einer indischen Rechtsanwaltskanzlei mit Datum vom 17. November 2015, zur Verfügung gestellt. Diese liegt demnach zeitlich nach dem Signing Date des Vertrages zwischen dem Fund 1 und der Wirecard Sales am 27. Oktober 2015 und vor dem Closing Date am 1. März 2016. Auf Seite 27 im „Main Report" der Legal Due Diligence ist aufgeführt, dass Hermes in einer „board resolutions for authorizing transfer of shares to Emerging Markets Investment Fund 1A" am 18. September 2015 u. a. folgenden Beschluss gefasst hat:

> „74,997 shares transferred from […] to […] @ Rs.35,067 per share totaling Rs. 262 crores (approx) pursuant to SPA dated September 7,2015".

Demzufolge hat der Fund 1 für 74.997 Aktien einen Gesamtpreis von INR 2.629.919.799 an Unternehmen 9 bezahlt. Dies entsprach zum Zeitpunkt des Beschlusses etwa EUR 35.066.600. Für den Kauf von 3.422 Aktien mit Beschluss vom 26. Mai 2015 sind in der Legal Due Diligence keine Preise hinterlegt.

Weiterführend geht aus der von Wirecard Sales beauftragten Legal Due Diligence der indischen Rechtsanwaltskanzlei hervor, dass der Fund 1 am 18. September 2015 99,99 % der Aktien von Hermes besaß. Die restlichen 0,01 % der Aktien (eine Aktie) verblieben im Besitz des Unternehmens 9.

In Bezug auf die dem Vorwurf zugrunde liegende Frage, weshalb die Wirecard AG zugestimmt habe, rund EUR 300 Mio für ein „Indian business" zu zahlen, welches kurz zuvor den Eigentümer für ca. EUR 37 Mio gewechselt hat, lässt sich hinsichtlich der Kenntnis des Kaufpreises i. H. v. ca. EUR 37 Mio Folgendes feststellen:

Im Rahmen der durchgeführten Gespräche wurde KPMG von allen Gesprächspartnern der Wirecard AG mitgeteilt, dass der Kaufpreis von dem Fund 1 an das Unternehmen 9 zum Zeitpunkt des Signing Dates nicht bekannt war. Der vorherige Kaufpreis hätte allerdings dem Leser der vollständigen Legal Due Diligence vom 17. November 2015 nach Signing Date und vor dem Closing Date bekannt werden können.

Die Rechtsanwaltskanzlei 2 hat untersucht, ob zum Zeitpunkt des Kaufs des „Payment-Geschäfts" des Unternehmens 9 durch die Wirecard AG der Kaufpreis i. H. v. ca. EUR 37 Mio bekannt gewesen ist. Die Rechtsanwaltskanzlei 2 hat dazu Unterlagen und E-Mails ausgewertet sowie Gespräche geführt. Hierbei ist die Rechtsanwaltskanzlei 2 zu folgendem Ergebnis gekommen:

> „We found nothing suspicious in relation to Wirecard's acquisition of the Hermes shares from […]."

> „Wirecard was not privy to […] negotiations with the former Hermes shareholders at all, and was never shown the relevant share purchase agreements."



Hinsichtlich der Erwähnung des Kaufpreises in der Legal Due Diligence vom 17. November 2015 führt Rechtsanwaltskanzlei 2 aus:

> *„[indische Rechtsanwaltskanzlei] finalised its due diligence on 17 November 2015 and that report did refer to the share price of […] to […] but it was not flagged – it was a minor detail in a 155 page report."*

Rechtsanwaltskanzlei 2 führt in einem Schreiben an die Wirecard AG weiter aus, dass nach indischem Recht ein „pricing of shares" nicht typischerweise von der Legal Due Diligence umfasst ist, da sich eine solche eher auf die Validität der Eigentumsübertragung fokussiert.

Mitarbeiter der Wirecard AG haben KPMG in Gesprächen mitgeteilt, dass der Kaufpreis für das „Payment-Geschäft" des Unternehmens 9 gerechtfertigt gewesen sei, da der Markteintritt in Indien von großer strategischer Relevanz gewesen sei. Die Wirecard AG hatte das Ziel, eine Gesellschaft zu 100 % zu übernehmen, um Minderheitsgesellschafter zu vermeiden. Dies habe nach Einschätzung des Vorstandes den Kaufpreis ebenfalls beeinflusst.

Der Vorstand der Wirecard AG hat KPMG mitgeteilt, dass selbst wenn der vorherige Preis bekannt gewesen wäre, dies keinen Einfluss auf das Kaufpreisangebot gehabt hätte. Die Kaufpreisfindung ist somit nach Angabe des Vorstands nicht von einer möglichen vorherigen Kenntnis abhängig gewesen.

In diesem Zusammenhang wurde KPMG erläutert, dass zur Realisierung des Markteintritts in Indien die Wirecard AG drei Unternehmen als „potenzielle Targets" betrachtet habe, bevor letztendlich die unternehmerische Entscheidung getroffen wurde, das „Payment-Geschäft" des Unternehmens 9 zu erwerben. Bei einem der anderen beiden Unternehmen, die in der engeren Auswahl standen, hat das Unternehmen 10 laut Presseberichterstattung zu einem späteren Zeitpunkt eine Investition i. H. v. ca. USD 680 Mio[19] getätigt. Dieser Kauf habe laut einem ehemaligen Vorstand der Wirecard AG auch die Preise für weitere Unternehmenstransaktionen erhöht.

KPMG hat in den vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen keine anderweitigen Anhaltspunkte erhalten.

Nach KPMG vorliegenden SWIFT-Belegen hat die Wirecard Sales alle vertraglich vereinbarten Zahlungen, bestehend aus Upfront Payment, Closing Payment und Earn-Outs, ausschließlich an den Fund 1 geleistet.

---

[19]    entspricht ca. EUR 611 Mio, Wechselkurs EUR 1 = USD 1,1122 vom 2. März 2020 (Quelle: EZB)



In der Presse wird zudem über eine Kapitalerhöhung i. H. v. EUR 14 Mio durch die Wirecard Acquiring & Issuing GmbH, Aschheim (im Folgenden „Wirecard Acquiring & Issuing"), bei der GI Technology Pte. Ltd., Chennai, Indien (im Folgenden „GI Technology"), berichtet. Diese Information wurde von der Wirecard AG schon im Geschäftsbericht 2015 bestätigt:

> *„Die GI Technology Pte. Ltd. wird erst zum 1. März 2016 zu 60 Prozent übernommen, da zu dem Zeitpunkt die letzten Schritte des Closings abgeschlossen waren, die Voraussetzung für die Übernahme der Anteile gewesen sind. In diesem Zuge wurde im Wege einer Kapitalerhöhung ein Betrag in Höhe von TEUR 14.000 geleistet."*

Zudem war der Wirecard AG aus der Financial and Tax Due Diligence bekannt, dass Unternehmen 11 in den Geschäftsjahren 2014 und 2015 ein negatives EBITDA ausgewiesen hat. Der Wirecard AG hätte dies bei der unternehmerischen Entscheidung des Erwerbs des „Payment-Geschäfts" des Unternehmens 9 bekannt sein können.

Der im FT-Artikel erhobene Vorwurf, dass aufgrund der dem Kauf vorausgehenden Transaktion über einen Kaufpreis i. H. v. ca. EUR 37 Mio ein überhöhter Kaufpreis für den Erwerb des „Payment-Geschäfts" des Unternehmens 9 durch Wirecard Sales an den Fund 1 als „Mittelsmann" gezahlt worden sei, kann auf Basis der vorliegenden Informationen nicht bestätigt werden. Um den Vorwurf abschließend zu klären, müsste die Identität des wirtschaftlich Berechtigten des Fund 1 geklärt und dessen Nähebeziehung zu den beteiligten Parteien bzw. zur Transaktion untersucht werden. Der wirtschaftlich Berechtigte des Fund 1 konnte jedoch nicht identifiziert werden.

### 1.3.4.2    „Roundtripping" von Zahlungen

#### 1.3.4.2.1   Vorwürfe

Hinsichtlich des Vorwurfs des „Roundtripping" von Zahlungen wurden insbesondere folgende Zitate in der Presse veröffentlicht:

| Zitat | Quelle |
|---|---|
| *„Wirecard is suspected of "round-tripping", where sales and profits are faked by sending money to a third party, who then uses it to buy goods and services from the sender in a pretence of real commerce."* | FT-Artikel vom 19. Dezember 2019, Titel: „Middleman's profits draw India deal into Wirecard scandal"[20] |

---

[20]   Link: https://www.ft.com/content/b3672388-200a-11ea-b8a1-584213ee7b2b, zuletzt eingesehen am 19. April 2020



| Zitat | Quelle |
|---|---|
| *„Investors should also be aware that some of the proceeds paid to […] appear to have flowed back to Hermes through multiple software deals – transactions that look like revenue roundtripping on the part of Wirecard and […]."* | Webseite 1, Artikel: „Part 1: The Indian Round-trip – Was Wirecard's Indian acquisition deliberately structured to generate round-trip profits through […]?"[21] |

Tabelle 8: Pressezitate zu „Roundtripping" von Zahlungen

Der Vorwurf lässt sich wie folgt grafisch darstellen:



*Abbildung 3: Grafische Darstellung Vorwurf „„Roundtripping" von Zahlungen"*

#### 1.3.4.2.2   Ergebnisse der Untersuchungshandlungen

**Aus den KPMG vorgelegten Unterlagen ließen sich Zahlungen zwischen den einzelnen in der Presse und im Internet aufgeführten Gesellschaften identifizieren.**

**Im Rahmen des Nachvollzuges der Vorwürfe durch KPMG kann festgestellt werden, dass zumindest seit dem Jahr 2015 eine Geschäftsbeziehung zwischen Hermes und Unternehmen 12 (später Unternehmen 13), besteht.**

**Der Vorstand der Wirecard AG hat KPMG bestätigt, dass Unternehmen 13 ein wesentlicher Geschäftspartner ist.**

---

[21]   Link: Webseite 1, zuletzt eingesehen am 19. April 2020



**KPMG hat den Verkauf von einzelnen Vermögensgegenständen von Hermes an Unternehmen 12 nachvollzogen. Die Verkäufe ließen sich vertraglich und hinsichtlich der Abwicklung vollständig nachvollziehen. Die Kaufpreisfindung zu diesen einzelnen Vermögensgegenständen konnte KPMG jedoch nicht nachvollziehen.**

**Nach den KPMG vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen ergaben sich keine Anhaltspunkte auf „Roundtripping".**

Im Rahmen der Presse- und Internetberichterstattung wurden Vorwürfe gegenüber Wirecard erhoben, welche in Zusammenhang mit „Roundtripping" von Zahlungen stehen. Es werden insbesondere Zahlungen zwischen Unternehmen 12 und Hermes, welche im Zuge des Erwerbs des „Payment-Geschäfts" des Unternehmens 9 durch Wirecard Sales von Fund 1geleistet wurden, in Frage gestellt.

Der Vorstand der Wirecard AG hat gegenüber KPMG erklärt, dass die Wirecard AG durch eine gezielte Unternehmenstransaktion den Markteintritt in Indien erreichen wollte. Ein organisches Wachstum sei zum damaligen Zeitpunkt keine Option gewesen. Die Wirecard AG habe sich dazu entschieden einen strategischen Partner zu suchen, um damit vorhandene lokale Anschlüsse und Strukturen zu nutzen. Der Wirecard AG sei es darüber hinaus wichtig gewesen, dass ein gutes Händlernetzwerk und ein Zugang zum Bankensystem ermöglicht werden kann.

In den Verhandlungen zum Erwerb des „Payment-Geschäfts" des Unternehmens 9 wurde zu Beginn der Verhandlungen laut Auskunft eines damaligen Vorstandsmitglieds der Wirecard AG aus geschäftspolitischen Erwägungen entschieden, dass das „travel business" nicht einbezogen werden sollte („carve-out"). Das „travel business" beinhaltete u. a. die Entwicklung und Bereitstellung von Reiselösungen und -dienstleistungen für Kunden und Reisevermittler, welches die Wirecard AG mit der Begründung „kein Reisegeschäft betreiben zu wollen" im Rahmen der Transaktion ausgegliedert hat. Basierend auf der KPMG vorliegenden Dokumentation sowie Gesprächen mit Vertretern der Wirecard AG ist diese geschäftspolitische Entscheidung nachvollziehbar.

Im Zuge des Erwerbs des „Payment-Geschäfts" des Unternehmens 9 wurden zumindest zwei Verkäufe von Vermögensgegenständen mit Bezug zum „travel business" von Hermes an Unternehmen 12 getätigt (Web-Domains und IT-Infrastruktur). Daneben hat Unternehmen 12 mit Hermes ein Service Agreement für Unterstützungen im „travel business" geschlossen (monatliche Hosting-Gebühr). Entsprechende Vertragsunterlagen wurden KPMG vorgelegt. Unterlagen zur Kaufpreisfindung bzw. zur Ermittlung der monatlichen Gebühr wurden KPMG nicht vorgelegt.

Aus den KPMG vorliegenden Dokumenten geht hervor, dass die Wirecard Gesellschaften in den Jahren 2016 bis 2019 jeweils Umsätze im einstelligen Millionenbereich (EUR) mit Unternehmen 14 sowie Unternehmen 13 realisiert haben.



Die Umsätze mit Unternehmen 14 im Jahr 2016 umfassen die oben aufgeführte monatliche Hosting-Gebühr. Daneben nutze Unternehmen 14 ein Multi-Channel-Reisebüro von Hermes und entsprechende Buchungsdienste. Im Jahr 2016 wurde diese Software auf Anforderung und Kosten von Unternehmen 14 geändert. In den Umsätzen im Zeitraum 2017 bis 2019 sind monatliche Hosting-Gebühren enthalten. In 2017 und 2018 hat Hermes Dienstleistungen für Call-Center und Helpdesks erbracht. Der weitere Umsatz in den Jahren 2017 bis 2019 wurde durch Provisionen und Incentives beim Verkauf von Reisetickets erzielt.

Die Umsätze mit dem Unternehmen 13 sind durch Software-Verkäufe, Unterstützung im Support-Service und des Verkaufs des Travel Agents Business von Hermes entstanden.

Im Rahmen der von KPMG durchgeführten Hintergrundrecherchen wurde Fund 1 als alleiniger Gesellschafter des Unternehmens 13 und Besitzer von 50,2 % der Gesellschaftsanteile von Unternehmen 14 identifiziert. Darüber hinaus soll Unternehmen 13 gemäß einer Presseveröffentlichung ein Darlehen i. H. v. USD 50 Mio[22] von Fund 1 erhalten haben. Die Geschäftsbeziehung und mögliche Darlehensvergabe von dem Fund 1 an das Unternehmen 13 konnte KPMG nicht verifizieren, da es sich um Dritte – nicht mit der Wirecard AG verbundene – Unternehmen handelt und damit keine Einsichtnahme in Unterlagen dieser Unternehmen möglich war.

Die Wirecard AG unterhält zu dem Unternehmen 13 eine enge geschäftliche Beziehung. Daneben ist der Verkäufer des „Payment-Geschäfts" des Unternehmens 9, der Fund 1, Gesellschafter des Unternehmens 13.

Auf Basis der KPMG vorgelegten Unterlagen und den durchgeführten Untersuchungshandlungen ergaben sich keine Anhaltspunkte auf „Roundtripping".

---

[22]   entspricht ca. EUR 44,4 Mio, Wechselkurs EUR 1 =USD 1.1249 vom 5. Juni 2017 (Quelle: EZB)



# 2    Schlussbemerkung

KPMG erstattet diesen Bericht nach bestem Wissen und Gewissen auf der Grundlage der KPMG vorgelegten Unterlagen, erteilten Auskünfte und eigenen Untersuchungshandlungen sowie unter Bezugnahme auf die Berufsgrundsätze.

München, den 27. April 2020
KPMG AG
Wirtschaftsprüfungsgesellschaft

gez. Sven-Olaf Leitz                 gez. Alexander Geschonneck
Wirtschaftsprüfer



# Anlagen

# Allgemeine Auftragsbedingungen
## für
## Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften
### vom 1. Januar 2017

### 1. Geltungsbereich

(1) Die Auftragsbedingungen gelten für Verträge zwischen Wirtschaftsprüfern oder Wirtschaftsprüfungsgesellschaften (im Nachstehenden zusammenfassend „Wirtschaftsprüfer" genannt) und ihren Auftraggebern über Prüfungen, Steuerberatung, Beratungen in wirtschaftlichen Angelegenheiten und sonstige Aufträge, soweit nicht etwas anderes ausdrücklich schriftlich vereinbart oder gesetzlich zwingend vorgeschrieben ist.

(2) Dritte können nur dann Ansprüche aus dem Vertrag zwischen Wirtschaftsprüfer und Auftraggeber herleiten, wenn dies ausdrücklich vereinbart ist oder sich aus zwingenden gesetzlichen Regelungen ergibt. Im Hinblick auf solche Ansprüche gelten diese Auftragsbedingungen auch diesen Dritten gegenüber.

### 2. Umfang und Ausführung des Auftrags

(1) Gegenstand des Auftrags ist die vereinbarte Leistung, nicht ein bestimmter wirtschaftlicher Erfolg. Der Auftrag wird nach den Grundsätzen ordnungsmäßiger Berufsausübung ausgeführt. Der Wirtschaftsprüfer übernimmt im Zusammenhang mit seinen Leistungen keine Aufgaben der Geschäftsführung. Der Wirtschaftsprüfer ist für die Nutzung oder Umsetzung der Ergebnisse seiner Leistungen nicht verantwortlich. Der Wirtschaftsprüfer ist berechtigt, sich zur Durchführung des Auftrags sachverständiger Personen zu bedienen.

(2) Die Berücksichtigung ausländischen Rechts bedarf – außer bei betriebswirtschaftlichen Prüfungen – der ausdrücklichen schriftlichen Vereinbarung.

(3) Ändert sich die Sach- oder Rechtslage nach Abgabe der abschließenden beruflichen Äußerung, so ist der Wirtschaftsprüfer nicht verpflichtet, den Auftraggeber auf Änderungen oder sich daraus ergebende Folgerungen hinzuweisen.

### 3. Mitwirkungspflichten des Auftraggebers

(1) Der Auftraggeber hat dafür zu sorgen, dass dem Wirtschaftsprüfer alle für die Ausführung des Auftrags notwendigen Unterlagen und weiteren Informationen rechtzeitig übermittelt werden und ihm von allen Vorgängen und Umständen Kenntnis gegeben wird, die für die Ausführung des Auftrags von Bedeutung sein können. Dies gilt auch für die Unterlagen und weiteren Informationen, Vorgänge und Umstände, die erst während der Tätigkeit des Wirtschaftsprüfers bekannt werden. Der Auftraggeber wird dem Wirtschaftsprüfer geeignete Auskunftspersonen benennen.

(2) Auf Verlangen des Wirtschaftsprüfers hat der Auftraggeber die Vollständigkeit der vorgelegten Unterlagen und der weiteren Informationen sowie der gegebenen Auskünfte und Erklärungen in einer vom Wirtschaftsprüfer formulierten schriftlichen Erklärung zu bestätigen.

### 4. Sicherung der Unabhängigkeit

(1) Der Auftraggeber hat alles zu unterlassen, was die Unabhängigkeit der Mitarbeiter des Wirtschaftsprüfers gefährdet. Dies gilt für die Dauer des Auftragsverhältnisses insbesondere für Angebote auf Anstellung oder Übernahme von Organfunktionen und für Angebote, Aufträge auf eigene Rechnung zu übernehmen.

(2) Sollte die Durchführung des Auftrags die Unabhängigkeit des Wirtschaftsprüfers, die der mit ihm verbundenen Unternehmen, seiner Netzwerkunternehmen oder solcher mit ihm assoziierten Unternehmen, auf die die Unabhängigkeitsvorschriften in gleicher Weise Anwendung finden wie auf den Wirtschaftsprüfer, in anderen Auftragsverhältnissen beeinträchtigen, ist der Wirtschaftsprüfer zur außerordentlichen Kündigung des Auftrags berechtigt.

### 5. Berichterstattung und mündliche Auskünfte

Soweit der Wirtschaftsprüfer Ergebnisse im Rahmen der Bearbeitung des Auftrags schriftlich darzustellen hat, ist alleine diese schriftliche Darstellung maßgebend. Entwürfe schriftlicher Darstellungen sind unverbindlich. Sofern nicht anders vereinbart, sind mündliche Erklärungen und Auskünfte des Wirtschaftsprüfers nur dann verbindlich, wenn sie schriftlich bestätigt werden. Erklärungen und Auskünfte des Wirtschaftsprüfers außerhalb des erteilten Auftrags sind stets unverbindlich.

### 6. Weitergabe einer beruflichen Äußerung des Wirtschaftsprüfers

(1) Die Weitergabe beruflicher Äußerungen des Wirtschaftsprüfers (Arbeitsergebnisse oder Auszüge von Arbeitsergebnissen – sei es im Entwurf oder in der Endfassung) oder die Information über das Tätigwerden des Wirtschaftsprüfers für den Auftraggeber an einen Dritten bedarf der schriftlichen Zustimmung des Wirtschaftsprüfers, es sei denn, der Auftraggeber ist zur Weitergabe oder Information aufgrund eines Gesetzes oder einer behördlichen Anordnung verpflichtet.

(2) Die Verwendung beruflicher Äußerungen des Wirtschaftsprüfers und die Information über das Tätigwerden des Wirtschaftsprüfers für den Auftraggeber zu Werbezwecken durch den Auftraggeber sind unzulässig.

### 7. Mängelbeseitigung

(1) Bei etwaigen Mängeln hat der Auftraggeber Anspruch auf Nacherfüllung durch den Wirtschaftsprüfer. Nur bei Fehlschlagen, Unterlassen bzw. unberechtigter Verweigerung, Unzumutbarkeit oder Unmöglichkeit der Nacherfüllung kann er die Vergütung mindern oder vom Vertrag zurücktreten; ist der Auftrag nicht von einem Verbraucher erteilt worden, so kann der Auftraggeber wegen eines Mangels nur dann vom Vertrag zurücktreten, wenn die erbrachte Leistung wegen Fehlschlagens, Unterlassung, Unzumutbarkeit oder Unmöglichkeit der Nacherfüllung für ihn ohne Interesse ist. Soweit darüber hinaus Schadensersatzansprüche bestehen, gilt Nr. 9.

(2) Der Anspruch auf Beseitigung von Mängeln muss vom Auftraggeber unverzüglich in Textform geltend gemacht werden. Ansprüche nach Abs. 1, die nicht auf einer vorsätzlichen Handlung beruhen, verjähren nach Ablauf eines Jahres ab dem gesetzlichen Verjährungsbeginn.

(3) Offenbare Unrichtigkeiten, wie z.B. Schreibfehler, Rechenfehler und formelle Mängel, die in einer beruflichen Äußerung (Bericht, Gutachten und dgl.) des Wirtschaftsprüfers enthalten sind, können jederzeit vom Wirtschaftsprüfer auch Dritten gegenüber berichtigt werden. Unrichtigkeiten, die geeignet sind, in der beruflichen Äußerung des Wirtschaftsprüfers enthaltene Ergebnisse infrage zu stellen, berechtigen diesen, die Äußerung auch Dritten gegenüber zurückzunehmen. In den vorgenannten Fällen ist der Auftraggeber vom Wirtschaftsprüfer tunlichst vorher zu hören.

### 8. Schweigepflicht gegenüber Dritten, Datenschutz

(1) Der Wirtschaftsprüfer ist nach Maßgabe der Gesetze (§ 323 Abs. 1 HGB, § 43 WPO, § 203 StGB) verpflichtet, über Tatsachen und Umstände, die ihm bei seiner Berufstätigkeit anvertraut oder bekannt werden, Stillschweigen zu bewahren, es sei denn, dass der Auftraggeber ihn von dieser Schweigepflicht entbindet.

(2) Der Wirtschaftsprüfer wird bei der Verarbeitung von personenbezogenen Daten die nationalen und europarechtlichen Regelungen zum Datenschutz beachten.

### 9. Haftung

(1) Für gesetzlich vorgeschriebene Leistungen des Wirtschaftsprüfers, insbesondere Prüfungen, gelten die jeweils anzuwendenden gesetzlichen Haftungsbeschränkungen, insbesondere die Haftungsbeschränkung des § 323 Abs. 2 HGB.

(2) Sofern weder eine gesetzliche Haftungsbeschränkung Anwendung findet noch eine einzelvertragliche Haftungsbeschränkung besteht, ist die Haftung des Wirtschaftsprüfers für Schadensersatzansprüche jeder Art, mit Ausnahme von Schäden aus der Verletzung von Leben, Körper und Gesundheit, sowie von Schäden, die eine Ersatzpflicht des Herstellers nach § 1 ProdHaftG begründen, bei einem fahrlässig verursachten einzelnen Schadensfall gemäß § 54a Abs. 1 Nr. 2 WPO auf 4 Mio. € beschränkt.

(3) Einreden und Einwendungen aus dem Vertragsverhältnis mit dem Auftraggeber stehen dem Wirtschaftsprüfer auch gegenüber Dritten zu.

(4) Leiten mehrere Anspruchsteller aus dem mit dem Wirtschaftsprüfer bestehenden Vertragsverhältnis Ansprüche aus einer fahrlässigen Pflichtverletzung des Wirtschaftsprüfers her, gilt der in Abs. 2 genannte Höchstbetrag für die betreffenden Ansprüche aller Anspruchsteller insgesamt.

50261
09/2016

Lizenziert für/Licensed to: KPMG AG | 5218980

**(5)** Ein einzelner Schadensfall im Sinne von Abs. 2 ist auch bezüglich eines aus mehreren Pflichtverletzungen stammenden einheitlichen Schadens gegeben. Der einzelne Schadensfall umfasst sämtliche Folgen einer Pflichtverletzung ohne Rücksicht darauf, ob Schäden in einem oder in mehreren aufeinanderfolgenden Jahren entstanden sind. Dabei gilt mehrfaches auf gleicher oder gleichartiger Fehlerquelle beruhendes Tun oder Unterlassen als einheitliche Pflichtverletzung, wenn die betreffenden Angelegenheiten miteinander in rechtlichem oder wirtschaftlichem Zusammenhang stehen. In diesem Fall kann der Wirtschaftsprüfer nur bis zur Höhe von 5 Mio. € in Anspruch genommen werden. Die Begrenzung auf das Fünffache der Mindestversicherungssumme gilt nicht bei gesetzlich vorgeschriebenen Pflichtprüfungen.

**(6)** Ein Schadensersatzanspruch erlischt, wenn nicht innerhalb von sechs Monaten nach der schriftlichen Ablehnung der Ersatzleistung Klage erhoben wird und der Auftraggeber auf diese Folge hingewiesen wurde. Dies gilt nicht für Schadensersatzansprüche, die auf vorsätzliches Verhalten zurückzuführen sind, sowie bei einer schuldhaften Verletzung von Leben, Körper oder Gesundheit sowie bei Schäden, die eine Ersatzpflicht des Herstellers nach § 1 ProdHaftG begründen. Das Recht, die Einrede der Verjährung geltend zu machen, bleibt unberührt.

### 10. Ergänzende Bestimmungen für Prüfungsaufträge

**(1)** Ändert der Auftraggeber nachträglich den durch den Wirtschaftsprüfer geprüften und mit einem Bestätigungsvermerk versehenen Abschluss oder Lagebericht, darf er diesen Bestätigungsvermerk nicht weiterverwenden.

Hat der Wirtschaftsprüfer einen Bestätigungsvermerk nicht erteilt, so ist ein Hinweis auf die durch den Wirtschaftsprüfer durchgeführte Prüfung im Lagebericht oder an anderer für die Öffentlichkeit bestimmter Stelle nur mit schriftlicher Einwilligung des Wirtschaftsprüfers und mit dem von ihm genehmigten Wortlaut zulässig.

**(2)** Widerruft der Wirtschaftsprüfer den Bestätigungsvermerk, so darf der Bestätigungsvermerk nicht weiterverwendet werden. Hat der Auftraggeber den Bestätigungsvermerk bereits verwendet, so hat er auf Verlangen des Wirtschaftsprüfers den Widerruf bekanntzugeben.

**(3)** Der Auftraggeber hat Anspruch auf fünf Berichtsausfertigungen. Weitere Ausfertigungen werden besonders in Rechnung gestellt.

### 11. Ergänzende Bestimmungen für Hilfeleistung in Steuersachen

**(1)** Der Wirtschaftsprüfer ist berechtigt, sowohl bei der Beratung in steuerlichen Einzelfragen als auch im Falle der Dauerberatung die vom Auftraggeber genannten Tatsachen, insbesondere Zahlenangaben, als richtig und vollständig zugrunde zu legen; dies gilt auch für Buchführungsaufträge. Er hat jedoch den Auftraggeber auf von ihm festgestellte Unrichtigkeiten hinzuweisen.

**(2)** Der Steuerberatungsauftrag umfasst nicht die zur Wahrung von Fristen erforderlichen Handlungen, es sei denn, dass der Wirtschaftsprüfer hierzu ausdrücklich den Auftrag übernommen hat. In diesem Fall hat der Auftraggeber dem Wirtschaftsprüfer alle für die Wahrung von Fristen wesentlichen Unterlagen, insbesondere Steuerbescheide, so rechtzeitig vorzulegen, dass dem Wirtschaftsprüfer eine angemessene Bearbeitungszeit zur Verfügung steht.

**(3)** Mangels einer anderweitigen schriftlichen Vereinbarung umfasst die laufende Steuerberatung folgende, in die Vertragsdauer fallenden Tätigkeiten:

**a)** Ausarbeitung der Jahressteuererklärungen für die Einkommensteuer, Körperschaftsteuer und Gewerbesteuer sowie der Vermögensteuererklärungen, und zwar auf Grund der vom Auftraggeber vorzulegenden Jahresabschlüsse und sonstiger für die Besteuerung erforderlicher Aufstellungen und Nachweise

**b)** Nachprüfung von Steuerbescheiden zu den unter a) genannten Steuern

**c)** Verhandlungen mit den Finanzbehörden im Zusammenhang mit den unter a) und b) genannten Erklärungen und Bescheiden

**d)** Mitwirkung bei Betriebsprüfungen und Auswertung der Ergebnisse von Betriebsprüfungen hinsichtlich der unter a) genannten Steuern

**e)** Mitwirkung in Einspruchs- und Beschwerdeverfahren hinsichtlich der unter a) genannten Steuern.

Der Wirtschaftsprüfer berücksichtigt bei den vorgenannten Aufgaben die wesentliche veröffentlichte Rechtsprechung und Verwaltungsauffassung.

**(4)** Erhält der Wirtschaftsprüfer für die laufende Steuerberatung ein Pauschalhonorar, so sind mangels anderweitiger schriftlicher Vereinbarungen die unter Abs. 3 Buchst. d) und e) genannten Tätigkeiten gesondert zu honorieren.

**(5)** Sofern der Wirtschaftsprüfer auch Steuerberater ist und die Steuerberatervergütungsverordnung für die Bemessung der Vergütung anzuwenden ist, kann eine höhere oder niedrigere als die gesetzliche Vergütung in Textform vereinbart werden.

**(6)** Die Bearbeitung besonderer Einzelfragen der Einkommensteuer, Körperschaftsteuer, Gewerbesteuer, Einheitsbewertung und Vermögensteuer sowie aller Fragen der Umsatzsteuer, Lohnsteuer, sonstigen Steuern und Abgaben erfolgt auf Grund eines besonderen Auftrags. Dies gilt auch für

**a)** die Bearbeitung einmalig anfallender Steuerangelegenheiten, z.B. auf dem Gebiet der Erbschaftsteuer, Kapitalverkehrsteuer, Grunderwerbsteuer,

**b)** die Mitwirkung und Vertretung in Verfahren vor den Gerichten der Finanz- und der Verwaltungsgerichtsbarkeit sowie in Steuerstrafsachen,

**c)** die beratende und gutachtliche Tätigkeit im Zusammenhang mit Umwandlungen, Kapitalerhöhung und -herabsetzung, Sanierung, Eintritt und Ausscheiden eines Gesellschafters, Betriebsveräußerung, Liquidation und dergleichen und

**d)** die Unterstützung bei der Erfüllung von Anzeige- und Dokumentationspflichten.

**(7)** Soweit auch die Ausarbeitung der Umsatzsteuerjahreserklärung als zusätzliche Tätigkeit übernommen wird, gehört dazu nicht die Überprüfung etwaiger besonderer buchmäßiger Voraussetzungen sowie die Frage, ob alle in Betracht kommenden umsatzsteuerrechtlichen Vergünstigungen wahrgenommen worden sind. Eine Gewähr für die vollständige Erfassung der Unterlagen zur Geltendmachung des Vorsteuerabzugs wird nicht übernommen.

### 12. Elektronische Kommunikation

Die Kommunikation zwischen dem Wirtschaftsprüfer und dem Auftraggeber kann auch per E-Mail erfolgen. Soweit der Auftraggeber eine Kommunikation per E-Mail nicht wünscht oder besondere Sicherheitsanforderungen stellt, wie etwa die Verschlüsselung von E-Mails, wird der Auftraggeber den Wirtschaftsprüfer entsprechend in Textform informieren.

### 13. Vergütung

**(1)** Der Wirtschaftsprüfer hat neben seiner Gebühren- oder Honorarforderung Anspruch auf Erstattung seiner Auslagen; die Umsatzsteuer wird zusätzlich berechnet. Er kann angemessene Vorschüsse auf Vergütung und Auslagenersatz verlangen und die Auslieferung seiner Leistung von der vollen Befriedigung seiner Ansprüche abhängig machen. Mehrere Auftraggeber haften als Gesamtschuldner.

**(2)** Ist der Auftraggeber kein Verbraucher, so ist eine Aufrechnung gegen Forderungen des Wirtschaftsprüfers auf Vergütung und Auslagenersatz nur mit unbestrittenen oder rechtskräftig festgestellten Forderungen zulässig.

### 14. Streitschlichtungen

Der Wirtschaftsprüfer ist nicht bereit, an Streitbeilegungsverfahren vor einer Verbraucherschlichtungsstelle im Sinne des § 2 des Verbraucherstreitbeilegungsgesetzes teilzunehmen.

### 15. Anwendendes Recht

Für den Auftrag, seine Durchführung und die sich hieraus ergebenden Ansprüche gilt nur deutsches Recht.

Lizensiert für/Licensed to: KPMG AG | 5218980

DokID: 501535    9FDYJ80