# Exhibit I



28 April 2020

**To:**

Thomas Eichelmann

Chairman of the Supervisory Board of Wirecard AG

Einsteinring 35

85609 Aschheim, Germany

**Copying:**

Wulf Matthias

Stefan Klestil

Anastassia Lauterbach

Vuyiswa V. M'Cwabeni

Susana Quintana-Plaza

Dear Mr Eichelmann,

**Audit of Wirecard by KPMG**

More than six months ago, Wirecard mandated KPMG to conduct a special audit to investigate allegations raised by the Financial Times around Wirecard's Third Party Acquiring business (TPA), which historically represented a significant portion of Wirecard's revenues and profits [p. 15 KPMG Report]. After several delays to the initial deadline, KPMG today concluded in its final report that it has been unable to verify the revenue booked with these TPA partners in the investigation period of 2016 to 2018 [p. 12 KPMG Report]. KPMG explains that it has encountered an "Untersuchungshemmnis" (in English: obstacles to the investigation).

KPMG was also unable to verify cash payments amounting to €1 billion that TPA partners supposedly paid into "trustee accounts" on behalf of Wirecard [p. 16 KPMG Report]. We understand that these cash balances are included in Wirecard's consolidated cash balance [p. 13f KPMG Report]. This compares to only €85 million of cash payments during the investigation period that were made by TPA partners to bank accounts held by Wirecard [p. 18 KPMG Report].

Neither was KPMG able to verify the beneficial owner of EMIF and could therefore not opine on the legitimacy of the purchase of Hermes in India [p. 50 KPMG Report]. It is our view that the beneficial owner of EMIF should have been determined as part of Wirecard's legal due diligence in order to comply with applicable anti-money laundering laws.

If KPMG was unable to obtain standard information that it requested from Wirecard such as bank statements, customer names and contracts as well as transaction data [p. 13 KPMG Report] after a

1



lengthy forensic investigation, then in our view this raises questions as to how investors, lenders and regulators can be confident that Wirecard's current and historic accounting is accurate.

Wirecard operates a banking license in Europe and is strictly regulated as a payments service provider; in our view it has to abide by applicable Know Your Customer and anti-money laundering laws. This raises questions as to how it is possible to comply with these regulations if Wirecard either does not know or will not disclose who its customers are.

KPMG further complained about a lack of cooperation from Wirecard's TPA partners to provide customer and transaction data [p. 13 KPMG Report]. Moreover, Wirecard did not provide KPMG with certain requested documents or only provided them with delay, and KPMG complained that arranged meetings with key executives of Wirecard were repeatedly cancelled and postponed [p. 10 KPMG Report].

KPMG further explains that the supervisory board received regular updates on the progress of the investigation [p. 6 KPMG Report]. Hence, we assume that the supervisory board was well aware of the difficulties KPMG encountered in properly conducting the audit. Given the allegations raised against Wirecard and its executive team by various whistleblowers and newspapers, it could not be more obvious that there is a need to take measures to avoid the likely conflict of interest whereby management supervises an audit of their own actions.

Given this situation, why did you and the supervisory board not intervene when it became clear that the audit could not be properly completed?

In our view, it is clearly now necessary for the supervisory board to take direct responsibility for this investigation immediately and to resolve the outstanding questions that the report has failed to answer. In fact, we are advised that the supervisory board has a legal duty of care (Sorgfaltspflicht) that requires it to intervene in these circumstances. In accordance with Section 84 (3) of the German Stock Corporation Act (Aktiengesetz), the supervisory board also may revoke the appointment of a member of the management board.

We are further advised that the supervisory board, as a corporate body as well as every single member of the supervisory board, has wide reaching legal obligations (fiduciary duties) to control and oversee the actions of the management board (Kontroll- und Überwachungsorgan). In circumstances such as these, where Wirecard's management did not provide KPMG with the necessary documentation to verify TPA revenues in the period of 2016 to 2018 and to verify cash balances amounting to €1 billion in "trustee accounts", **we are of the view that the supervisory board is legally obliged to intervene. In our opinion, the necessary intervention is now to remove the CEO from all management duties.**

If the supervisory board does not remove the CEO, at the very least, they must directly take responsibility for the investigation and remove Wirecard's management from all involvement in this



audit until all of the allegations have been fully resolved. In our view, this is the only way to get to the bottom of the allegations that continue to be unresolved. Otherwise, in our opinion, the supervisory board commits a breach of duty of care for which its members are liable to the company pursuant to Sections 116 and 93 of the German Stock Corporation Act. Such a breach of duty of care can also amount to a failure to take necessary measures to prevent or limit damage.

For full disclosure, funds managed by TCI Fund Management Limited submitted in compliance with their disclosure duties to the German Supervisory Authority (BaFin) and published in the Federal Gazette on 28 April 2020 a short position in Wirecard's stock, equivalent to 1.04% of shares outstanding.


Yours sincerely,


Sir Chris Hohn                                Max Schroeder

3